RAINES FELDMAN LLP
Erik S. Syverson (Bar No. 221933)
       esyverson@raineslaw.com
Scott M. Lesowitz (Bar No. 261759)
       slesowitz@raineslaw.com
9720 Wilshire Boulevard, 5th Floor
Beverly Hills, California 90212
Telephone:  (310) 440-4100
Facsimile:  (310) 691-1943

Attorneys for Defendants PPC Claims Limited
And Kieran Paul Cassidy

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| REACHLOCAL, INC.,<br><br>              Plaintiff,<br><br>vs.<br><br>PPC CLAIMS LIMITED AND KIERAN PAUL CASSIDY,<br><br>              Defendants | Case No. 2:16-cv-1007-R-AJW<br><br>Judge: Hon. Manuel L. Real<br><br>**ERIK S. SYVERSON'S DECLARATION IS SUPPORT OF DEFENDANTS PPC CLAIMS LIMITED AND KIERAN PAUL CASSIDY'S REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

I Erik S. Syverson declare under penalty of perjury as follows:

1. I am an attorney at law duly licensed to practice law in this Court. I am a partner at Raines Feldman LLP, counsel for Defendants in this matter. I have personal knowledge of the contents stated herein. If called as a witness I could and would testify truthful to the contents herein.

2. Attached as Exhibit 1 is a true and correct copy of the transcript of the September 12, 2016, deposition of Rick Hutton in this matter.

3. Attached as Exhibit 2 is a true and correct copy of the transcript of the September 12, 2016, deposition of Adriana Hutton in this matter.

4. Attached as Exhibit 3 is a true and correct copy of excerpts from the August 2, 2016, deposition of Sharon Rowlands in this matter.

I swear the foregoing is true and correct under the laws of the United States and that this declaration was executed in Beverly Hills, California.

Dated: September 19, 2016

*/s/ Erik S. Syverson*
ERIK S. SYVERSON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1

Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 4 of 208  Page ID #:10799

RICK HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              1

1                UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
2
    REACHLOCAL, INC.,            )
3       Plaintiff,               )
                                 )
4   vs.                          ) Civil Action No.
                                 ) 2:16-cv-01007-R
5   PPC CLAIM LIMITED,           )
    et al.,                      )
6       Defendant.               )

7

8   ********************************************************

9            ORAL AND VIDEOTAPED DEPOSITION OF

10                    RICK HUTTON

11                 SEPTEMBER 12, 2016

12  ********************************************************

13      ORAL AND VIDEOTAPED DEPOSITION OF RICK HUTTON,

14  produced as a witness at the instance of the Plaintiff,

15  and duly sworn, was taken in the above-styled and

16  numbered cause on the 12th day of September, 2016, from

17  11:19 a.m. to 12:53 p.m., before Julie C. Brandt, RMR,

18  CRR, and CSR in and for the State of Texas, reported by

19  machine shorthand, at the offices of Gray Reed & McGraw,

20  P.C., 1601 Elm Street, Suite 4600, Dallas, Texas,

21  pursuant to the Federal Rules of Civil Procedure and the

22  provisions stated on the record or attached hereto.

23

24

25



```
 1                    A P P E A R A N C E S

 2
     FOR THE PLAINTIFF:
 3
          Amjad Mahmood Khan
 4        BROWN, NERI, SMITH & KHAN LLP
          11766 Wilshire Blvd., Suite 1670
 5        Los Angeles, California 90025
          310.593.9890
 6        amjad@bnsklaw.com

 7
     FOR THE DEFENDANTS KIERAN CASSIDY AND PPC CLAIM LIMITED:
 8
          Erik Syverson (via telephone)
 9        RAINES FELDMAN
          9720 Wilshire Blvd., 5th Floor
10        Beverly Hills, California 90212
          310.440.4100
11        esyverson@raineslaw.com

12
     FOR THE WITNESS:
13
          Jason S. Brookner
14        GRAY REED & McGRAW, P.C.
          1601 Elm Street, Suite 4600
15        Dallas, Texas 75201
          214.954.4135
16        jbrookner@grayreed.com

17
     VIDEOGRAPHER:
18
          Ryan Fickling - Esquire Deposition Solutions
19

20

21

22

23

24

25
```



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 6 of 208   Page ID #:10801

RICK HUTTON                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                    3

```
 1                         INDEX
                                               PAGE
 2
      Appearances................................     2
 3    Proceedings................................     4
      Stipulations...............................    82
 4
      RICK HUTTON
 5         Examination by MR. KHAN...............     4

 6    Signature and Changes......................    84
      Reporter's Certificate.....................    86
 7

 8    DEPOSITION EXHIBITS                  IDENTIFIED

 9    Exhibit 14      Subpoena....................     8

10    Exhibit 15      Declaration.................    79

11

12                 PREVIOUSLY-MARKED EXHIBITS

13

14            Deposition Exhibit 10.............    32

15            Deposition Exhibit 11.............    49

16            Deposition Exhibit 12.............    66

17            Deposition Exhibit 13.............    72

18

19

20

21

22

23

24

25
```



```
 1                    P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  We are now on the
 3   record for the video deposition of Rick Hutton.  The
 4   time is 11:21 on September 12, 2016.  This is the matter
 5   of ReachLocal, Incorporated versus PPC Claim Limited,
 6   et al. being held in the United States District Court
 7   for the Central District of California, Civil Action
 8   No. 2:16-CV-01007-R.
 9              Counsel, will you please introduce yourselves
10   for the record.
11              MR. KHAN:  Good morning.  My name is
12   Amjad Khan.  I'm representing ReachLocal, which is a
13   Plaintiff in this action.
14              MR. SYVERSON:  Erik Syverson from the
15   firms of Raines Feldman for the Defendants.
16              MR. BROOKNER:  Jason Brookner from Gray
17   Reed & McGraw on behalf of the witness.
18              THE VIDEOGRAPHER:  Will the court
19   reporter please administer the oath.
20                      RICK HUTTON,
21   having been first duly sworn, testified as follows:
22                      EXAMINATION
23   BY MR. KHAN:
24       Q.   Good morning, Mr. Hutton.
25       A.   Good morning.
```



 1      Q.    Why don't we begin by telling us where you

 2  work.

 3      A.    At Projection Technologies InLight Gobos.

 4      Q.    For purposes of the deposition, is it okay to

 5  use InLight as the shorthand?

 6      A.    Yes.

 7      Q.    And what is the nature of the company?  What

 8  does it do?

 9      A.    We manufacture products for the entertainment

10  lighting industry.

11      Q.    Okay.  And for how long have you worked in

12  this company?

13      A.    14 years.

14      Q.    Are you the founder of the company?

15      A.    Yes.

16      Q.    Prior to working at InLight, where did you

17  work?

18      A.    Varilight.

19      Q.    Okay.  Is the company based here in Dallas?

20      A.    Yes.

21      Q.    Does it have any other offices?

22      A.    No.

23      Q.    Mr. Hutton, have you ever been deposed before?

24      A.    No.

25      Q.    So this will be a short deposition, but I



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 9 of 208   Page ID #:10804

RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              6

1  would like to go over a few ground rules.  I have five
2  ground rules.
3        The first is just try to avoid speaking over
4  me or any of the other lawyers, Mr. Syverson is on the
5  phone and your own lawyer.  That's only because the
6  court reporter is trying to record one thing at a time,
7  and so we'll try to stick to this flow, although I'm
8  sure I'll be guilty of violating it myself.  I'll ask a
9  question, your lawyer will have a chance to object, and
10 then you can provide your answer.
11       And for my part, I'll try not to cut you off
12 and let you finish your answers.  I may not always
13 succeed.
14       And if you can let me finish the question
15 before you answer, that would also help for a cleaner
16 transcript.  It's a little bit of a stilted process,
17 these depositions.  So that's sort of the first ground
18 rule.  Is that okay?
19    A.   Yes.
20    Q.   The second is -- again, you're already off to
21 a good start.  Please keep your answers as audible,
22 yeses or nos or explanations, but not nodding because
23 that's not going to be captured on the actual
24 transcript.  Is that okay?
25    A.   Yes.



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 10 of 208   Page ID #:10805

RICK HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                       7

1     Q.   And I'm entitled to your best testimony today,
2   and that testimony may include best estimates of dates
3   or approximations of dates or other such information.
4   There's a difference between an estimate and a guess.
5   The example that I frequently use, one that I think your
6   counsel objects to but I'll say again, is that if I were
7   to ask you how much money you have in your pocket right
8   now, while you may not know the exact number, you may be
9   able to estimate roughly how much you had in your
10  pocket.   That's because you probably put the money in
11  your pocket yourself.   You have a good idea about how
12  much money you took out of the bank and how much you
13  spent, and there's some amount of money left in your
14  pocket.   So that's an estimate.   But if I were to ask
15  you how much money I have in my pocket, you really
16  wouldn't have any basis to answer that.   It would be a
17  wild guess because you haven't seen the contents of my
18  wallet.   You have no point of reference to answer that.
19  So that's, in my mind, a -- perhaps a rough distinction
20  or a crude distinction between a pure guess and a
21  reasonable approximation.   Do you understand that?
22       A.   Yes.
23            MR. BROOKNER:   Objection to that
24  instruction.
25       Q.   (BY MR. KHAN)   So I don't want wild guesses.



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 11 of 208   Page ID #:10806

RICK HUTTON                                           September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                       8

1   I prefer best estimates.  We won't be here for very

2   long, as I mentioned.  You can take a break, though,

3   anytime you like.  Just let me know.  If there's a

4   question pending, just answer it before you do.

5          And it's my job to answer -- to ask questions

6   that you can understand, and sometimes I'm not going to

7   succeed with that.  I'm sure your counsel will remind me

8   of that.  But if you don't understand something, just

9   ask me to rephrase it.

10         I have to ask this question.  Are you under

11  the influence of any medications that could affect your

12  testimony today?

13     A.   No.

14     Q.   Okay.  So I want to begin by having the court

15  reporter mark this document as Exhibit 14.

16             (Exhibit 14 marked.)

17     Q.   (BY MR. KHAN)  And take a moment, Mr. Hutton,

18  to review that.  This is a copy of the subpoena that was

19  issued to you.  Is that accurate?

20     A.   Yes.

21     Q.   Have you reviewed this document?

22     A.   Yes.

23     Q.   Included among these pages is an Attachment A,

24  which sets forth certain document requests for documents

25  that were supposed to be produced today.  Do you see



 1  that?

 2      A.   Yes.

 3      Q.   And you reviewed the 12 requests that are

 4  mentioned on page 4 of the subpoena?

 5      A.   Yes.

 6      Q.   Have you produced all documents --

 7      A.   Yes.

 8      Q.   -- responsive to this?

 9           MR. BROOKNER:  Rick, just let him finish

10  his question before you answer.  Okay?

11      Q.   (BY MR. KHAN)  What steps did you take to

12  search for the documents?

13      A.   Are you done with your question?

14      Q.   Yes.

15      A.   Okay.  I looked through all e-mails that were

16  corresponding to this, and that was all I had.

17      Q.   Okay.  When you say "this," I just want to be

18  clear on what you mean.  You mean this, meaning the

19  requests 1 through 12?

20      A.   Yes.

21      Q.   Okay.  So to be clear, you searched for

22  communications between yourself and Mr. Cassidy?

23      A.   There are no communications between myself and

24  Mr. Cassidy.

25      Q.   Okay.  And you did the same with respect to



1  PPC Claim?

2       A.   Yes.

3       Q.   And all other documents related to him?

4       A.   Yes.

5       Q.   Correct?

6            Did you speak to anyone else in conducting

7  this search?

8       A.   Adriana.

9       Q.   Okay.  And Adriana Hutton is -- works for

10 InLight?

11      A.   Yes, she does.

12      Q.   What's her position there?

13      A.   VP of operations.

14      Q.   Okay.  And she's been working at the company

15 alongside you?

16      A.   Yes.

17      Q.   She's also your spouse.  Correct?

18      A.   Correct.

19      Q.   Apart from searching for documents, what did

20 you do to prepare for today's deposition?

21      A.   Provided the documents that were asked.

22      Q.   Okay.  Did you speak to your lawyer in advance

23 of today's deposition?

24      A.   Yes.

25      Q.   Did you speak via phone or in person?



RICK HUTTON                                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                             11

1       A.   Both.

2       Q.   Okay.   How many times did you speak to your

3  lawyer?

4       A.   I would have to guess on that.   I don't have

5  an exact number.

6       Q.   Do you know approximately how long you spoke

7  to him in preparation of this -- for this deposition?

8       A.   I'd say 20 minutes.

9       Q.   Okay.   Did you speak to anyone else other than

10  your lawyer?

11       A.   No.

12       Q.   Okay.   Did you speak to Ms. Hutton, Adriana?

13       A.   Yes.

14       Q.   And did you speak about the document requests

15  or did you speak about something beyond just the

16  document requests?

17       A.   We spoke of the document requests.

18       Q.   Okay.   Did you discuss your declaration that

19  was provided in this matter?

20       A.   Yes.

21       Q.   Okay.   Did you speak to Mr. Syverson prior to

22  this deposition today?

23       A.   Yes.

24       Q.   When was that?

25       A.   I don't have an exact date.   I would say about



RICK HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                     12

 1  two months ago.

 2       Q.   Did Mr. Syverson call you?

 3       A.   Yes.

 4       Q.   How did Mr. Syverson identify himself in that

 5  call?

 6       A.   To the best of my recollection, that he was an

 7  attorney on behalf of the Cassidy lawsuit which I was

 8  not real familiar with.

 9       Q.   Okay.  When you say on behalf of the Cassidy

10  lawsuit, do you mean he was an attorney representing

11  Mr. Cassidy or do you mean that he just said he was

12  calling on the Cassidy matter?

13       A.   I do not recall.

14       Q.   Okay.  Did he say he was representing any

15  party?

16       A.   I do not recall.

17       Q.   Did he say he was representing ReachLocal?

18       A.   No.

19       Q.   Okay.  Did he say he was representing PPC

20  Claim?

21       A.   No.

22       Q.   Okay.  And how long did you speak to him on

23  that call?

24       A.   Best of my recollection, maybe ten minutes.

25       Q.   Okay.  What was discussed, as far as you



 1  remember, on that call?

 2      A.   That he was representing Cassidy and wanted to

 3  know what I knew about it.

 4      Q.   What you knew about the lawsuit?

 5      A.   Uh-huh.

 6      Q.   Okay.  And did you know anything about the

 7  lawsuit at that time?

 8      A.   No.

 9      Q.   Okay.  Did you know who Mr. Cassidy was at

10  that time?

11      A.   Just from the FaceBook post that we got.

12      Q.   Okay.  What did you know about him at that

13  point in time?

14      A.   Just what I read and what he sent.

15      Q.   What did you read?

16      A.   The FaceBook posting that was sent to us.

17      Q.   Do you recall what was the content of that

18  FaceBook posting?

19      A.   Something to the regards of ReachLocal was

20  ripping people off in Europe and they sued them and

21  we're suing them here.

22      Q.   Okay.  We're suing them here.  What did you

23  mean by that?  You understood that Mr. Cassidy was suing

24  them here?

25      A.   Here in the US.



1      Q.    Okay.  So you understood from the FaceBook

2  post that he was suing ReachLocal in the United States?

3      A.    Uh-huh.

4      Q.    Okay.  Did you understand that there was a

5  pending lawsuit by Cassidy against ReachLocal?

6      A.    Just from what I read in that posting.

7      Q.    Okay.  Okay.  And did you speak to Mr. Cassidy

8  at any point in time --

9      A.    No.

10      Q.    -- over the phone?

11            So back to the ten minute call.  You spoke

12  about what you knew of Mr. -- what you knew of the

13  lawsuit between ReachLocal and Cassidy.  Is that right?

14  Or he asked you if you knew about the lawsuit?

15      A.    He asked me if I knew about it, and I didn't

16  know much about it.

17      Q.    Okay.  What else was discussed on the call?

18      A.    He asked if I would sign a declaration, and I

19  said I would.  He said he would e-mail it to me.

20      Q.    Now as far as this declaration is concerned,

21  did you know what a declaration was?

22      A.    Yeah.

23      Q.    What's a declaration?

24      A.    It's your version of what's happening in a

25  legal matter.

```
 1      Q.   Okay.  And he asked you to sign this
 2 declaration for what purpose?
 3      A.   To -- he asked me to sign the declaration to
 4 clarify my understanding of what the lawsuit was.
 5      Q.   Okay.  So the purpose of the declaration, as
 6 far as you understood, was to clarify what you knew
 7 about the lawsuit?
 8      A.   Uh-huh.
 9      Q.   Any other purpose, as far as you understood
10 it, of what the declaration was supposed to be?
11      A.   Not that I understood.
12      Q.   Did you understand that what you were going to
13 say in the declaration would be sworn under penalty of
14 perjury?
15      A.   Yes.
16      Q.   Did you understand that what you included in
17 the declaration has to be the truth?
18      A.   Yes.
19      Q.   Did you understand that it would have force
20 and effect --
21      A.   Yes.
22      Q.   -- in a Court?
23      A.   (Witness nods head.)
24      Q.   Did -- did you discuss with Mr. Syverson
25 whether or not Mr. Cassidy had -- had caused InLight to
```



RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                            16

```
 1  stop using ReachLocal products?

 2       A.   No.

 3       Q.   Okay.  So what did you discuss in terms of --

 4  we're going to get to your declaration, Mr. Hutton,

 5  shortly.  But what did you discuss, I'm talking broadly

 6  speaking, about what you would say in the declaration?

 7       A.   I told him that we had nothing to do with the

 8  Cassidy lawsuit and didn't want anything to do with it.

 9       Q.   Okay.  So you told Mr. Syverson you had

10  nothing to do with Cassidy and didn't want anything to

11  do with it and that's why you signed the declaration?

12       A.   No.

13       Q.   Okay.  Then why did you sign the declaration?

14       A.   He asked me if I would sign a declaration,

15  which I said I would.  He said he would e-mail it down

16  to me.  Two weeks went by, nothing.  He called, asked me

17  if I had seen it.  And I said you were going to e-mail

18  me something to show to my attorney and I have not

19  received anything.

20       Q.   Okay.  So at that point you hadn't gotten

21  anything from him?

22       A.   No.

23       Q.   Okay.  He said he would draft a declaration.

24  Did he tell you what he was going to draft?

25       A.   No.
```



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 20 of 208   Page ID #:10815

RICK HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                            17

1     Q.   You understood when he was going to draft this

2  that -- what was going to be drafted was that basically

3  telling your story, that you had nothing to do with the

4  Cassidy lawsuit?

5     A.   I don't know what he was going to draft.

6     Q.   Okay.  So at the point in time you didn't know

7  what he was going to draft?

8     A.   No.

9     Q.   But you were willing to look at it?

10     A.   I told him I would be willing to have my

11  attorney look at it.

12     Q.   Okay.  You were represented at the time by

13  Mr. Brookner?

14     A.   Yes.

15     Q.   You are represented by Mr. Brookner?

16     A.   Yes.

17     Q.   Okay.  When I say "you," are you personally or

18  is InLight Gobos the company represented by

19  Mr. Brookner?

20     A.    In this matter, it would be InLight Gobos.

21     Q.   Okay.  How long have you had -- have you been

22  represented by Mr. Brookner?

23          MR. BROOKNER:  You know, I'm going to

24  object to any inquiry regarding my relationship with

25  InLight Gobos or Mr. Hutton in regards to the



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 21 of 208   Page ID #:10816

RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                          18

1 attorney/client privilege, and I will direct you not to

2 answer any such questions unless I say otherwise.

3      Q.   (BY MR. KHAN)  Did he say that he -- did

4 Mr. Brookner say he would represent you in connection

5 with this matter?

6           MR. BROOKNER:  Objection.  And I direct

7 you not to answer the question.

8      You're treading on the attorney/client

9 relationship.  I'm going to ask you to stop.

10           MR. KHAN:  I'm just asking whether -- I'm

11 not asking about the communication, Mr. Brookner.

12           MR. BROOKNER:  Any communication I have

13 with Mr. Hutton is privileged.

14           MR. KHAN:  That's not what I'm asking.

15           MR. BROOKNER:  You can ask -- and I'm

16 going to direct you not to answer.

17      Q.   (BY MR. KHAN)  The question I'm asking is did

18 Mr. Brookner say he would represent you for this

19 proceeding?  Not the substance of the communication.

20           MR. BROOKNER:  Objection.  What I say to

21 my client about all representation is privileged, no

22 matter when I say it or where I say it.

23      And I'm going to direct you not to answer the

24 question.

25      Q.   (BY MR. KHAN)  Is Mr. Brookner representing



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 22 of 208   Page ID #:10817

RICK HUTTON                                      September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              19

 1  you in this deposition?
 2          MR. KHAN:  Is that privileged?
 3          MR. BROOKNER:  You can answer that.
 4      A.   Yes.
 5          MR. BROOKNER:  I represent both Rick and
 6  Adriana individually and InLight Gobos.  Anything other
 7  than that is privileged.  And you can ask, and you will
 8  be directed not to answer.
 9          MR. KHAN:  That's all I was asking.  I
10  just wanted to know if you're representing him in this
11  action.  That's it.
12      A.   (Witness nods head.)
13      Q.   (BY MR. KHAN)  Okay.  Is that a "yes,"
14  Mr. Hutton?
15          MR. BROOKNER:  You can answer that one.
16      A.   Yes.
17      Q.   (BY MR. KHAN)  Okay.  So back to the
18  communication with Mr. Syverson.  It sounds like you had
19  a communication where at the end of that communication
20  you had agreed to review a declaration that he would
21  draft.
22      A.   Yes.
23      Q.   Is that right?
24      A.   Yes.
25      Q.   And he said he would get that to you, and you



1  never received it in a few weeks.  Correct?

2      A.   Correct.

3      Q.   Did you ever receive it?

4      A.   Yes.

5      Q.   When did you receive that?

6      A.   I don't have the exact date.  It would be in

7  the e-mails that you have.

8      Q.   Okay.  And when you received that declaration,

9  did you review it?

10     A.   Yes.

11     Q.   And did you agree with what was written in

12 there?

13     A.   No.

14     Q.   Okay.  Who -- to whom did you communicate that

15 you disagreed with what was written in there?

16     A.   Jason.

17     Q.   Okay.  So your communications with

18 Mr. Syverson were through your lawyer?

19     A.   Uh-huh.

20     Q.   Okay.  You never communicated at that point

21 directly with Mr. Syverson?

22     A.   No.

23     Q.   Okay.  What specifically did you disagree

24 with, if you remember?

25     A.   I don't remember.



RICK HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                       21

1        Q.    Okay.  We'll get to it.  I'll need to refresh

2    your recollection later.

3            Does InLight Gobos have a social media

4    presence?

5        A.    Yes.

6        Q.    Okay.  What is that presence, as far as you

7    understand?

8        A.    We have a website.  We have a FaceBook page.

9        Q.    Okay.  Do you have a Twitter page?

10       A.    I believe so.

11       Q.    Okay.  Do you use social media regularly as

12   part of your business?

13       A.    No.

14       Q.    Okay.  You just have a FaceBook page for your

15   business generally?

16       A.    Correct.

17       Q.    You don't use it as a means to communicate

18   with your customers?

19       A.    No.

20       Q.    Has that ever happened before?  Have customers

21   used FaceBook to communicate with InLight?

22       A.    I can't answer that.  I don't know.  I don't

23   deal with the FaceBook page.

24       Q.    Okay.  Who deals with the FaceBook page?

25       A.    Adriana.



1    Q.    How about Twitter?  Have customers ever
2  interacted with InLight by Twitter?
3    A.    I can't answer that.
4    Q.    Okay.  Do you have any understanding or
5  involvement with InLight Gobos's FaceBook page, its
6  operations, what's on there, the content, anything?
7    A.    I have understanding of it.  I'm not the one
8  who monitors it.
9    Q.    Okay.  So you don't monitor the FaceBook page?
10   A.    No.
11   Q.    Do you develop the content on that page?
12   A.    No.
13   Q.    I want to talk a little bit about your
14  relationship with Compass Point.  First off, what is
15  Compass Point?
16   A.    A marketing firm.
17   Q.    Okay.  And how did -- what does Compass Point
18  do, as best as you understand?
19   A.    They build websites and do SCO.
20   Q.    When did you first learn of this company?
21   A.    They're two doors down from me.  I don't know.
22  Five, six years ago.
23   Q.    Okay.  So you had interaction socially at
24  least with Compass Point?
25   A.    Yes.



RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                            23

1        Q.    For five to six years?

2        A.    Uh-huh.

3        Q.    Is that correct?

4        A.    Yes.

5        Q.    Who at Compass Point would you interact with?

6        A.    Matt.

7        Q.    Okay.  By Matt, you mean Mr. Ramsey?

8        A.    Yes.

9        Q.    Okay.  Anyone else?

10       A.    Not business wise, no.

11       Q.    Okay.  And so it's safe to say you've known

12   Mr. Ramsey for at least six years?

13       A.    Uh-huh.

14       Q.    How long have you worked with him

15   professionally, if at all?

16       A.    I think he's been doing our SCO for three

17   years, four years.

18       Q.    What do you mean by SCO?

19       A.    Helping us get better placement on our

20   website.

21       Q.    Okay.  So you hired him?

22       A.    Yes.

23       Q.    And, again, when was that?

24       A.    Three or four years ago.

25       Q.    Three or four years ago.  And did you have a



1    contract with Compass Point?

2         A.    No.

3         Q.    So you hired him without a contract?

4         A.    Yes.

5         Q.    Okay.  Did you have any written understanding

6    over e-mail or any document that captured your

7    relationship with Compass Point?

8         A.    No.

9         Q.    Okay.  Did you have an oral understanding that

10   they were your --

11        A.    Yes.

12        Q.    -- that you had hired them?

13              Okay.  Have you been working with Compass

14   Point for approximately three or four years?

15        A.    Correct.

16        Q.    And during that time, they have managed your

17   online presence?

18        A.    Correct.

19        Q.    And do you know approximately how much you

20   spent a month with Mr. Ramsey and Compass Point?

21        A.    Nothing now.

22        Q.    Nothing now.  I'm just saying when you were in

23   business with them?

24        A.    About $1,000 a month.

25        Q.    Okay.  And what would that $1,000 cover?



RICK HUTTON                                              September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                        25

1        A.    The $1,000 was the money spent with

2    ReachLocal.

3        Q.    Okay.

4        A.    And then we were also charged $82 a month from

5    Compass Point to give us results.

6        Q.    So you paid Mr. Ramsey, Compass $82 a month

7    over the course of three years to get results, and the

8    rest of the money was spent on ReachLocal?

9        A.    Correct.

10       Q.    And when you say spent on ReachLocal, what do

11   you mean by that?

12       A.    Our credit card was charged $1,000 a month.

13       Q.    Okay.  No, I don't mean technically.  I mean,

14   what did you spend with ReachLocal on?  What was that

15   money spent on for ReachLocal?

16       A.    That was supposed to be to raise our internet

17   presence.

18       Q.    Okay.  So you understood that Compass Point

19   was working with ReachLocal to use ReachLocal products

20   to help your business?

21       A.    They hired ReachLocal, correct.

22       Q.    So Compass Point hired ReachLocal.  Okay.

23   Prior to Compass Point hiring ReachLocal, had you ever

24   heard of them?

25       A.    No.



1    Q.   Okay.  Have you -- do you know anyone at

2  ReachLocal?

3    A.   No.

4    Q.   Have you ever interacted with anyone at

5  ReachLocal?

6    A.   No.

7    Q.   Do you know if ReachLocal has any -- any

8  people who manage your account there?

9    A.   No idea.

10    Q.   From your vantage point, Compass Point is the

11  contracting party, the party that you're doing business

12  with?

13    A.   Absolutely.

14    Q.   Okay.  So you agree that the money ReachLocal

15  spends is being processed by Compass Point because

16  Compass Point is who you're doing business with?

17    A.   No.

18         MR. BROOKNER:  Objection.  Objection to

19  the form, but you can answer if you understand the

20  question.

21         THE WITNESS:  I understand the question.

22    A.   No, Compass Point charged our credit card --

23  excuse me -- charged our credit card for the $84 a

24  month.  ReachLocal charged our credit card for the

25  $1,000 a month.



RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              27

1        Q.    (BY MR. KHAN)  And you as the owner of InLight

2   consented to ReachLocal charging your card?

3        A.    Yes.

4        Q.    Okay.  And Mr. Ramsey, as part of his services

5   to you, said he could help with your online presence by

6   using ReachLocal.  Correct?

7        A.    Yes.

8        Q.    And so the money that you're spending, which I

9   guess is the vast majority that you spend directly on

10  ReachLocal, it's your understanding you do so because

11  Mr. Ramsey told you to?

12       A.    Not because he told me to, no.

13       Q.    Okay.  Why?

14       A.    We did that in agreement of trying to raise

15  our internet presence.

16       Q.    Right.  And so what I mean is he told you that

17  the way to raise the internet presence is to use

18  ReachLocal?

19       A.    He suggested that, yes.

20       Q.    Okay.  So during the course of these three

21  years, approximately you spent about $12,000 a year?

22       A.    Approximately.

23       Q.    So you've spent roughly $36,000 -- you

24  spent -- I understand that you no longer do business

25  with Mr. Ramsey, but you spent roughly $36,000 with



RICK HUTTON                                              September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                        28

1    ReachLocal?

2         A.   Correct.

3         Q.   Okay.  When the relationship started with

4    Compass Point and they were providing these services and

5    you were spending on ReachLocal, were you satisfied with

6    the return that Compass Point was providing you?

7         A.   No.

8         Q.   Okay.  At what point -- was that always the

9    case?  You had a relationship for three years.  At what

10   point, if you recall, did you feel that you were not

11   satisfied?

12        A.   About a year into it.

13        Q.   Okay.  So if I'm doing the math, you had a

14   contract somewhere around 2013?

15        A.   We have no contract.

16        Q.   Well, you have an understanding and you hired

17   Compass Point in 2013.  Is that correct, Mr. Hutton?

18        A.   To the best of my recollection.

19        Q.   Okay.  So in 2013, you engaged without a

20   contract, but you engaged Matt Ramsey for services for

21   online presence.  Right?

22        A.   Correct.

23        Q.   And in 2013 to 2014, were you satisfied with

24   the services that you were being offered?

25        A.   I can't say whether I was satisfied or not.



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 32 of 208   Page ID #:10827

RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              29

1    Q.   Well, you continued to pay money every month.

2  Is that correct?

3    A.   We continued to pay money.

4    Q.   And I assume you paid money every month

5  because you were getting some return.  Is that correct?

6    A.   Yes.

7    Q.   Okay.  So is it fair to say, again, that you

8  were satisfied with what ReachLocal was -- ReachLocal --

9  rather, Compass Point was providing to you during the

10 first year of your relationship with them?

11   A.   The first year, yes.

12   Q.   Okay.  So now let's talk about the second

13 year, which I guess would be 2014 to 2015.  During that

14 time were you satisfied with the return on services that

15 Compass Point was providing?

16   A.   No.

17   Q.   And explain why not.

18   A.   Because we did not seem to be getting as much

19 ranking as we were looking to get for the amount of

20 money we were spending.

21   Q.   Okay.  And during this time did you

22 communicate those concerns to Mr. Ramsey?

23   A.   Yes.

24   Q.   How frequently?

25   A.   I couldn't answer that.



RICK HUTTON                                      September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                          30

1      Q.    Okay.  But at some point you did tell him that

2    you're not liking your return on the services.  Is that

3    right?

4      A.    Yes.

5      Q.    Okay.  That was some point between 2014 and

6    2015?

7      A.    (Witness nods head.)

8      Q.    How would Mr. Ramsey respond to those

9    concerns?  What would he do?  Would he meet you to

10   discuss them?

11     A.    Not necessarily.  He's two doors down from us.

12     Q.    Yes.

13     A.    So we have verbal communications without phone

14   calls, without e-mails.

15     Q.    Sure.  Sure.  How frequently do you guys meet?

16     A.    I talk to him at least once a week.

17     Q.    Okay.  Once a week.  So during the course of

18   those three years, you spoke to him about once a week?

19     A.    Not on business, but I speak with him.

20     Q.    Yeah, I just mean generally.

21     A.    Yes.

22     Q.    Okay.  Okay.  And how about on business with

23   respect to actual services Compass Point's offering, how

24   frequently did you communicate with him?

25     A.    Infrequently.



 1      Q.   Infrequently meaning once a month?

 2      A.   Sure.

 3      Q.   Okay.  So maybe around once a month.  Was it

 4  more than once a month?

 5      A.   I don't think so.

 6      Q.   Okay.  During the second year, 2014 to 2015,

 7  when you felt like there were concerns, at that point in

 8  time did you want to stop using Compass Point's

 9  services?

10      A.   We had discussed stopping using Reach.

11      Q.   Stop using ReachLocal.  Okay.  When did you

12  discuss stop using ReachLocal?

13      A.   With Matt or --

14      Q.   Yeah, with Matt.

15      A.   I don't know.  Probably November last year,

16  something like that.

17      Q.   Okay.  November 2015.  And why did you discuss

18  with him to stop using ReachLocal?

19      A.   Because we weren't receiving the uplift in

20  presence that we were expecting.

21      Q.   Okay.  So you still wanted to continue working

22  with Matt, but you wanted him to stop using ReachLocal.

23  Is that right?

24      A.   Yes.

25      Q.   Okay.  Have you ever heard of Kieran Cassidy?



1       A.    Just through the FaceBook post.

2       Q.    Okay.  And have you ever heard of a company

3    called PPC Claim?

4       A.    Just from what we've received on this stuff.

5       Q.    So meaning the FaceBook messages and the

6    communications that Ms. Hutton received?

7       A.    Correct.

8       Q.    Okay.  And you reviewed those communications?

9    She shared those with you?

10      A.    Correct.

11      Q.    Okay.  Do you know what PPC Claim is --

12      A.    I do not.

13      Q.    -- as you sit here today?

14      A.    (Witness shakes head.)

15      Q.    Okay.  Do you know what Mr. Cassidy does?

16      A.    I do not.

17      Q.    I would like to show you a document that has

18   been previously marked by the court reporter as

19   Exhibit 10.  Take a moment to look at that.

20      A.    Okay.

21      Q.    It's a few pages of documents.  Have you seen

22   this document before?

23      A.    I have seen this document.

24      Q.    And by this, you're referring to

25   Mr. Cassidy's --



```
 1        A.    FaceBook post --

 2        Q.    -- FaceBook message?  Okay.

 3        A.    -- on our FaceBook page.

 4        Q.    Have you seen the e-mail before, Mr. Hutton,

 5   that --

 6        A.    This e-mail?

 7        Q.    -- Adriana sent to Matt Ramsey dated

 8   March 2nd?

 9        A.    Yes.

10        Q.    Okay.  When did you first see that e-mail?

11        A.    Probably -- I don't know -- three weeks ago.

12        Q.    Okay.  So was this e-mail ever forwarded by

13   Ms. Hutton to you at the time it was sent?

14        A.    No.

15        Q.    Did she ever tell you about it?

16        A.    Yes.

17        Q.    Okay.  What did she tell you about it?

18        A.    I had seen this FaceBook posting, and I said

19   forward it to Matt so he can see it.

20        Q.    Okay.  So when you're saying you saw this

21   FaceBook posting, did Ms. Hutton show you the actual

22   FaceBook post?

23        A.    Yes.

24        Q.    Okay.  Because you don't check it directly

25   yourself.  Right?
```



RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              34

```
 1        A.    No.

 2        Q.    So she raised it to your attention.  Right?

 3        A.    Uh-huh.

 4        Q.    And what did she say when she brought it to

 5   your attention?

 6        A.    I don't recall.

 7        Q.    But she told you that this was a communication

 8   she received on FaceBook?

 9        A.    Yeah.

10        Q.    And was --

11        A.    Here, have a look at this.

12        Q.    -- she surprised by it?

13        A.    No.

14        Q.    Okay.  So why did she show it to you?

15        A.    Because I'm the president of the company.

16        Q.    Okay.  And what was she trying to impart to

17   you?  Why did she show it to you?  What did she want to

18   tell you about it?

19              MR. BROOKNER:  Objection to the extent it

20   calls for you to speculate on what Adriana may or may

21   not have been thinking, but if you know or think you

22   know, then you can answer the question.

23        A.    She brought it to my attention because we

24   communicate on pretty much everything.

25        Q.    (BY MR. KHAN)  Okay.  I understand that.  But
```



RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                            35

1  with respect to the -- when you actually saw the

2  FaceBook messages, how did you react?

3      A.   I reacted by saying why don't you forward this

4  to Matt so he can see it.

5      Q.   Okay.  Did you read and review the messages

6  themselves?

7      A.   Yes, I saw the message.

8      Q.   Okay.  Okay.  So turning to the message

9  itself, Mr. Hutton.  So first looking at the e-mail, it

10 was the e-mail dated Wednesday, March 2nd; and if you

11 read the e-mail it says, I received the attached

12 message yesterday.  So from your understanding, is this

13 message -- was this message received by Adriana on

14 March 1st?

15     A.   I don't know.

16     Q.   Well, I'm asking you to review, Mr. Hutton,

17 the actual document.

18     A.   Well, I do not see a date on here.

19     Q.   Well, if you turn to the first page, if you

20 could.

21     A.   Uh-huh.

22     Q.   And do you see a date now?

23     A.   Yes.  It's March 2nd.

24     Q.   Okay.  And can you read the message where it

25 says I received the attached message yesterday?



```
 1        A.    (Witness nods head.)

 2        Q.    So is it safe to assume that the message

 3   that's being attached is this FaceBook message?

 4        A.    I assume so.

 5        Q.    And that would have been received March 1st.

 6   Correct?

 7        A.    I assume so.

 8        Q.    Okay.  Do you remember reading the full

 9   contents of the message?

10        A.    Yes.

11        Q.    Okay.  And it says -- first I have to ask.  Is

12   it common for customers -- first customers to contact

13   InLight through FaceBook?

14        A.    No.

15        Q.    Is it common for anyone to contact InLight

16   through FaceBook?

17        A.    I can't answer that.  I don't deal with

18   FaceBook.

19        Q.    Okay.  So is it fair to say that this

20   communication struck you as unusual?

21        A.    No.

22        Q.    Okay.  This message here that's written, have

23   you read this message?

24        A.    Yes.

25        Q.    Okay.  And it says, I noticed you're using
```



RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                               37

 1  ReachLocal for your marketing.  Did you hear about what
 2  they did to all the UK businesses?  Do you know they
 3  keep most of your money instead of spending it on
 4  AdWords?  Do you recall reading that at the time --
 5      A.   Yes.
 6      Q.   -- or at least having Adriana convey that
 7  information to you?
 8      A.   Yes.
 9      Q.   And what did you understand that statement to
10  mean or those statements to mean?
11      A.   I don't take anything that people say -- I
12  don't understand what you're getting at.
13      Q.   My question is I just wanted -- it's not a
14  trick question.  I'm just asking what did you understand
15  this message to be saying?
16      A.   Exactly what it says in black and white.
17      Q.   Okay.  So you understood that this individual,
18  Mr. Cassidy, is saying that ReachLocal keeps most of its
19  money.  Correct, Mr. Hutton?
20              MR. BROOKNER:  Objection to the -- I
21  mean, Rick did not see this until Adriana gave it to him
22  and again today.  So to the extent, Rick, that you have
23  an understanding from reading this, you know, then and
24  now, then you can answer.
25              MR. KHAN:  Mr. Mr. Hutton has testified



1  that he actually read this message on the day of.

2      Q.   (BY MR. KHAN)  Is that -- am I inaccurate?

3      A.   No.

4      Q.   Okay.  So you did.  So you have an

5  understanding at that time then.  That's what I want to

6  know.  At the time you read this message, what did you

7  understand it to mean?

8      A.   I understood that someone was saying that the

9  company we were using was spending most of our money on

10  something else.

11      Q.   Okay.  So the company that you were using is

12  ReachLocal.  Correct?

13      A.   Was.

14      Q.   Was, right.  And you understood that a company

15  that you had been working with at this point in time for

16  almost three years was keeping most of its money.

17  Correct?

18      A.   Speculation.

19      Q.   Right.  So you understood -- well, I want to

20  understand what you mean by that.  What do you mean by

21  speculation?

22      A.   I see no proof here other than something that

23  somebody wrote.

24      Q.   Okay.  Understood.

25      A.   Speculation.



RICK HUTTON                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                     39

1      Q.    Yeah, I just -- so you're characterizing what

2   Mr. Cassidy is saying as speculation?

3      A.    Correct.

4      Q.    Is that your testimony?

5      A.    Yes.

6      Q.    Okay.  And so when you read this, did you have

7   any reason to believe what Mr. Cassidy was saying was

8   correct?

9      A.    No.

10      Q.    Okay.  Did you wonder whether it's true that

11   ReachLocal was keeping most of its money?

12      A.    No.

13      Q.    It was true, though, at the time that you had

14   problems with ReachLocal's products.  Correct?

15      A.    Yes.

16      Q.    For a long time at that point --

17      A.    Yes.

18      Q.    -- almost two years?

19      A.    Uh-huh.

20      Q.    So did this statement by Mr. Cassidy prompt

21   you to wonder whether what he's saying about ReachLocal

22   is true?

23      A.    No.

24      Q.    Why not?

25      A.    Because all businesses that are for profit



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 43 of 208  Page ID #:10838

RICK HUTTON                                                     September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                              40

1  businesses spend some of the money that they collect on

2  running the business.

3      Q.   Okay.

4      A.   I do the same thing.

5      Q.   Okay.  So you just assumed this to be just a

6  speculative comment by some single individual.  Correct?

7      A.   Yes.

8      Q.   Do you -- going back to the first page, do you

9  see that Ms. Hutton asked Mr. Cassidy whether he had any

10  proof of what was being said in his message?  Do you see

11  that?

12     A.   Yes.

13     Q.   Do you know why she did that?

14     A.   Because anyone who puts out claims is just

15  putting out cold air unless there's something behind it.

16     Q.   Understood.  And did you ask her to do that?

17     A.   No.

18     Q.   Did you ask her to follow up with Mr. Cassidy

19  to explain what he means?

20     A.   No.  And she didn't.

21     Q.   Okay.  Well, she followed up with Mr. Cassidy

22  to ask for proof.  Is that not true?

23     A.   Yes.

24     Q.   It is.  So she did follow up with Mr. Cassidy

25  asking what he means.  Correct?



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 44 of 208   Page ID
#:10839

RICK HUTTON                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      41

 1      A.   Yes.

 2      Q.   Okay.  So did you ask her to do that?

 3           MR. BROOKNER:  Objection.  Asked and

 4 answered.  You can answer.

 5      A.   No.

 6      Q.   (BY MR. KHAN)  Okay.  And do you see that

 7 there's a link here from PPC Claim, a PPC Claim link

 8 that Adriana provides Matt?  Correct?

 9      A.   Uh-huh.

10      Q.   And that includes this document that begins

11 with reveal the raw data behind the ReachLocal platform.

12 This is the document that's in the link.  Do you

13 remember reading this document, Mr. Hutton?

14      A.   Never seen it before.

15      Q.   Okay.  So you've never seen the link that

16 Ms. Hutton had sent to Matt?

17      A.   No.

18      Q.   Okay.  Did you understand that ReachLocal had

19 a platform that it used for its -- ReachLocal had a

20 platform that it used for its customers?

21           MR. BROOKNER:  Objection to the form.

22      Q.   (BY MR. KHAN)  Do you understand that term

23 "platform"?

24           MR. BROOKNER:  Sorry.  Objection to the

25 form.  You can answer the question.  Remember, don't



1  talk over counsel.  Wait a second to answer.  Okay?  Go

2  ahead.

3       A.   I don't understand your question.

4       Q.   (BY MR. KHAN)  Well, I'm just trying to

5  understand what you -- if you understand ReachLocal's

6  business model.  Do you understand how ReachLocal

7  operates?

8       A.   I understand that you pay them certain amounts

9  of money and they allocate that towards --

10      Q.   Okay.  Understood.  So you had not read this

11 link at any point in time.  Is this the first time

12 you're seeing this document?

13      A.   Yes.

14      Q.   Okay.  If you take a moment to review it --

15 it's not very long, but take your time.  Do you see the

16 part, Mr. Hutton, where it says towards the beginning,

17 For those of you who do not already know ReachLocal our

18 premier SME partner of Google AdWords?

19      A.   Okay.

20      Q.   Did you know that to be true?

21      A.   Like I said, I've never read this before.

22      Q.   No, no, I'm not asking you whether you've read

23 it before, Mr. Hutton.  I'm asking you now about the

24 contents of it.  This statement, for those of you who do

25 not already know ReachLocal, our premier SME partner of



RICK HUTTON                                                   September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                            43

1  Google AdWords.  Did you know that ReachLocal was a

2  premier SME partner of Google AdWords?

3       A.   I did not.

4       Q.   Okay.  Did you ask Adriana to -- I think you

5  testified earlier that you asked her to forward the

6  message to Mr. Ramsey.  Am I accurate?

7       A.   Correct.

8       Q.   Okay.  Why did you do that?

9       A.   As a general courtesy --

10      Q.   Okay.

11      A.   -- as I would do with any person that I do

12 business with if something came up that regarded them.

13      Q.   Okay.  So just -- I want to understand what

14 you mean by general courtesy.  So you had done business

15 with Matt at this point for almost three years.

16 Correct?

17      A.   Uh-huh.

18      Q.   You had an ongoing agreement orally with him.

19 Correct?

20      A.   Yes.

21      Q.   You were spending about $1,000 a month with

22 Compass Point.  Correct?

23      A.   No.

24      Q.   With Compass Point via ReachLocal, a portion

25 of it ReachLocal, a portion of it Compass Point.



RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              44

 1   Correct?

 2        A.   Correct.

 3        Q.   Okay.  So this message concerned Reach Local,

 4   correct, the one from Cassidy?

 5        A.   Yes.

 6        Q.   And so you felt it was important enough to

 7   send it to Mr. Ramsey because he was using ReachLocal.

 8   Correct?

 9        A.   Correct.

10        Q.   And what was the purpose behind it?  Was it to

11   have Matt look into whether ReachLocal should be

12   continued to be used as a partner?

13        A.   No.

14        Q.   Did you want Mr. Ramsey to stop using

15   ReachLocal?

16        A.   No.

17        Q.   But you had communicated to him a year prior

18   that you were questioning ReachLocal's ROI, return on

19   investment.  Correct?

20        A.   Correct.

21        Q.   Did you ask him to stop using ReachLocal at

22   that time?

23        A.   Not at that time, no.

24        Q.   Okay.  Did you talk -- did you ask him to stop

25   using ReachLocal in 2016?



1    A.   Yes.

2    Q.   At what point?

3    A.   About May or so.

4    Q.   May?

5    A.   May or June.  I don't have an exact date.

6    Q.   Okay.  So you're saying that May of this year

7  is when you asked him to stop using ReachLocal.  Right?

8    A.   Correct.

9    Q.   Okay.  So at that point, that was the first

10  time you asked him to stop using ReachLocal?

11    A.   We had discussed stopping using ReachLocal for

12  months prior to that.

13    Q.   Okay.  But that's when you asked him to

14  officially stop using ReachLocal.  Correct?

15    A.   Yes.

16    Q.   Now you are saying you had discussed with him

17  stopping using ReachLocal for months prior.  Can you be

18  more specific?

19    A.   We had had conversations that we were not

20  receiving what we thought was good dollar for our -- or

21  good return on our dollar, and we had talked about doing

22  some other campaigns.

23    Q.   Okay.  So there were ongoing discussions

24  between you and Compass Point about the continuing

25  viability of ReachLocal in 2016?



1        A.    For us, yes.

2        Q.    For InLight --

3        A.    Uh-huh.

4        Q.    -- right.  Yet, you still had ongoing

5   campaigns in January.  Correct?

6        A.    January of this year, yeah.

7        Q.    February, March --

8        A.    Uh-huh.

9        Q.    -- April, and possibly May you think is when

10  it stopped.  Correct?

11       A.    Uh-huh.

12       Q.    So you continued to -- the business as usual

13  that you had with -- with Compass Point until it was

14  terminated.  Right?

15       A.    Yeah.

16       Q.    Okay.  So at this time then there was an

17  ongoing campaign that Compass Point was managing for you

18  when you were using ReachLocal products as of the date

19  of this e-mail.  Correct?

20       A.    Correct.

21       Q.    And so you felt that the e-mail should be sent

22  to Matt to inform him about his partner ReachLocal.

23  Correct?

24       A.    Just to give him information that we received.

25       Q.    Did you expect him to look into the



RICK HUTTON                                                September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                          47

1  information that you received?

2      A.   I didn't expect anything.

3      Q.   Did Matt -- does Matt -- have you forwarded

4  Matt information in the past, just generally?

5      A.   Nothing like this has come up.

6      Q.   Okay.  But you've sent him e-mails and

7  communications in the past on things that interest you

8  from a business perspective?

9           MR. BROOKNER:  Object.  Never mind.

10 Sorry.  Go ahead.

11     A.   Yes.

12     Q.   (BY MR. KHAN)  Yes.  And in the communications

13 that you had with Matt when you send him information,

14 it's a dynamic relationship; you're sharing information

15 with one another.  Correct?

16     A.   Yes.

17     Q.   And you expect him when you forward a link or

18 send something with online presence, that he would

19 follow up or look into your concerns or whatever

20 questions you have generally?

21     A.   Generally.

22     Q.   So in this context when you sent -- given the

23 long-standing relationship you had with him, four or

24 five years personally and professionally -- personally

25 almost seeing him once a week, as you previously



1 testified, you would expect him to review the

2 information that was being sent to him.  Correct?

3      A.   No.

4      Q.   Why not?

5      A.   Because I don't expect him to do anything.  I

6 simply forward him some information that we received.

7      Q.   Okay.  So do you expect him to --

8      A.   We did not ask him to investigate it or --

9      Q.   That's not what I'm asking --

10      A.   Well, that's what I'm telling you.

11      Q.   -- Mr. Hutton.  Yeah, but that's not an answer

12 to my question.  So why don't we repeat the question,

13 have the court reporter do that if she doesn't mind.

14           (Requested testimony read.)

15      Q.   (BY MR. KHAN)  So, again, I'll repeat the

16 question if it's not clear.  My question is simply you

17 forwarded the information for his consumption.  Correct,

18 Mr. Hutton?

19      A.   Correct.

20      Q.   For his consumption?  You expected him to

21 review it.  Correct?

22           MR. BROOKNER:  Objection.  Asked and

23 answered several times.  And Rick, you may answer the

24 question.

25      A.   I did not expect him to do anything.  We



RICK HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      49

 1  simply forward him some information.

 2       Q.    (BY MR. KHAN)   Okay.   So when you sent him the

 3  information about what Cassidy is saying about

 4  ReachLocal, is it not reasonable to assume that Matt,

 5  who has a relationship with ReachLocal for several

 6  years, would take seriously what you're sending him?

 7       A.    Yes.

 8       Q.    And is it not reasonable that he would look

 9  into the link that was sent to him?

10       A.    Reasonable.

11       Q.    And is it not reasonable that he would review

12  the contents of the allegations that Mr. Cassidy is

13  saying about ReachLocal?

14       A.    I cannot answer for him.

15       Q.    I'm not asking you to answer for him.   I'm

16  saying do you think it's reasonable for him to have done

17  that?

18       A.    Yes.

19       Q.    Okay.   Now I would like you to review a

20  document that the court reporter previously marked as

21  Exhibit 11.

22       A.    Okay.

23       Q.    These are documents that were produced to me

24  this morning.   So let me just get the online version

25  here so I can follow along and ask questions about it.



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 53 of 208   Page ID #:10848

RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                 50

1  So Mr. Hutton, these are e-mail communications that

2  continue, and it's the full extent of the FaceBook

3  messages that were exchanged by your wife, Ms. Hutton

4  and Mr. Cassidy.  Do you see that?

5       A.   Yes.

6       Q.   Okay.  I'm going to ask you a series of

7  questions about each of these individual documents.

8            First, after the e-mail attaching the FaceBook

9  communication and message and the link was sent to

10  Mr. Ramsey, Mr. Ramsey responds to Ms. Hutton.  Do you

11  see this on page 2?  It's an e-mail dated Wednesday,

12  March 2, 2016 at 4:20 p.m.?

13      A.   Yes.

14      Q.   That appears to be the same day that he

15  received the information that was shared to him that you

16  wanted him to read.  Correct?

17            MR. BROOKNER:  Objection to the

18  characterization of Rick wanting anything.  But you can

19  answer the question.

20      A.   Yes.

21      Q.   (BY MR. KHAN)  Well, I think you previously

22  testified you wanted this information to be shared with

23  Mr. Ramsey.  Is that not correct?

24      A.   I wanted it forwarded to him --

25      Q.   Yeah, that's what I'm asking.



RICK HUTTON                                                September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                            51

1        A.    -- as a courtesy.

2        Q.    Okay.  And so this e-mail dated March 2nd at

3    4:20 p.m. was sent the same day in response to

4    Ms. Hutton's e-mail.  Correct?

5        A.    Correct.

6        Q.    Now in the e-mail he says, Hey, Adriana, I

7    talked with Rick about this this morning.  Do you see

8    that?

9        A.    Yes.

10       Q.    Did Mr. Ramsey have a conversation with you

11   about this, meaning -- first off, let me step back.  Bad

12   question.

13             Does the "this" refer to the communication

14   that Cassidy made on FaceBook?

15       A.    Yes.

16       Q.    Did Mr. Ramsey speak to you about the

17   communications with Mr. Cassidy that were forwarded to

18   him that morning?

19       A.    Yes.

20       Q.    Okay.  I want to talk about that conversation.

21   How long was it for?

22       A.    I don't recall.

23       Q.    Was it ten minutes?

24       A.    No.  Two.

25       Q.    Two minutes?



RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              52

1    A.   Yeah.

2    Q.   You spoke to him for two minutes?

3    A.   Yes.

4    Q.   Okay.  And what did you discuss?

5    A.   We discussed -- he had checked into this, and

6  we discussed about, yes, all companies take some money

7  to operate the company.

8    Q.   So all companies -- so you're talking about

9  the contents of what Cassidy was saying, that some

10  companies take margins to earn money, and you're saying

11  that you discussed that all companies do this, including

12  ReachLocal.  Correct?

13    A.   I am saying that the communication between

14  Matt and I are that, yes, companies take a cut.

15    Q.   Companies generally take a cut?

16    A.   Sure.

17    Q.   But was specifically there a discussion about

18  ReachLocal?  You were talking about Cassidy's

19  communication, which concerns ReachLocal, so I assume

20  the conversation was about ReachLocal?

21    A.   Yes --

22    Q.   Okay.

23    A.   -- as the e-mail says.

24    Q.   Yes.  And -- yeah, the e-mail does say --

25  you're right, Mr. Hutton, the e-mail does say, I talked



1  with him about ROI.  Does ROI stand for return on

2  investment?

3       A.   Yes.

4       Q.   And it's the return on investment that you're

5  interested in for your company InLight.  Isn't that

6  true?

7       A.   Yes.

8       Q.   And so the question is whether the discussion

9  that you had was whether ReachLocal was maximizing the

10  ROI for you?

11       A.   Yes.

12       Q.   And the discussion was whether Cassidy's

13  allegation in the post about ReachLocal keeping money

14  was true or not.  Correct?

15       A.   No.  I mean, all for profit companies keep

16  some money to run the company.  I understand that.  I'm

17  a businessman.

18       Q.   Correct.  But I'm saying that that -- your

19  discussion -- the point of Mr. Ramsey calling you was to

20  respond about the messages that he received that

21  Ms. Hutton forwarded, which were Mr. Cassidy's messages,

22  correct, about ReachLocal?

23       A.   I do not recall how the conversation came up.

24  I was down there.  We talked.

25       Q.   Is it reasonable to assume that he spoke to



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 57 of 208  Page ID #:10852

RICK HUTTON                                      September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              54

1    you on the phone in response to an e-mail that he

2    received from Ms. Hutton?

3        A.   No.

4        Q.   So he didn't call you in response to the

5    e-mail he received from Ms. Hutton?

6        A.   No.

7        Q.   So --

8        A.   We spoke --

9        Q.   -- when he says here, I talked with Rick about

10   this this the morning, that was an independent

11   conversation and had nothing to do with the e-mail he

12   received from Adriana?

13       A.   No.  It was not a phone call.  We had a face

14   to face --

15       Q.   Okay.

16       A.   -- conversation.

17       Q.   Fair enough.  Just trying to understand.  So

18   now I know it's a face to face conversation.  Okay.

19       A.   Uh-huh.

20       Q.   And you're saying it lasted for two minutes.

21   He's a few offices down.  So he walked into your office.

22   Did you ask him to walk into your office --

23       A.   No.

24       Q.   -- to talk about this matter?  He walked in?

25       A.   No.



RICK HUTTON                                      September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              55

```
 1        Q.    He felt it important enough to walk in.
 2   Right?
 3        A.    No.
 4        Q.    No.   Then what happened?
 5        A.    I went down to his office to discuss some
 6   other matters --
 7        Q.    Okay.
 8        A.    -- and we talked about that.
 9        Q.    Okay.   You went down to his office to discuss
10   other matters.   What other matters?
11        A.    Irrelevant to this meeting.
12        Q.    Well, whether it's irrelevant or not, I just
13   want to know the substance of it.   What actually did you
14   go there to talk to him about?
15        A.    When we were going to go have beer.   You know,
16   just general conversation.
17        Q.    Okay.   And -- but this issue of Mr. Cassidy's
18   communications came up?
19        A.    Yes.
20        Q.    Okay.   Now I understand.   I just want to
21   understand exactly what happened.
22              So you have a meeting with Mr. Ramsey.   It was
23   the morning of March 2nd.   It was after information was
24   forwarded to him about Mr. Cassidy's messages.   The
25   contents of that conversation included a variety of
```



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 59 of 208   Page ID #:10854

RICK HUTTON                                              September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                        56

1  things socially but also included what Mr. Cassidy had

2  said in those messages.  Is that an accurate depiction

3  of the meeting you had?

4       A.   Yes.

5       Q.   Okay.  Thank you.

6            In this e-mail he says, But I logged into

7  ReachLocal this afternoon and, lo and behold, there is

8  already a letter written about this Kieran Cassidy

9  fella.  Seems he's bad news.  Crazy that he contacted

10 you all the way from England.

11           A few questions about this.  Mr. Ramsey is

12 saying that he logged into ReachLocal this afternoon.

13 So do you understand this to mean that he was looking

14 into the information that was shared by you to him?

15      A.   No.

16      Q.   Okay.  What do you understand that statement

17 to mean then?

18      A.   He deals with ReachLocal on many companies,

19 not just ours.  So he logged in to reach for whatever

20 reason.  I do not know.  I'm not him.

21      Q.   Well, I'm not asking you to delve into his

22 mind.  I'm asking you about what he's saying here,

23 because he's referencing a meeting he had with you.  He

24 says here there is already a letter written about this

25 Kieran Cassidy fellow.  Do you see that?



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 60 of 208   Page ID #:10855

RICK HUTTON                                                September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                          57

 1        A.    Uh-huh.

 2        Q.    Do you know what letter he's referring to?

 3        A.    No.

 4        Q.    Well, it's in the documents that you have

 5   before you.  So why don't you take a moment and read it.

 6        A.    Okay.

 7        Q.    Okay.  It seems like there's a letter written

 8   by ReachLocal concerning Mr. Cassidy.  Do you see that?

 9        A.    Uh-huh.

10        Q.    Okay.  Now this is a letter that was sent to

11   Ms. Hutton in response to the e-mail that she received.

12   Right?  So in this e-mail Mr. Ramsey is attaching a

13   letter about Cassidy that was prepared by ReachLocal.

14   Correct?

15        A.    I guess so.

16        Q.    Okay.  Did you read this letter before, prior

17   to today at any point in time?

18        A.    Not that I recall.

19        Q.    Okay.  Do you recall reviewing the contents of

20   this letter or discussing the contents of this letter

21   with Ms. Hutton at any time?

22        A.    I can't say.  I don't recall.

23        Q.    You don't recall.  Did Ms. -- you don't recall

24   one way or the other.  You could have or you could not

25   have.  Correct?



1        A.    Correct.

2        Q.    And did Ms. Hutton tell you that ReachLocal

3   had written a letter about this Cassidy fellow?

4        A.    I think Matt did.

5        Q.    So Matt in that meeting that he had with you,

6   that's when he raised it?

7        A.    I don't recall if it was that meeting or not.

8        Q.    But at some point in time he did mention the

9   letter?

10       A.    Uh-huh.

11       Q.    Okay.  Do you remember what he talked to you

12  about with respect to that letter?

13       A.    No, I don't.

14       Q.    Just that it was sent possibly, that a letter

15  had been sent about Cassidy?

16       A.    Yeah.

17       Q.    Okay.  He says, I'll stop by tomorrow or

18  Friday to discuss further with Adriana about -- you

19  know, about this matter.  Do you recall him meeting with

20  Adriana later in this week to discuss the FaceBook

21  messages of Mr. Cassidy?

22       A.    No, I don't recall that.

23       Q.    But you do recall just a meeting he had with

24  you, which was very brief?

25       A.    (Witness nods head.)



RICK HUTTON                                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                             59

1       Q.   Okay.  Reviewing this letter, it mentions in
2   the letter that Mr. Cassidy -- sorry.
3            It mentions in the letter that Mr. Cassidy is
4   an owner of PPC Claim and is soliciting business.  Do
5   you see that?
6       A.   Yes.
7       Q.   And do you see it says, Indeed, Mr. Cassidy is
8   a disqualified director, debarred from acting as a
9   director and from the formation, promotion and
10  management of companies?
11      A.   Yes.
12      Q.   Did you -- do you recall hearing that from
13  either Matt or Adriana at the time?
14      A.   I do not.
15      Q.   Do you recall -- do you know if you understood
16  Mr. Cassidy to have been acting on behalf of PPC Claim
17  at that time?
18      A.   I did not get that involved in this.
19      Q.   That's not my question.  I'm just asking if
20  you --
21      A.   No.
22      Q.   Okay.  Thank you.
23           When you're saying you did not get this
24  involved in this, you personally did not get involved,
25  but did you direct Adriana Hutton to get involved?



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 63 of 208   Page ID #:10858

RICK HUTTON                                      September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                 60

1      A.    I directed her to forward what she got on

2   FaceBook to Matt.

3      Q.    Okay.  And did you direct her to respond to

4   Cassidy in any way --

5      A.    No.

6      Q.    -- on FaceBook?

7      A.    No.

8      Q.    Did you ask her to reply on FaceBook to

9   Cassidy?

10      A.    No.

11      Q.    Did you feel it was appropriate to respond to

12   Mr. Cassidy asking for proof?

13      A.    It never crossed my mind.

14      Q.    Okay.  So Ms. Adriana Hutton did it on her own

15   accord; you did not ask her to actually ask for proof?

16      A.    Not that I recall.

17      Q.    And you did not ask her to respond to

18   Mr. Cassidy via FaceBook?

19      A.    No.

20      Q.    Okay.  Looking forward in these communications

21   here, there are FaceBook communications; and in these

22   FaceBook communications, Ms. Hutton actually sends the

23   entire letter pasted to Mr. Cassidy.  Do you see that?

24   Review it further down.  You'll see it.

25              Do you see the lengthy communication where she



1  encloses the contents of the letter to Mr. Cassidy,

2  Mr. Hutton?

3       A.   Yeah.

4       Q.   Okay.

5            MR. BROOKNER:  I'm sorry.  Objection to

6  the form.  I thought you called somebody else

7  Mr. Hutton, but maybe I got it wrong.  Go ahead.

8       Q.   (BY MR. KHAN)  I'm just asking you whether you

9  see in this document that Ms. Hutton did, indeed, send

10 the contents of the letter to Mr. Cassidy via FaceBook?

11      A.   I guess so.

12      Q.   Okay.

13      A.   I had nothing to do with it.

14      Q.   Okay.  So she -- you didn't ask her to do

15 that.  Correct?

16      A.   No.

17      Q.   You had never seen that -- did you know prior

18 to today that she did that?

19      A.   No.

20      Q.   Okay.  Do you see the communications from

21 Mr. Cassidy?  I want you to keep looking at the

22 document, Mr. Hutton.  At the very end there are

23 communications from Mr. Cassidy in response to her.  Can

24 you read those and review those?

25            MR. BROOKNER:  Are you talking about the



```
 1   FaceBook stuff --
 2                 MR. KHAN:  Yes.
 3                 MR. BROOKNER:  -- at the back?
 4                 MR. KHAN:  Yes, I am.
 5       A.   Yes, I did see this.  And if you will look, it
 6   says, If not, I wish you the best in your business.  If
 7   we were not interested in joining, that which we were
 8   not, and we didn't.
 9       Q.   (BY MR. KHAN)  That's not my question.  I'm
10   just asking you do you see those messages, Mr. Hutton?
11       A.   Yes.
12       Q.   Okay.  And did you see that Mr. Cassidy is
13   responding to Ms. Hutton having pasted the letter saying
14   that you should ask ReachLocal this, send them this?  Do
15   you see that message?
16       A.   Yes.
17       Q.   Okay.  And do you see that Mr. Cassidy says
18   that we are in the process of building a class action in
19   the United States?
20                 MR. BROOKNER:  Look at the document, and
21   after this question or two, let's take a two minute
22   break.
23                 MR. KHAN:  Okay.  I want to finish this
24   line of --
25                 MR. BROOKNER:  That's fine.
```



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 66 of 208   Page ID #:10861

RICK HUTTON                                             September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                       63

1              MR. KHAN:  -- inquiry on this document

2    before I take a break.

3              MR. BROOKNER:  That's fine.

4         A.   The question again?

5         Q.   (BY MR. KHAN)  Yes.  You're looking at this

6    FaceBook page, right?  And it says -- FaceBook message.

7    And it says we are in the process of building a class

8    action in the US.  If you would like to register

9    interest, feel free to drop me an e-mail.  Do you see

10   that?

11        A.   Uh-huh.

12        Q.   Your testimony earlier was prior to today you

13   had not seen these messages before.  Is that correct?

14        A.   No.

15        Q.   So you had seen these messages?

16        A.   I have seen the FaceBook messages.

17        Q.   Okay.  So these are the FaceBook messages?

18        A.   I have not seen the document from PPC --

19        Q.   Claim, right.  That was the screenshot, the

20   proof, that link to the PPC Claim.  I understand that.

21   But you have seen all of these messages prior to today?

22        A.   I have seen the ones from Kieran Cassidy.

23        Q.   Okay.  So just so we understand now, earlier

24   you testified that you hadn't seen the message

25   Ms. Hutton sent to Cassidy that included the letter



1  ReachLocal had provided --

2      A.   Correct.

3      Q.   -- through Matt.

4      A.   Correct.

5      Q.   But you have seen this message?

6      A.   Yes.

7      Q.   And you saw it at that time.  Correct?  You

8  saw it at the time it was sent?

9      A.   I saw this message at the time it was

10  received.

11      Q.   Did you understand that Kieran Cassidy had

12  brought a lawsuit against ReachLocal in the United

13  States?

14      A.   I saw that they were building a class action

15  suit.

16      Q.   Earlier in your testimony you mentioned

17  that -- when you spoke to Mr. Syverson, that you

18  understood that Cassidy had brought a lawsuit against

19  ReachLocal in the United States.  Do you recall that

20  testimony?

21      A.   I knew that they had brought one against the

22  UK.

23      Q.   Okay.  But does this now refresh your

24  recollection that what your -- what you understood to be

25  a lawsuit in the United States was referring to this



1  message that we are in the process of building a class

2  action in the US?

3       A.   Yes.

4       Q.   Okay.  So you understood at this time that

5  Cassidy was on the verge of suing ReachLocal.  Is that

6  correct?

7       A.   Yes.

8       Q.   Did you make anything of that?

9       A.   No.

10      Q.   Did you tell Adriana to look into that?

11      A.   No.

12      Q.   Did you ask Matt about whether that was true?

13      A.   I believe that was forwarded to Matt.

14      Q.   Yes.  I'm saying did you personally

15  subsequently to that have a conversation in person or

16  over the phone where you asked Matt about whether or not

17  Cassidy was bringing a lawsuit in the United States?

18      A.   No.

19      Q.   Did you discuss with Matt about what Cassidy

20  had been saying about ReachLocal's hidden margins?

21      A.   Yes.  We had a discussion about ReachLocal and

22  businesses in general.

23      Q.   Okay.

24            MR. BROOKNER:  Are we good for a break

25  now?



RICK HUTTON                                              September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                       66

```
 1                  MR. KHAN:  Yes, we are.

 2                  THE VIDEOGRAPHER:  We are now off the

 3   record.  The time is 12:27.

 4                  (Break from 12:26 p.m. to 12:30 p.m.)

 5                  THE VIDEOGRAPHER:  We are back on the

 6   record.  The time is 12:31.  This is tape number 2.

 7       Q.   (BY MR. KHAN)  So Mr. Hutton, I want to show

 8   you a document which the court reporter previously

 9   marked as Exhibit 12.  Take a look at that.

10       A.    Okay.

11       Q.    This is an e-mail from Mr. Ramsey.  This

12   includes, sorry, the e-mail from Ms. Hutton to

13   Mr. Ramsey which we previously asked questions about.

14   And there is a subsequent e-mail from Mr. Ramsey to a

15   Steven Dollar at ReachLocal copied to Ben Layne at

16   Compass Point.  Do you know someone by the name of Ben

17   Layne at Compass Point?  Does that name ring a bell?

18       A.    It might be one of his employees.

19       Q.    Okay.  So in this e-mail, which was sent on

20   March 2nd at 2:32, this was the afternoon -- the same

21   afternoon when Ms. Hutton had forwarded you information

22   from the Cassidy FaceBook messages.  This was also after

23   you had met with Matt when you had gone to his office to

24   have a short discussion about a variety of things but

25   that included Cassidy's FaceBook messages.  Is that
```



1   right?

2        A.   Yes.

3        Q.   Okay.  So this e-mail is later that afternoon

4   and it's addressed to Steven.  Steven Dollar is a

5   representative at ReachLocal who manages the InLight

6   account.  He said, We've had one customer who had been

7   with ReachLocal, for I'm guessing four to five years,

8   drop ReachLocal completely this week.  Another one below

9   is questioning continuing with ReachLocal as well.  Do

10  you see that?

11       A.   Uh-huh.

12       Q.   So in this e-mail Mr. Ramsey is referring to

13  the e-mail from Ms. Hutton.  Correct?

14       A.   Yes.

15       Q.   And he's saying he's questioning continuing --

16  he's interpreting that to say that InLight is

17  questioning continuing with ReachLocal.  Is that true?

18       A.   Yes, we had been for several months prior.

19       Q.   Okay.  But he's saying that with respect to

20  this e-mail particularly, that is why InLight is

21  questioning continuing with ReachLocal.

22       A.   I cannot speak for him.

23       Q.   I understand that.  I'm just saying does it

24  surprise you that Mr. Ramsey is saying that he

25  understands Ms. Hutton's e-mail to say that he's



1  questioning -- that InLight is questioning to continue

2  with ReachLocal?

3       A.   No.

4       Q.   Why not?

5       A.   Because I had been talking with Matt

6  questioning about keeping ReachLocal for several months

7  prior to.

8       Q.   Okay.

9       A.   This does not refer to that.

10      Q.   This -- how do you know that it doesn't refer

11 to that when it actually says below, the word "below" on

12 it?

13      A.   I cannot speak for him.

14      Q.   Okay.  So you don't know that it doesn't refer

15 to that, because you just said you can't speak for the

16 e-mail.  So you don't know for certain, Mr. Hutton, that

17 what he's saying here refers to prior discussions?

18      A.   No.

19      Q.   Okay.  So in this e-mail he says another one

20 below is questioning continuing with ReachLocal.

21 Mr. Ramsey is referring to an e-mail from Ms. Hutton

22 about Cassidy's communications and characterizing that

23 as InLight questioning continuing with ReachLocal.  Does

24 that surprise you?

25      A.   No.



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 72 of 208  Page ID #:10867

RICK HUTTON                                September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                          69

1     Q.   Do you believe it was -- it's a reasonable

2  inference or it's reasonable for Mr. Ramsey to have read

3  and received a forwarded e-mail with Cassidy's

4  communications that would inform his understanding that

5  InLight was worried about what Mr. Cassidy was saying?

6     A.   No.

7           MR. BROOKNER:  Objection to the form, and

8  objection to the extent you're asking him to interpret

9  what somebody he's never met thinks.  But if you can

10  answer the question, go ahead.

11           MR. KHAN:  Oh, he met Mr. Ramsey once a

12  week for three years.

13           MR. BROOKNER:  I thought you were talking

14  about the other guy.

15           MR. KHAN:  No, I'm talking about

16  Mr. Ramsey.

17           MR. BROOKNER:  Go ahead.

18           MR. KHAN:  I don't understand that part

19  of the objection, but go ahead.

20           MR. BROOKER:  I thought you were talking

21  about the other guy.

22     A.   No.

23     Q.   (BY MR. KHAN)  I'm sorry?

24     A.   The answer to your question is no.

25     Q.   Okay.  Why not?



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 73 of 208   Page ID #:10868

RICK HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      70

1      A.   Because this does not say that InLight is

2  looking at dropping ReachLocal because of this e-mail.

3      Q.   That's not what it says at all.

4      A.   Right.

5      Q.   And I'm not characterizing that.  It actually

6  says something quite different, Mr. Hutton, and you're

7  right.  It says another one below is questioning

8  continuing with ReachLocal.  Mr. Ramsey is drawing the

9  conclusion that the e-mail sent to him from Ms. Hutton

10  forwarding Mr. Cassidy's communication means that

11  InLight is questioning continuing with ReachLocal.  Is

12  that not accurate?

13      A.   No.

14      Q.   Okay.  Why not?

15      A.   Because InLight was simply supplying him with

16  information that we received that has to do with

17  something that he contracted.

18      Q.   Okay.  So from your vantage point, that's how

19  you --

20      A.   Yes.

21      Q.   -- expected Mr. Ramsey to have interpreted the

22  e-mail?

23      A.   Yes.

24      Q.   My question is slightly different.  Is it

25  reasonable for Mr. Ramsey to have -- having reviewed



1  this e-mail, to have interpreted it as InLight being

2  concerned about Cassidy's messages?

3        A.    I cannot answer for Mr. Ramsey.

4        Q.    Okay.  But does it surprise you that he has

5  characterized it that way?

6        A.    Yeah.

7        Q.    Okay.  Why?

8        A.    Because it was not taken to him of, Matt, we

9  are really concerned about this, what do you think?  It

10 was FYI, here is a posting we received on our FaceBook

11 page.

12       Q.    Yet Mr. Ramsey immediately responded to the

13 message with a letter from ReachLocal, immediately said

14 this person was in London, and then had a meeting with

15 you in person where you discussed it for a few minutes.

16 Correct?

17       A.    Correct.

18       Q.    So from his vantage point -- I'm not talking

19 about your vantage point -- you know him very well.

20       A.    No.

21       Q.    I understand that you guys are friends.

22 Correct?

23       A.    Business neighbors.

24       Q.    Neighbors.  You interact socially.  So from

25 your vantage point, knowing Matt -- you have a very long



1  standing relationship with him -- was it reasonable for

2  him to -- wrongly or rightly, but to understand what is

3  being said to him is that InLight is concerned about

4  what Cassidy is saying about ReachLocal?

5       A.   I cannot answer for him.

6       Q.   Okay.  So you don't -- I'm not asking you to

7  answer for him.  I'm asking is it reasonable for him to

8  feel that way or not?

9       A.   Yes.

10      Q.   Okay.  Let me show you a document that's been

11 previously marked as Exhibit 13 in this matter.  Take a

12 moment to review that, Mr. Hutton.

13      A.   Okay.

14      Q.   This is an e-mail that appears to be a week or

15 so later.  So it's sent by Mr. Ramsey to, again, Steven

16 Dollar, who was at ReachLocal.  Copied are Josh Carney

17 and Zach Chambers.  Do you know either of those names?

18      A.   Josh is one of his employees.  I don't know

19 who the other is.

20      Q.   Okay.  Have you ever worked with Josh before?

21      A.   No.

22      Q.   Okay.  So in this e-mail -- it's actually a

23 chain -- there's an e-mail, if you go to the third page,

24 from Mr. Dollar to Mr. Ramsey saying, Gentlemen, Have

25 any more of your clients been contacted from PPC Claim?



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 76 of 208  Page ID #:10871

RICK HUTTON                                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                             73

1  And can you tell me which client relationships have been

2  impacted?  I know you said you lost one client already.

3  Can you tell me who?

4         Do you see that?

5     A.   Uh-huh.

6     Q.   So in this e-mail Mr. Dollar is asking about

7  prior communications he had with Mr. Ramsey about

8  contacts from PPC Claim to both -- to InLight and to

9  another client, which if you look at this e-mail, says

10  Gomo.  Now my question is directed towards this

11  communication from Mr. Ramsey, this response.  He says

12  on the first line, InLight Gobos is coming to our office

13  on Monday to discuss PPC Claim matters.  Do you recall

14  Mr. Ramsey requesting a meeting from you about

15  discussing PPC Claim or Mr. Cassidy?

16     A.   I do not.

17     Q.   Do you recall Mr. Ramsey requesting Ms. Hutton

18  for a meeting to discuss PPC Claim or Mr. Cassidy?

19     A.   No, not that I'm aware of.

20     Q.   Yet Mr. Ramsey says in this e-mail that

21  InLight, your company, is coming to his office, which I

22  assume is two doors down, on Monday, which would be the

23  14th of March, to discuss PPC Claim.  Do you know why

24  Mr. Ramsey would say that?

25     A.   I do not.



RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                               74

1      Q.    From his vantage point, he's understanding a
2   meeting to discuss PPC Claim.  Why would he be wanting
3   to meet to discuss PPC Claim?
4      A.    I do not know.
5      Q.    Did you have any discussions with him in the
6   intervening days about PPC Claim?
7      A.    I don't recall.
8      Q.    So he's reviewing and understanding from prior
9   communications sent to him from Ms. Hutton that he needs
10  to discuss with you and with Ms. Hutton about Kieran
11  Cassidy and PPC Claim?
12     A.    No.
13     Q.    But this is what he's saying in this e-mail.
14  So does that surprise you?
15     A.    Yes.
16     Q.    Do you think it's reasonable for him to have
17  interpreted, wrongly or rightly, that InLight and you
18  particularly, Mr. Hutton, may be concerned about what
19  Mr. Cassidy is saying so he wants to allay your
20  concerns?
21     A.    I can't answer that.
22     Q.    Well, Mr. Ramsey is your account manager.  He
23  handles -- he's not account manager.  He's your business
24  partner in this context for three years.  Correct?
25     A.    Yes.



1      Q.   And he's been managing your online presence,

2   including at this point in time an active campaign.

3   Correct?

4      A.   Yes.

5      Q.   And so from a sales perspective -- and that's

6   what Mr. Ramsey is, a salesperson -- is it reasonable

7   for him to feel that you may be concerned about what

8   Mr. Cassidy has said in these postings?

9      A.   Reasonable for him?  I guess.

10      Q.   Okay.  And so it would be reasonable for him

11   to talk to you about the truth of what's being said

12   because it affects whether or not to continue with

13   ReachLocal.  Correct?

14      A.   No.

15      Q.   Why not?

16      A.   Because we had already discussed dropping

17   ReachLocal and going up to that point and beyond.  Yes,

18   we had some very short conversations about this.  I was

19   not concerned about this, so --

20      Q.   But you had discussed dropping ReachLocal

21   prior.

22      A.   Correct.

23      Q.   You had testified to that earlier, right --

24      A.   Uh-huh.

25      Q.   -- in prior negotiations?



RICK HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      76

1            That was even as early as 2014 to 2015 that

2    year.  Correct?

3        A.   Yes.

4        Q.   But ReachLocal hadn't been dropped?

5        A.   No.

6        Q.   And ReachLocal hadn't been dropped in March?

7        A.   No.

8        Q.   And ReachLocal hadn't been dropped as of

9    March 10th?

10       A.   Not that I recall.

11       Q.   And ReachLocal hadn't been dropped until May,

12   is what you testified to.  Correct?

13       A.   Yes.

14       Q.   Okay.  So at this time it was an active

15   relationship, a continuing one that had existed for

16   almost three years in which InLight continued to use

17   ReachLocal products?

18       A.   Yes.

19            MR. BROOKNER:  Objection to -- all right.

20   Never mind.  Go ahead.

21       Q.   (BY MR. KHAN)  And so given that relationship,

22   you had not actually ceased using ReachLocal products as

23   of March 10th?

24       A.   I do not recall the exact date that we stopped

25   it.



RICK HUTTON                                                September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                        77

 1        Q.    But it wasn't as of this date, March 10th?

 2        A.    No.

 3        Q.    You previously testified it was in May.

 4   Correct?

 5        A.    I believe.

 6        Q.    Okay.  So there was no -- you had not directed

 7   Mr. Ramsey to cancel the Compass Point account as of

 8   March?

 9        A.    Not that I recall.

10        Q.    You had not directed Mr. Ramsey to cancel or

11   stop using ReachLocal products completely as of the date

12   of this e-mail --

13              MR. BROOKNER:  Objection.  Asked and

14   answered.  You can answer.

15        A.    Not that I recall.

16        Q.    (BY MR. KHAN)  And you had not directed

17   Mr. Ramsey to terminate the Compass Point account in

18   April?

19        A.    Not that I recall.

20        Q.    And you had not directed Mr. Ramsey to

21   terminate and stop using ReachLocal products in April of

22   2016?

23              MR. BROOKNER:  Objection.  Asked and

24   answered.  You can answer.

25        A.    I don't recall.



RICK HUTTON                                         September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                    78

 1      Q.    (BY MR. KHAN)  You don't recall?

 2      A.    I don't recall --

 3      Q.    Okay.

 4      A.    -- the exact date that we stopped using it.

 5      Q.    Okay.  I understand you don't recall the exact

 6  date, but I guess my question was at the point of time

 7  when the e-mail -- or the FaceBook messages were

 8  forwarded to Mr. Ramsey about Cassidy and about the

 9  allegations of ReachLocal, it was an active business

10  relationship between you and Compass Point?

11      A.    Yes.

12            MR. BROOKNER:  Objection.  Asked and

13  answered.  You may answer.

14      A.    Yes.

15      Q.    (BY MR. KHAN)  And that active relationship

16  had been ongoing for several years?

17            MR. BROOKNER:  Objection.  Asked and

18  answered.  You may answer.

19      A.    Yes.

20      Q.    (BY MR. KHAN)  Okay.

21            MR. KHAN:  Why don't we go off the record

22  for a few minutes, and I'll gather if I have any more

23  questions.  I may not.  Is that okay?

24            MR. BROOKNER:  That's fine.

25            THE VIDEOGRAPHER:  We are now off the



1  record.  The time is 12:46.

2              (Break from 12:45 p.m. to 12:48 p.m.)

3              THE VIDEOGRAPHER:  We are back on the

4  record.  The time is 12:49.

5      Q.   (BY MR. KHAN)  Mr. Hutton, I want to have the

6  court reporter mark as Exhibit 15 a copy of your

7  declaration.

8              (Exhibit 15 marked.)

9              MR. KHAN:  We'll first have her mark it.

10     Q.   (BY MR. KHAN)  Mr. Hutton, this is a copy of

11 the declaration you signed on August 15 in this case.

12 Correct?

13     A.   Correct.

14     Q.   You've reviewed the contents of this before?

15     A.   Correct.

16     Q.   You believe everything that's included in here

17 is true and correct.  Correct?

18     A.   Correct.

19     Q.   Okay.  In paragraph 3 you say that Cassidy

20 contacted InLight through FaceBook in the past regarding

21 ReachLocal.  You know that because of your conversations

22 with Ms. Adriana Hutton.  Correct?

23     A.   Correct.

24     Q.   It later says that communication was forwarded

25 to Compass Point Marketing.  We know that Ms. Adriana



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 83 of 208   Page ID #:10878

RICK HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      80

1   Hutton forwarded that communication to Compass Point.

2   Correct?

3        A.   Correct.

4        Q.   Not you?

5        A.   Correct.

6        Q.   You write, We had a short message exchange

7   with Mr. Cassidy over FaceBook.  By "we," you are

8   referring to Ms. Hutton.  Is that correct?

9        A.   Correct.

10       Q.   So in this paragraph, you did not have any

11  personal direct knowledge -- sorry.  Scratch that.  Let

12  me rephrase.

13            In this paragraph, the contents of what you're

14  testifying to are entirely derived from your

15  communications and understanding with Ms. Hutton.

16  Correct?  Because you didn't read the FaceBook page

17  directly.  Correct?

18       A.   Not directly.  I read it prior to this, yes.

19       Q.   Because Ms. Hutton brought it to your

20  attention.  Correct?

21       A.   Yes.

22       Q.   I'm just trying to make sure I understand

23  paragraph 3, because when you use the word "we," you are

24  referring to Ms. Hutton and not you yourself?

25       A.   I am referring to we as in the company.



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 84 of 208  Page ID
#:10879

RICK HUTTON                                       September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              81

1        Q.   Okay.  Fine.  Fair enough.

2             The company had a short message exchange with

3    Mr. Cassidy.  That's what you're referring to?

4        A.   (Witness nods head.)

5        Q.   Okay.  But is it fair to say that the primary

6    point of contact with Mr. Cassidy and then the primary

7    point of contact with Mr. Ramsey with respect to

8    Mr. Cassidy's messages on FaceBook is Ms. Adriana

9    Hutton?

10       A.   Yes.  But that is also InLight's FaceBook

11   page, not Adriana Hutton's.

12       Q.   You're right about that.

13       A.   So --

14       Q.   You're right about that, correct.

15            MR. KHAN:  I don't have anything further.

16   And so I am willing to do the stipulation if you would

17   like.

18            MR. BROOKNER:  I think we have to defer

19   to Erik to see if he has any.

20            MR. SYVERSON:  No questions.

21            MR. KHAN:  Okay.  So I propose the

22   following stipulation.  We'll relieve the court reporter

23   of her duty to maintain the original transcript under

24   the Code.  We'll send the original transcript to

25   Mr. Hutton's deposition directly to Mr. Brookner, who is



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 85 of 208   Page ID
#:10880

RICK HUTTON                                                September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                          82

```
 1  his lawyer.  He will make arrangements to have
 2  Mr. Hutton review the transcript, make any necessary
 3  changes or corrections to it and sign the transcript
 4  under penalty of perjury within 30 days of receipt.
 5              MR. SYVERSON:  So stipulated.
 6              MR. BROOKNER:  That's fine.  And to
 7  follow up on that as well with Adriana.  Where do you
 8  want the signed and read copies sent back to the court
 9  reporter, or are there going to be instructions included
10  with that?  Where do those go?
11              MR. KHAN:  I think you should,
12  Mr. Brookner, notify me of any changes or corrections
13  and of the signing of the transcript within the 30 days.
14  And then if it's not -- if you don't notify me or if the
15  original of the transcript becomes lost, then an
16  unsigned certified copy can be used.  And then in terms
17  of the maintenance of the custody of the transcript, I
18  think you should maintain it.
19              MR. BROOKNER:  That's fine.
20              MR. SYVERSON:  All that I would add,
21  Mr. Brookner, is just copy me on any communications
22  regarding changes.
23              MR. BROOKNER:  Absolutely Erik, no
24  problem.  I'm sorry, Mr. Syverson.
25              MR. SYVERSON:  You can call me Erik.  I
```



RICK HUTTON
REACHLOCAL vs. PPC CLAIM LIMITED

September 12, 2016
83

1  don't mind.  It's your birthday.  You can do what you

2  want.

3                    MR. KHAN:  Okay.  We're off the record

4  now.

5                    MR. SYVERSON:  Thank you.

6                    THE VIDEOGRAPHER:  We are now off the

7  record.  The time is 12:54.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    CHANGES AND SIGNATURE

 2   WITNESS NAME:  RICK HUTTON

 3   DATE OF DEPOSITION:  SEPTEMBER 12, 2016

 4   PAGE    LINE    CHANGE          REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```



1        I, RICK HUTTON, have read the foregoing
   deposition and hereby affix my signature that same is
2  true and correct, except as noted above.

3

4
                    _____
5                            RICK HUTTON

6

7  THE STATE OF _____)
   COUNTY OF _____)
8
           Before me, _____, on
9  this day personally appeared RICK HUTTON, known to me
   (or proved to me under oath or through
10 _____) (description of identity
   card or other document) to be the person whose name is
11 subscribed to the foregoing instrument and acknowledged
   to me that they executed the same for the purposes and
12 consideration therein expressed.
           Given under my hand and seal of office this
13 _____ day of _____, _____.

14

15
                    _____
16                  NOTARY PUBLIC IN AND FOR
                    THE STATE OF _____
17                  COMMISSION EXPIRES: _____

18

19

20

21

22

23

24

25



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 89 of 208   Page ID #:10884

RICK HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              86

```
 1  STATE OF TEXAS    )

 2  COUNTY OF DALLAS  )

 3       I, Julie C. Brandt, a Certified Shorthand Reporter

 4  duly commissioned and qualified in and for the State of

 5  Texas, Certified Realtime Reporter and a Registered

 6  Merit Reporter, do hereby certify that there came before

 7  me on the 12th day of September, 2016, at the offices of

 8  Gray Reed & McGraw, located at 1601 Elm Street, Suite

 9  4600, Dallas, Texas, the following named person, to-wit:

10  RICK HUTTON, who was duly sworn to testify the truth,

11  the whole truth, and nothing but the truth of knowledge

12  touching and concerning the matters in controversy in

13  this cause; and that she was thereupon examined upon

14  oath and her examination reduced to typewriting by me or

15  under my supervision; that the deposition is a true

16  record of the testimony given by the witness.

17       I further certify that pursuant to FRCP Rule 30(e)

18  that the signature of the deponent:

19       [X] was requested by the deponent before the

20  completion of the deposition, and that signature is to

21  be before any notary public and returned to counsel

22  within 30 days from date of receipt of this transcript.

23       [ ] was not requested by the deponent or a party

24  before the completion of the deposition.

25       I further certify that I am neither attorney or
```



1  counsel for, nor related to or employed by any of the

2  parties to the action in which this deposition is taken,

3  and further that I am not a relative or employee of any

4  attorney or counsel employed of any attorney or counsel

5  employed by the parties hereto, or financially

6  interested in the action.

7       CERTIFIED TO BY ME on this the 13th day of

8  September, A.D., 2016.

9

10

11

12

_____

13  Julie Brandt, CSR, RMR, CRR
    Texas CSR No. 4018
14  Expiration date:  12/31/16

15

16

17

18

19

20

21

22

23

24

25



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 2

Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 92 of 208   Page ID
#:10887

ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                    1

1                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
2
       REACHLOCAL, INC.,            )
3          Plaintiff,               )
                                    )
4      vs.                          ) Civil Action No.
                                    ) 2:16-cv-01007-R
5      PPC CLAIM LIMITED,           )
       et al.,                      )
6          Defendant.               )

7

8      *******************************************************

9                 ORAL AND VIDEOTAPED DEPOSITION OF

10                          ADRIANA HUTTON

11                       SEPTEMBER 12, 2016

12     *******************************************************

13         ORAL AND VIDEOTAPED DEPOSITION OF ADRIANA HUTTON,

14     produced as a witness at the instance of the Plaintiff,

15     and duly sworn, was taken in the above-styled and

16     numbered cause on the 12th day of September, 2016, from

17     9:18 a.m. to 11:13 a.m., before Julie C. Brandt, RMR,

18     CRR, and CSR in and for the State of Texas, reported by

19     machine shorthand, at the offices of Gray Reed & McGraw,

20     P.C., 1601 Elm Street, Suite 4600, Dallas, Texas,

21     pursuant to the Federal Rules of Civil Procedure and the

22     provisions stated on the record or attached hereto.

23

24

25



Case 2:16-cv-01007-R-AJW Document 109 Filed 09/19/16 Page 93 of 208 Page ID #:10888

ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                    2

```
 1                  A P P E A R A N C E S

 2

     FOR THE PLAINTIFF:
 3
           Amjad Mahmood Khan
 4         BROWN, NERI, SMITH & KHAN LLP
           11766 Wilshire Blvd., Suite 1670
 5         Los Angeles, California 90025
           310.593.9890
 6         amjad@bnsklaw.com

 7

     FOR THE DEFENDANTS KIERAN CASSIDY AND PPC CLAIM LIMITED:
 8
           Erik Syverson (via telephone)
 9         RAINES FELDMAN
           9720 Wilshire Blvd., 5th Floor
10         Beverly Hills, California 90212
           310.440.4100
11         esyverson@raineslaw.com

12

     FOR THE WITNESS:
13
           Jason S. Brookner
14         GRAY REED & McGRAW, P.C.
           1601 Elm Street, Suite 4600
15         Dallas, Texas 75201
           214.954.4135
16         jbrookner@grayreed.com

17

     VIDEOGRAPHER:
18
           Ryan Fickling - Esquire Deposition Solutions
19

20

21

22

23

24

25
```



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              3

```
1                          INDEX
                                              PAGE
2
     Appearances...................................    2
3    Proceedings...................................    4
     Stipulations..................................   98
4
     ADRIANA HUTTON
5         Examination by MR. KHAN..................    5

6    Signature and Changes.........................  100
     Reporter's Certificate........................  102
7

8    DEPOSITION EXHIBITS                        IDENTIFIED

9    Exhibit 9        Subpoena........................    9

10   Exhibit 10       March 2016 e-mail string........   35

11   Exhibit 11       March 2016 e-mail string........   56

12   Exhibit 12       March 2016 e-mail string........   84

13   Exhibit 13       March 2016 e-mail string........   90

14

15

16

17

18

19

20

21

22

23

24

25
```



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 95 of 208   Page ID #:10890

ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                    4

```
 1            P R O C E E D I N G S

 2            THE VIDEOGRAPHER:  We are now on the

 3   record for the video deposition of Adriana Hutton.  The

 4   time is 9:20 on September 12th, 2016.  This is the

 5   matter of ReachLocal, Incorporated versus PPC Claim

 6   Limited, et al., being held in the United States

 7   District Court for the Central District of California,

 8   Civil Action No. 2:16-CV-001007-R.

 9            Counsel, will you please introduce yourselves

10   for the record.

11            MR. KHAN:  Good morning.  This is Amjad

12   Khan of Brown Neri Smith & Khan representing the

13   Plaintiff ReachLocal.

14            MR. BROOKNER:  Jason Brookner --

15            MR. SYVERSON:  And this is --

16            MR. BROOKNER:  Oh, sorry, Erik.  Go

17   ahead.

18            MR. SYVERSON:  This is Erik Syverson on

19   the telephone from the law firm of Raines Feldman

20   representing the Defendants Kieran Cassidy and PPC Claim

21   Limited.

22            MR. BROOKNER:  Jason Brookner from Gray

23   Reed & McGraw on behalf of Ms. Hutton.

24            THE VIDEOGRAPHER:  Will the court

25   reporter please administer the oath.
```



ADRIANA HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                         5

```
 1                      ADRIANA HUTTON,

 2  having been first duly sworn, testified as follows:

 3                       EXAMINATION

 4  BY MR. KHAN:

 5       Q.   Good morning, Ms. Hutton.

 6       A.   Good morning.

 7       Q.   Thank you for being here.  Would you let me

 8  know where you work currently?

 9       A.   Projection Technologies Corporation DBA

10  InLight Gobos.

11       Q.   I didn't catch the full name.  Projection?

12       A.   Technologies.

13       Q.   Technologies.

14       A.   Corporation.

15       Q.   Corporation.  And you mentioned then InLight

16  Gobos.  Is that all one name?

17       A.   It's a DBA.

18       Q.   It's a DBA.  Okay.

19       A.   InLight, one word, and then Gobos.

20       Q.   And how long have you worked there?

21       A.   Eight years.

22       Q.   And what is your current position there?

23       A.   Vice president of operations.

24       Q.   I'm going to get into a little bit more about

25  your employment background, but before I do, I just
```



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 97 of 208   Page ID #:10892

ADRIANA HUTTON                                           September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                         6

1   wanted to ask if you've ever been deposed before?

2        A.   No.

3        Q.   Okay.  So this can be a rather unusual

4   process, so I'll try to demystify it a little bit.  I

5   really only have five ground rules, which make for an

6   easier process.

7             The first is please try to avoid speaking over

8   me or any of the lawyers, you know, your lawyer at this

9   table or Mr. Syverson who is on the phone.  And that's

10  only because the court reporter can only record one

11  thing at a time.  So here is how the flow will go.  I'll

12  ask a question, and then your lawyer will be able to

13  object to my question, and then you'll be able to

14  provide your answer.  So if you can keep that sequence,

15  that will help.

16            And for my part, I'll try not to cut you off

17  and let you finish your answer before I ask another

18  question.  For your part, it would be great if you don't

19  answer until I've completed the question.  Does that

20  make sense?

21       A.   Yes, it does.

22       Q.   The second ground rule is that -- and you're

23  already off to a good start, but please try to answer

24  every question with an audible response, like a yes or a

25  no, because uh-huhs or huh-uhs don't really translate



1  well on the transcript.  Is that okay?

2      A.   Correct.

3      Q.   And third is that we're entitled to your best

4  testimony today, and that includes your best estimates

5  or approximations.  Now that can be a little bit tricky

6  for folks who aren't lawyers, so there's a difference

7  between an estimate and a guess.  So as an example, if I

8  were to ask you how much money you have in your pocket,

9  while you may not know the exact number, you may be able

10  to estimate roughly how much money you have in your

11  pocket because you probably put the money in your pocket

12  yourself, you have a good idea how much money you took

13  out of the bank, how much you spent, and you have a

14  certain amount of money in your pocket.  So that's an

15  estimate.  But if I were to ask how much money I have in

16  my pocket, because you haven't seen my wallet, anything

17  you say would be a pure guess.  So you haven't seen the

18  contents of my wallet.  You have no point of reference

19  of what's in my pocket.  So that would just be a wild

20  guess.  So do you understand the difference --

21      A.   I do.

22      Q.   -- and distinction?

23          MR. BROOKNER:  And I object to that

24  instruction.

25          MR. KHAN:  Okay.



1      Q.   (BY MR. KHAN)  So I don't want wild guesses.

2   I just want best estimates.

3      A.   (Witness nods head.)

4      Q.   And the fourth ground rule is we won't be here

5   for very long.  This is a shorter deposition.  And so --

6   but you can take a break at any time you want.  That's

7   totally up to you.  The only caveat is that if there's a

8   question pending, you have to answer it and then you can

9   take a break.  Is that okay?

10     A.   Yeah.

11     Q.   And finally, it's my job to ask questions that

12  you can understand.  So if you don't understand

13  something, which is entirely likely at some point this

14  morning, just let me know and I'll try to rephrase it.

15  Is that okay?

16     A.   Sounds good.

17     Q.   I have to ask this question.  Are you under

18  the influence of any medications that could affect your

19  testimony today?

20     A.   I am taking pain medication, yeah.

21     Q.   Okay.  I don't need to know all the detail,

22  but will that medication in any way impact your ability

23  to testify truthfully today?

24     A.   It doesn't.

25     Q.   Okay.  So I would like the court reporter to



 1  please mark this document as an exhibit.

 2                    (Exhibit 9 marked.)

 3       Q.   (BY MR. KHAN)  And it's marked as Exhibit 9,

 4  continuing the numbering from the deposition previously.

 5  And this is a copy of the subpoena that was issued to

 6  you.  If you would take a moment to review that.  So

 7  have you seen the document before?

 8       A.   Yes, I have.

 9       Q.   And what does this appear to be to you?

10       A.   What do you mean?

11       Q.   What is it?  What is the document, as you

12  understand it?

13       A.   It requests for me to show up for this

14  deposition and to provide you with the documents

15  necessary.

16       Q.   Right.  And in Attachment A, which is, I

17  guess, marked Exhibit A, there are a list of

18  instructions and then 12 requests for production.

19       A.   Yes.

20       Q.   Did you review that?

21       A.   Yes.

22       Q.   And have you searched for all of the documents

23  that are included in here?

24       A.   Yes, I did.

25       Q.   Okay.  I just wanted to get a little bit of an



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 101 of 208   Page ID #:10896

ADRIANA HUTTON                                      September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      10

1   understanding of the search.  Where did you search for

2   these documents?

3        A.   My communications were through Facebook and

4   e-mail, so that's what I provided.

5        Q.   When you say your communications, what are you

6   referring to?

7        A.   E-mails and exchanges with Cassidy.

8        Q.   Okay.

9             MR. BROOKNER:  Let me just state.  We did

10  provide the documents via e-mail and hard copy this

11  morning.  I want to note that one of the e-mail chains,

12  the very first communication, is a lawyer client

13  communication that does not have any third parties on

14  it.  Rather than have to spend time and energy redacting

15  or creating a log, we just left it there.  So -- but

16  that should not be deemed a waiver of any of the

17  attorney/client privilege.

18            MR. KHAN:  You're referring, Jason, to an

19  e-mail that you had with your client?

20            MR. BROOKNER:  That's correct.

21            MR. KHAN:  Okay.

22            MR. BROOKNER:  The bottom of the chain is

23  an e-mail between, I think, you and I or maybe me and

24  Erik.

25            MR. KHAN:  Okay.



1            MR. BROOKNER:  But there is -- no, it was

2    with you and I, because it was about the subpoena.  And

3    it was just my direction to Rick and Adriana about what

4    to do and when to do it, but that is not to be construed

5    as a waiver of the privilege by any mean.

6            MR. KHAN:  Okay.  Understood.

7        Q.   (BY MR. KHAN)  And I did receive those

8    documents this morning from your counsel.  Just going

9    through each of these, you had mentioned that you had

10   searched for communications via Facebook and e-mails

11   between you and Cassidy.  That's request number 1, if

12   you can turn to --

13       A.   Yes.

14       Q.   -- page 4 of the subpoena.

15            And did you also review requests 2 through 12,

16   which ask for different communications and documents?

17       A.   I did.

18       Q.   And in so reviewing, for example,

19   communications with PPC Claim, communications with Erik

20   Syverson, Scott Lesowitz, et cetera, the areas in which

21   you searched for include your e-mails and your Facebook

22   messages?

23       A.   Correct.  I never communicated with anybody

24   else.

25       Q.   Okay.  So those are the only two means you



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 103 of 208  Page ID #:10898

ADRIANA HUTTON                                             September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                          12

1    communicated?

2         A.    Correct.

3         Q.    Okay.  In the course of reviewing this and

4    searching for documents, did you speak to Rick Hutton?

5         A.    Yeah.

6         Q.    And who --

7         A.    Yes, I did.

8         Q.    Who is Rick Hutton?

9         A.    He works with me.  He's the president of the

10   company and also my husband.

11        Q.    Okay.  How long has he been president of the

12   company?

13        A.    Since the opening, 12 years, 13 years.

14        Q.    And do you understand that he also received a

15   separate subpoena with similar document requests?

16        A.    I do.

17        Q.    Did you speak to anyone else at InLight -- is

18   it okay if I refer to your employer as InLight --

19        A.    Yes.

20        Q.    -- just as a shorthand?

21        A.    Yes.

22        Q.    Did you speak to anyone else at InLight in

23   preparing to respond to this subpoena?

24        A.    No, I didn't.

25        Q.    And on that point, what did you do to prepare



ADRIANA HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                        13

```
 1   for today's deposition?

 2        A.   Just looked at the documents that were

 3   requested, went through the communications.

 4        Q.   Okay.  And just -- did you speak to your

 5   lawyer in preparation for this?

 6        A.   Yes, I did.

 7        Q.   And I don't want to know what you spoke about.

 8   I just want -- and how many times did you meet him prior

 9   to today's deposition?

10        A.   A couple of times maybe.

11        Q.   Okay.  And how long -- approximately how long

12   did you meet with your lawyer in preparation for --

13        A.   About an hour.

14        Q.   Okay.  And did you speak to anyone else other

15   than your lawyer in preparation for the deposition?

16        A.   No, I didn't.

17        Q.   You spoke to Mr. Hutton?

18        A.   Uh-huh.

19        Q.   Okay.  And for -- approximately how long did

20   you speak to him specifically about preparing for this

21   deposition?

22        A.   To Rick?

23        Q.   Yeah.

24        A.   A couple of hours.

25        Q.   Okay.  Did you speak to Mr. Syverson --
```



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 105 of 208   Page ID #:10900

ADRIANA HUTTON                                              September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                          14

```
 1        A.    I did not.

 2        Q.    -- the lawyer to the defendants in the case?

 3        A.    I did not.

 4        Q.    At any point in time?

 5        A.    Huh-uh.

 6        Q.    Okay.  And did you speak to anyone at

 7   ReachLocal in preparation --

 8        A.    Well, I take that back.  The first time

 9   Mr. Syverson called, I answered the phone.

10        Q.    Okay.

11        A.    And when he mentioned this was a legal issue,

12   then I passed the phone call to Rick.

13        Q.    Do you remember when he called you?

14        A.    I do not.  I will say maybe two, three months

15   ago, but that will be just a total guess.

16        Q.    Okay.  And when he called you, you picked up

17   the phone.  And how did he introduce himself?

18        A.    I honestly do not recall.  I wasn't paying

19   much attention to -- I didn't think it was going to be a

20   big issue at the time, so I just -- you know, he

21   referred to something with ReachLocal, I believe, and he

22   say something about a legal matter.  So I just say,

23   well, let me let you --

24        Q.    Did you understand him to be a lawyer when he

25   called you?
```



ADRIANA HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      15

1      A.   I would say no.

2      Q.   Okay.  So he didn't introduce himself as a

3  lawyer?

4      A.   He may have.  I was just not, you know --

5      Q.   Okay.  Did he say that he was affiliated with

6  ReachLocal in any way?

7      A.   I believe that ReachLocal was mentioned, but

8  there was an issue between ReachLocal and PPC Claim

9  something.

10      Q.   Okay.

11      A.   Something of a legal matter that I just didn't

12  want to have anything to do with, so I put the right

13  person on the phone.

14      Q.   Right.  No, I understand.  I just wanted to

15  ask did he say that he's representing ReachLocal?

16      A.   I would say no.  I mean, I couldn't tell you

17  100 percent that that is true, so I would say no.

18      Q.   Okay.  And did he say he's representing Kieran

19  Cassidy?

20      A.   I can't tell you that either.  I --

21      Q.   Did he say he was representing --

22      A.   -- assumed it was a legal matter, but --

23      Q.   Did he say he was representing PPC Claim?

24      A.   I couldn't --

25      Q.   Okay.  Did he mention Mr. Cassidy or PPC Claim



1    in that phone call?

2        A.    I believe that he did because that was

3    probably why I decided to put Rick on the phone.

4        Q.    Okay.  How long did you speak to him?

5        A.    No more than two minutes probably.

6        Q.    And then you contemporaneously put Rick on the

7    line?

8        A.    Uh-huh.

9        Q.    Okay.  And do you know approximately how long

10   Rick spoke for him -- spoke with him, rather?

11       A.    Not too long, but I couldn't tell you.

12       Q.    Okay.  At the point you transferred the phone

13   to Mr. Hutton, did Mr. Syverson talk to you at all about

14   Kieran Cassidy?

15       A.    I couldn't tell you.

16       Q.    Okay.

17       A.    I just do not recall very well that

18   conversation.

19       Q.    Okay.  Did you speak to anyone at ReachLocal

20   prior to today's deposition?

21       A.    No.

22       Q.    Okay.  Did you speak to anyone at Compass

23   Point prior to today's deposition?

24       A.    When --

25       Q.    I'm speaking specifically -- it was a bad



 1  question.  In preparation for today's deposition.

 2      A.  In preparation, no.

 3          (Reporter clarification.)

 4          MR. BROOKNER:  Everyone, just let

 5  everyone finish before you answer or ask because you're

 6  starting to speak over each other.

 7          MR. KHAN:  Yeah.  Thank you.

 8      Q.  (BY MR. KHAN)  So just to ask the question

 9  again.  So did you -- in preparation for today's

10  deposition, did you speak at all to anyone at Compass

11  Point?

12      A.  Do not.

13      Q.  Okay.  So just to round this out, you spoke to

14  your lawyer, you spoke to Mr. Hutton, and that's it in

15  preparation for today's deposition?

16      A.  That is correct.

17      Q.  Okay.  So I want to talk a little bit about

18  InLight.  What is InLight in the business of?

19      A.  We manufacture products for the lighting

20  entertainment industry.

21      Q.  And where is the company based?

22      A.  In Dallas.

23      Q.  And is this the only location of the company?

24      A.  It is.

25      Q.  Okay.  And when was it founded?



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 109 of 208   Page ID #:10904

ADRIANA HUTTON                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                       18

1        A.    14 years ago.  Next year is our 15-year

2    anniversary.

3        Q.    Okay.  Congratulations.

4        A.    Thanks.

5        Q.    And you mentioned you are vice president of

6    operations.

7        A.    (Witness nods head.)

8        Q.    Have you always occupied that position?

9        A.    I was a general manager prior to that.

10        Q.    Okay.  Was that your first position, the

11    founding?

12        A.    (Witness nods head.)

13        Q.    Okay.  For how many years?

14        A.    I would say about three years I was the

15    general manager and then moved to vice president of

16    operations.

17        Q.    What was the scope of your duties as general

18    manager for InLight?

19        A.    Production schedules, client relationships,

20    artwork preparation, shipping.

21        Q.    When you say client relationships, does that

22    mean external facing clients or customers of InLight?

23        A.    We don't really have -- most of our contact is

24    through e-mail, so basically I'm the interface.  When

25    the order gets placed, I receive the orders and prepare



1  them.

2      Q.   But what I mean is that you're actually

3  interfacing -- even if it's by e-mail, but you're

4  interfacing with customers and clients?

5      A.   Yes.

6      Q.   What about actual vendors or third parties who

7  aren't customers with InLight?  Is it your

8  responsibility to interface with them?

9      A.   I do some of them, not all of them.

10     Q.   Okay.  When you --

11             MR. BROOKNER:  I have a clarification.

12  It seems like we're blending -- I think the original

13  question was about Adriana's duties when she was the

14  general manager as opposed to what they are today in her

15  position as vice president.  So --

16             MR. KHAN:  I'm speaking about her

17  position as general manager right now.  I'll get to the

18  vice president of operations.

19     Q.   (BY MR. KHAN)  So as general manager, in the

20  few years that you were working as general manager since

21  the founding of the company, what were your job duties?

22  You mentioned a few, and I just wanted -- one of them, I

23  think, was client relationships or managing client

24  relationships, and so my question is what does that

25  mean?



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              20

 1      A.   I basically receive the orders and prepare
 2  them and get them ready for production and follow the
 3  orders all the way to the end stage where they ship out
 4  to clients.
 5      Q.   Okay.  And I wanted to know whether you also
 6  service or interact with third parties who aren't
 7  InLight customers when you were a general manager?
 8      A.   A few times I do a little bit of advertising,
 9  a little bit of vendors.
10      Q.   Okay.  So let's talk a little bit about
11  advertising.  You worked with advertising companies to
12  help with your business.  Is that accurate?
13      A.   We have used them in the past.
14      Q.   And I meant when you're a general manager --
15  actually, let me step back.  Everything you're saying
16  right now as general manager, do you continue to do that
17  as vice president of operations?
18      A.   I do.
19      Q.   So it's just a different title, but it's
20  largely the same work.  Is that correct?
21      A.   Yes.
22      Q.   Okay.  So now the questions I'm going to ask
23  are going to speak broadly to just your role generally.
24  So back to advertising.  You said you work occasionally
25  with advertisers?



1    A.   (Witness nods head.)

2    Q.   And what specifically -- can you give me an

3  example of the type of work?

4    A.   I design ads for the company.  So I interact

5  with magazines on artwork specifications, deadlines and

6  that kind of stuff to get them the ads that we need.

7    Q.   Okay.  And do you work -- have you worked with

8  any outside company to assist with the marketing of

9  InLight Gobos?

10    A.   We hire Compass Point for them to manage our

11  online advertising for a period.

12    Q.   Okay.  So online advertising through a company

13  called Compass Point.  Okay.  Let me ask you a bit about

14  Compass Point.  What is Compass Point, as far as you

15  understand it?

16    A.   A third party that does website improvements

17  and advertising management for other companies.

18    Q.   Okay.  And where is it based?

19    A.   Dallas.

20    Q.   Okay.  And how did you come to learn of

21  Compass Point?

22    A.   They're two doors down from our building.

23    Q.   I see.  Okay.  When did you first learn of

24  Compass Point?

25    A.   A couple of years ago, I think.



1        Q.    Okay.  Did you -- prior to Compass Point, did

2    you work with any outside vendor for marketing of

3    InLight?

4        A.    Online you mean?

5        Q.    Let's start with online.

6        A.    No.  I was managing the Google AdWords

7    campaign myself.

8        Q.    Okay.  So you say you have a Google AdWords

9    campaign.  Is that something that's an important part of

10   InLight's business?

11       A.    It is advertising, so, yeah.

12       Q.    What does that mean, Google AdWords campaign?

13       A.    Basically when people search for products

14   related to our industry, then we want them to find our

15   company.

16       Q.    Okay.

17       A.    So we create ads to try to get people to visit

18   our website.

19       Q.    So you're responsible for most of that work?

20       A.    I do.  Yeah, I am.

21       Q.    Okay.  And you still are?

22       A.    Yes.  We really don't pay as much attention to

23   it as we should, but, yes, I am the person in charge of

24   that.

25       Q.    Okay.  And with respect to Compass Point, they



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                 23

```
 1   were -- did you actually hire them?
 2        A.    No.
 3        Q.    Did --
 4        A.    Rick.
 5        Q.    -- Mr. Hutton?
 6        A.    (Witness nods head.)
 7        Q.    Did you first learn of them or Mr. Hutton?
 8        A.    I believe together --
 9        Q.    Okay.
10        A.    -- we have a talk with Matt a long time ago
11   about what they could do to improve our website and do
12   the advertising part, and we decided to give them a try
13   on the Google part, not the website part.
14        Q.    Okay.  And by Matt, you mean Matt Ramsey?
15        A.    Matt Ramsey.
16        Q.    Okay.  And does -- InLight has a social media
17   presence.  Correct?
18        A.    Yes.
19        Q.    And define that presence.
20        A.    We don't really do much of social media.  We
21   do have a FaceBook account, a Twitter account.
22        Q.    Okay.  Let's start with Facebook.  How active
23   is that account?  How often do you use it?
24        A.    Not very much.  Not very active.
25        Q.    Okay.  So by that do you mean like do you not
```



ADRIANA HUTTON                                     September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              24

```
 1   check it daily?
 2        A.   I check it, of course.
 3        Q.   Okay.
 4        A.   But we don't post, and we don't use it --
 5        Q.   Okay.
 6        A.   -- as advertising as much.
 7        Q.   Do you interact with customers by Facebook?
 8        A.   If I receive requests, yes, I do.
 9        Q.   Okay.
10        A.   We don't reach out to them, but if they reach
11   out to us, we'll, of course, respond to that.
12        Q.   Do you work with any third party vendors via
13   Facebook?
14        A.   No.
15        Q.   Do they communicate with you via FaceBook?
16        A.   No.
17        Q.   How about Twitter?
18        A.   I honestly haven't checked our Twitter account
19   in years.  We have it, but it's not active.
20        Q.   So if you're going to have a communication or
21   an interaction on Facebook, it's typically client
22   facing?
23        A.   It will most --
24        Q.   Okay.
25        A.   -- yeah, likely be that.
```



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 116 of 208   Page ID #:10911

ADRIANA HUTTON                                            September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                           25

 1      Q.   Okay.  Back to Compass Point, did you enter

 2  into a contract with Compass Point at any point in time?

 3      A.   You will have to ask Rick that question.  I

 4  would imagine so, but I'm not sure.

 5      Q.   I'm sorry.  I would have to ask?

 6      A.   Rick.

 7      Q.   Oh, ask Rick the question.  I'm sorry.  I

 8  didn't catch that.

 9           And do you know what you hired Compass Point

10  to do?

11      A.   They want us to give them a try and see if we

12  can get any more business through their online

13  advertising.

14      Q.   And what specifically would they be doing for

15  you?

16      A.   Doing -- managing our advertising online

17  through, I believe, Google, Yahoo! and another search

18  engine.  I can't remember what it was.

19      Q.   Was it Bing?

20      A.   Possibly.

21      Q.   At some point in time you learned that InLight

22  hired Compass Point.  Is that right?

23      A.   Yeah, I was aware that we were looking into

24  it, and we did.

25      Q.   Okay.  And you just don't know whether there



ADRIANA HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      26

1  was a contract or not?

2       A.    (Witness shakes head.)

3       Q.    Okay.  And that was approximately two years

4  ago?

5       A.    I believe we were on a monthly --

6       Q.    Okay.

7       A.    -- basis, but I can't tell you that for sure.

8       Q.    Okay.  With respect to Compass Point, would

9  Mr. Ramsey or anyone else at Compass Point actually tell

10  you about specific products to use?

11      A.    I don't believe so.

12      Q.    Okay.  So they would just try to develop ways

13  to optimize --

14      A.    We just caused the search words that we

15  thought the word would give us the more benefit, and we

16  look into the advertising that they created for the

17  words and discussed if they were appropriate.  So we

18  discussed the campaign.

19      Q.    Do you know approximately how much -- well,

20  let me unpack this a bit.  How frequently do you use

21  Compass Point's services?

22      A.    It was, like I say, in a monthly base, they

23  have a budget to use in the monthly base.

24      Q.    Like a budget spend?

25      A.    Correct.



ADRIANA HUTTON                                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                                27

1     Q.    Okay.   Do you know approximately how much your

2  budget spend has been over the course of these last few

3  years?

4     A.    I believe it was $1,000 a month.

5     Q.    Okay.

6     A.    And then we will pay an additional fee to

7  Compass Point marketing to analyze that data.

8     Q.    So is it fair to say that you spent

9  approximately $12,000 a year on Compass Point in

10  addition to fees?

11     A.    If we used them for a year, then, yes, that

12  will be correct.

13     Q.    But you've testified that you think you've

14  used them for a few years.   Correct?

15     A.    I believe so.

16     Q.    So that would be roughly $24,000, plus fees of

17  spend that you've paid Compass Point?

18     A.    Rick will give you a better answer to that.  I

19  just know --

20     Q.    Okay.

21     A.    -- what the monthly budget was, but not the

22  length of the contract for sure.

23     Q.    Okay.   And how long have you known Matt

24  Ramsey?

25     A.    Probably for as long as I've been working



1    there.  I would say, you know, seven, eight years.

2        Q.   Seven, eight years.  But in official business

3    capacity, just the last few years?

4        A.   Correct.

5        Q.   Did you have any business relationship in any

6    other context?

7        A.   Would you repeat that?

8        Q.   Did you have a relationship with him in the

9    business context otherwise other than Compass Point?

10       A.   No.

11       Q.   Anyone else at Compass Point that you worked

12   with?

13       A.   I've talked to a few of his people, you know,

14   and -- when something didn't make sense on the report or

15   whatever, but not, you know, like on a daily basis or a

16   constant basis.

17       Q.   So he was your primary point of contact with

18   Compass Point?

19       A.   (Witness nods head.)

20            And then he will -- if he wouldn't know the

21   answer, then he will refer us to somebody else to

22   discuss it.

23       Q.   Okay.  Have you ever heard of a company called

24   ReachLocal?

25       A.   Yeah.



ADRIANA HUTTON                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      29

1        Q.    What is ReachLocal?

2        A.    I believe it's the company that managed the

3   advertising, that Compass marketing uses to manage our

4   advertising.

5        Q.    So you're saying that ReachLocal is the

6   company Compass Point uses to manage your advertising?

7        A.    Correct.

8        Q.    InLight's advertising?

9        A.    Correct.

10       Q.    Okay.  So help me understand that.  So Compass

11  Point has a separate relationship with ReachLocal, and

12  then it tells you that ReachLocal products can be

13  beneficial for InLight.  Is that accurate?

14       A.    The reason why I know it was ReachLocal is

15  because we would receive two different bills, one from

16  ReachLocal on the advertising and one for Compass

17  Marketing on the -- analyzing the data.

18       Q.    Okay.

19       A.    I don't recall if we discussed with Matt

20  Ramsey what Reach was doing exactly.

21       Q.    Okay.  So -- but is it fair to say that

22  Compass Point was using ReachLocal for advertising

23  services for your company?

24       A.    Yes.

25       Q.    Okay.  And with respect to evaluating the data



1  or evaluating advertising data, that's something Compass

2  Point was doing directly?

3        A.    I believe so.

4        Q.    Okay.  You said you would receive two bills.

5  Would the bills come to you?

6        A.    I was copied.

7        Q.    Okay.  And when you say you received a bill

8  directly from ReachLocal, it had ReachLocal's logo on

9  it?

10       A.    I'm very positive, but I can't tell you

11  100 percent for sure.

12       Q.    Okay.  Did it have any point of contact

13  written on the bill from ReachLocal?

14       A.    I can't tell you.

15       Q.    Okay.  Did you ever speak to anyone at

16  ReachLocal about the account?

17       A.    I don't believe so.

18       Q.    Okay.  So you had no direct communications

19  with ReachLocal with respect to the advertising that

20  they were doing for you?

21       A.    As far as I know, yeah, I have not.

22       Q.    Okay.  Do you know if Mr. Hutton has?

23       A.    I don't believe so, but I couldn't tell you.

24       Q.    So you knew that Compass Point had a

25  relationship with ReachLocal and InLight was using



ADRIANA HUTTON                                September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                            31

1   ReachLocal products.  Correct?

2        A.   Yes, that's an assumption.

3        Q.   But you had no relationship with --

4        A.   Directly with --

5        Q.   -- ReachLocal directly?

6        A.   Excuse me.  Directly with Reach, I did not

7   have any relationship.

8        Q.   Do you know of anyone who works there

9   currently who's managing the InLight -- or I know

10  InLight is no longer using ReachLocal products.  But

11  when it was, do you know anyone at ReachLocal who

12  Mr. Ramsey was working with?

13            MR. BROOKNER:  Objection to the form.

14       Q.   (BY MR. KHAN)  It was a bad question.  Let me

15  try again.

16            Did you work with anyone directly at

17  ReachLocal about advertising or analysis of data for

18  your company?

19       A.   I didn't.

20       Q.   Okay.  Did Mr. Hutton?

21       A.   I do not know.

22       Q.   Okay.  And did Mr. Ramsey ever communicate to

23  you conversations he had with ReachLocal?

24       A.   I don't believe so.  I don't recall any.

25       Q.   Okay.  So your -- I just want to get your



ADRIANA HUTTON                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                        32

 1  complete understanding of ReachLocal.  So you understand
 2  it to be a company that Compass Point uses to help
 3  manage the advertising of InLight.  Correct?
 4        A.   Correct.  A third party account, yeah.
 5        Q.   Third party account you call it.  Okay.
 6             Do you know anything else about ReachLocal,
 7  its business, its operations?
 8        A.   I don't know.
 9        Q.   Do you know where it's based?
10        A.   I do not.
11        Q.   Do you know if it has a Texas presence?
12        A.   I do not.
13        Q.   Okay.  Have you ever heard of someone by the
14  name of Kieran Cassidy?
15        A.   Yes.
16        Q.   Who is Kieran Cassidy?
17        A.   A person who contact the InLight FaceBook
18  account online.
19        Q.   A person who contacted the InLight FaceBook
20  account online.  Okay.  So we'll have to step back and
21  understand that.
22             First, before we get into his contact with
23  InLight, I just want to know do you know who he is?
24        A.   I don't.
25        Q.   Do you know where he's based?



ADRIANA HUTTON                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                    33

 1        A.   I believe he's in the UK.

 2        Q.   In the UK.  How do you know that?

 3        A.   Because the information he provided was from

 4   the UK.

 5        Q.   Okay.  And do you know a company called PPC

 6   Claim?

 7        A.   I don't.

 8        Q.   Okay.  Have you ever been contacted by a

 9   company called PPC Claim?

10        A.   I don't recall.

11        Q.   You don't recall or you don't know?

12        A.   I don't.

13        Q.   You --

14        A.   I'm very positive I have not been contacted by

15   PPC Claim.

16        Q.   By PPC Claim.  Okay.

17             But you have been contacted by Mr. Cassidy?

18        A.   Correct.

19        Q.   Okay.  Do you know if Mr. Cassidy has any

20   connection to PPC Claim?

21        A.   I don't -- well, I guess from the legal issue

22   in question, I guess, yes.

23        Q.   Okay.  But apart from the legal issue --

24        A.   Before --

25        Q.   -- do you have any understanding that Cassidy

ADRIANA HUTTON                                                September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                            34

1  was representing PPC Claim in any way?

2       A.   No.

3       Q.   Did he say he was representing PPC Claim --

4       A.   No.

5       Q.   -- in any way to you?

6            Okay.  When was the first time that

7  Mr. Cassidy -- well, did you ever speak to Mr. Cassidy

8  directly?

9       A.   No.

10      Q.   Over the phone?

11      A.   I did not.

12      Q.   Did you ever interact with him over e-mail?

13      A.   No.

14      Q.   Did you ever interact with him over Twitter?

15      A.   No.

16      Q.   And did you ever interact with him over

17  FaceBook?

18      A.   Yes.

19      Q.   And when was that?

20      A.   March 2nd, I believe.

21      Q.   Prior to March 2nd did you have any

22  interactions with Mr. Cassidy?

23      A.   I didn't.

24      Q.   So is it fair to say that his communication to

25  you was the first you ever heard of him?



 1      A.   That is correct.

 2      Q.   First interaction you ever had with him?

 3      A.   Yes.

 4           MR. KHAN:  I would like the court

 5  reporter to mark this document as Exhibit 10.

 6           (Exhibit 10 marked.)

 7      Q.   (BY MR. KHAN)  Take a moment to review it.

 8  It's a six page document.

 9      A.   I haven't looked at this link in a while, but

10  it seems correct, the raw data behind ReachLocal.

11      Q.   I'll be asking questions about the document.

12  I just want you to take a look at it.

13      A.   Yes, I recognize this.

14      Q.   When you're ready, I'll ask a few questions.

15  Thank you.

16           What is this document?

17      A.   My communication with Matt Ramsey from Compass

18  Point.

19      Q.   Okay.  So your communication with Matt Ramsey

20  from Compass Point.  Is that what is referred to in the

21  first page?  Is that the first page of this document?

22      A.   Yes.

23      Q.   Okay.  And is this an e-mail from you to

24  Mr. Ramsey on Wednesday, March 2nd at 9:56 a.m.?

25      A.   Yes, it is.



1    Q.   And Matt Ramsey's e-mail is

2  Matt@GetPointed.com?

3    A.   That's correct.

4    Q.   Matt works for Compass Point?

5    A.   Correct.

6    Q.   And Compass Point was managing online

7  marketing for InLight.  Correct?

8    A.   Correct.

9    Q.   At this time for how long had Compass Point

10  been managing InLight's online presence?

11    A.   I don't remember exactly.  Rick will answer

12  that more accurately.

13    Q.   Is it fair to say that you were already in

14  business with Compass Point at this point?

15    A.   We were doing business with Compass Point --

16    Q.   In 2015 did you have a relationship with

17  Compass Point or did you do business with Compass Point?

18    A.   I believe so.

19    Q.   So at this point in time you had a preexisting

20  relationship with Compass Point.  Correct?

21    A.   Yes.

22    Q.   Okay.  And the subject line says ReachLocal.

23  Do you see that?

24    A.   Uh-huh.

25    Q.   Okay.



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              37

 1                    MR. BROOKNER:  Let me just remind you.

 2      Take a minute before you answer to let counsel finish

 3      the question so we have a clean record.  Okay?

 4                    THE WITNESS:  Got it.

 5          Q.   (BY MR. KHAN)  I think I asked this earlier,

 6      but I want to get your best approximation.  When did

 7      InLight first start using ReachLocal products?

 8                    MR. BROOKNER:  Objection.  Asked and

 9      answered.  And you can answer if you remember.

10          A.   I don't.

11          Q.   (BY MR. KHAN)  Okay.  And do you know when

12      InLight stopped using ReachLocal products?

13          A.   Yeah.

14          Q.   Okay.

15          A.   We had discussed stopping the campaign during

16      the slow time for us, which is the summertime, so I

17      believe we were going to start April.

18          Q.   April of 2016.  Correct?

19          A.   Correct.

20          Q.   Okay.  So turning to this e-mail, the first

21      line says, Hi Matt, I hope you're doing well.  And I

22      want to unpack portions of this.  The first part you

23      say, I received the attached message yesterday.  Is that

24      correct?

25          A.   Correct.



1    Q.   In the -- on page 2, there is a screenshot of

2  what appears to be a message on FaceBook?

3    A.   Correct.

4    Q.   And on the top it says Kieran Cassidy.

5    A.   Uh-huh.

6    Q.   Does this refresh your recollection that this

7  is the message that Mr. Cassidy sent you for the first

8  time?

9          MR. BROOKNER:  Objection, to the extent

10 it mischaracterizes the testimony as her having to

11 recall anything or not recall it.  But you can answer.

12   A.   This is the first time I communicated with

13 Kieran Cassidy.

14   Q.   (BY MR. KHAN)  Okay.  And this InLight Gobos

15 right in the middle, that's your FaceBook logo and

16 FaceBook page for the company?

17   A.   Yes, it is.

18   Q.   And you manage this.  Correct?

19   A.   Yes, I do.

20   Q.   Anyone else manage this?

21   A.   We have some other people that have access to

22 it as administrators, yes.

23   Q.   The message -- it has a timestamp.  It doesn't

24 have a date stamp, although your e-mail says I received

25 the attached message yesterday.



ADRIANA HUTTON                                      September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              39

```
 1        A.   (Witness nods head.)
 2        Q.   So I just want to clarify.  Would this message
 3  have been received on Tuesday, March 1st?  So if you can
 4  turn, Ms. Hutton, to page -- the first page, do you see
 5  in the e-mail it says, I received the attached message
 6  yesterday?
 7        A.   (Witness nods head.)
 8        Q.   So my question is is this the attached message
 9  to which you're referencing?
10        A.   Yes.
11        Q.   So would that have been received then
12  yesterday, meaning March 1st?
13        A.   I believe that's correct.
14        Q.   Okay.  And 12:59 p.m. is the time you would
15  have received the message?
16        A.   I believe that's the time he sent it --
17        Q.   Okay.
18        A.   -- because of the time difference.
19        Q.   Yes, you're right.  You're right.
20        A.   So --
21        Q.   That's correct.  So he sent -- Mr. Cassidy
22  sent the message at 12:59 p.m.?
23        A.   (Witness nods head.)
24        Q.   Do you remember when you received the message?
25  That same day, I assume?
```



1      A.   That -- whatever that day was in the morning.

2  I usually check my e-mails and my FaceBook, so --

3      Q.   Okay.  Understood.  So in this message he

4  says, Hello.  And you respond, Hi Kieran, How can we

5  help you?  Did you -- at this point of the conversation

6  in this FaceBook chat -- I guess it's a dynamic chat --

7  did you understand him to be a customer, potential

8  customer of InLight?

9      A.   That's what I thought.

10     Q.   Okay.  And the message after you say, Hi,

11  Kieran, how can we help you? he says, I noticed you are

12  using ReachLocal for your marketing.  Did you hear about

13  what they did to all the UK businesses?  Do you know

14  that they keep most of your money instead of spending it

15  on AdWords?

16          Is this -- did you respond at all to that

17  message?

18     A.   Yes, I did.

19     Q.   Okay.  So is this second page not a complete

20  transcript of the FaceBook message?

21     A.   There should be more.

22     Q.   Okay.  Well, your counsel produced some

23  documents today, so let me take a look.  Just bear with

24  me a moment.

25     A.   Uh-huh.



```
 1      Q.   There doesn't appear to be any further
 2  message.
 3      A.   There should be another screenshot when I ask
 4  him if he had any proof, and that's where he send the
 5  link to the article that's attached to this.
 6      Q.   Okay.  Well, I'll get to that in a moment, but
 7  with respect to this -- just this message, which is the
 8  message that you received initially, this is the full
 9  extent of the communications you had with him that day?
10      A.   This page?
11      Q.   Yes.
12      A.   I respond asking him for proof.
13      Q.   Okay.  So there is a message after he sent
14  this one where you asked him for proof?
15      A.   Correct.
16      Q.   Would that be a FaceBook -- you asked him --
17      A.   Through FaceBook, yes.
18      Q.   And I don't see that message here.  I haven't
19  seen it in the records that your counsel has produced or
20  that's in your possession, but is it safe to assume that
21  the question that you asked was can you provide proof or
22  would you provide proof?
23      A.   I believe my exact words were, Do you have any
24  proof?
25      Q.   Do you have any proof?
```



```
 1          And that is consistent with your e-mail here
 2  on the first page where you say, I asked him if he had
 3  any proof, and meaning you asked Mr. Cassidy.  Correct?
 4      A.   (Witness nods head.)
 5      Q.   Okay.  We'll talk a little bit about the proof
 6  that he provided in a bit.  When you received the
 7  message from Mr. Cassidy that's here on page 2, what did
 8  you make of this message?
 9      A.   I just was curious to see what he had to say.
10  At this point I didn't know what he was talking about,
11  so I just wanted to hear what it was.
12      Q.   Okay.  And did you -- did you think that he
13  was a customer at this stage?
14      A.   No.  At this point --
15      Q.   Okay.
16      A.   -- I figured he was not a customer, potential
17  customer.
18      Q.   I understand.  What did you figure he was?
19      A.   Somebody that had some issues with ReachLocal
20  probably.
21      Q.   Someone who had issues with ReachLocal.  Okay.
22  And why do you say that?
23      A.   Because somebody is talking bad about that
24  company, so --
25      Q.   Okay.  So you understood this message that
```



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 134 of 208  Page ID #:10929

ADRIANA HUTTON                                      September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              43

 1  he's talking bad about ReachLocal?

 2        A.    Uh-huh.

 3        Q.    Okay.  Why do you say that?

 4        A.    Saying that they're keeping the money instead

 5  of using it for AdWords.

 6        Q.    Okay.  And at this point you understood who

 7  ReachLocal was?

 8        A.    Yeah.

 9        Q.    And you understood them to be working with

10  Compass Point.  Correct?

11        A.    Yeah.

12        Q.    And you understood that they were managing

13  InLight's online presence.  Correct?

14        A.    Yes.

15        Q.    Okay.  At this point in time, you had an

16  ongoing campaign with Compass Point?

17        A.    (Witness nods head.)

18        Q.    And therefore, you had an ongoing campaign

19  with ReachLocal.  Correct?

20        A.    (Witness nods head.)

21        Q.    And at this point in time, you don't know the

22  exact duration of how long you had had that campaign,

23  but would it be fair to say you had spent thousands of

24  dollars on ReachLocal --

25        A.    Probably.



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 135 of 208   Page ID #:10930

ADRIANA HUTTON                                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                                      44

1      Q.    -- at this point in time?

2            Okay.  You say here, Ms. Hutton, to Matt, I

3   thought you might want to see it.  Why did you think

4   that Matt should see both the message on FaceBook and

5   the proof that you asked for?

6      A.    Just was kind of a courtesy to his company.  I

7   figure he should be aware of what this person was saying

8   about the company he was using.

9      Q.    Why did you think he should be aware of it?

10     A.    Just as a courtesy.  I say, you know, he can

11  make his own decisions, he wants to be using this

12  company for business or not.

13     Q.    Okay.  When you say it's a courtesy, at this

14  point in time InLight was using ReachLocal products.

15  Correct?

16     A.    Yes.  We had -- excuse me -- we had already

17  talked to Matt about canceling for the upcoming

18  summertime.  So at this point, yes, we did have a

19  relationship, but we have also discussed stopping the

20  campaigns.

21     Q.    Okay.  Let me step back here.  So you

22  mentioned that you had already discussed with Mr. Ramsey

23  at Compass Point about canceling ReachLocal.  Let's step

24  back on that.  When did you have that discussion?

25     A.    That was Rick, again, so I cannot give you an



1 | exact time, but I know that at this point we had already
2 | made that decision.
3 |     Q.   Okay.   And I just want to understand the
4 | decision.
5 |     A.   Uh-huh.
6 |     Q.   Are you saying the decision to cancel Compass
7 | Point's engagement with your company?
8 |     A.   Correct.
9 |     Q.   And that means to cease all business running
10 | any marketing online?
11 |     A.   Correct.
12 |     Q.   And so --
13 |     A.   Business online through them.
14 |     Q.   Through them, yes.
15 |     A.   We went back to our own Google AdWords.
16 |     Q.   Sure.   So you're saying prior to March 2nd,
17 | you had already communicated with Mr. Ramsey and Compass
18 | Point that you were terminating Compass Point's
19 | contract.   Correct?
20 |     A.   Yes, that is correct.
21 |     Q.   Approximately how long prior to this?
22 |     A.   I can't tell you.   That was Rick again.
23 |     Q.   So -- but can you approximate, because at this
24 | point in time on March 2nd, you're still communicating
25 | with Mr. Ramsey?



ADRIANA HUTTON                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      46

```
 1        A.   (Witness nods head.)
 2        Q.   So at this point if they had been terminated,
 3   why would you still be communicating with Mr. Ramsey?
 4        A.   We have discussed terminating it, and I'm very
 5   positive they already had a date for when that was going
 6   to be terminated, but we still had a relationship at
 7   this point.
 8        Q.   I see.  So I just want to understand.
 9        A.   Uh-huh.
10        Q.   So I understand, InLight -- and let me know if
11   I'm stating this incorrectly.  InLight had made a
12   decision to stop using Compass Point's services at a
13   future date?
14        A.   Correct.
15        Q.   And that future date was already determined?
16        A.   I'm very positive it was.
17        Q.   Okay.  And you're saying it was determined
18   before March 2nd?
19        A.   That's correct.
20        Q.   Do you know if it was determined in February?
21        A.   I can't tell you.
22        Q.   In January?
23        A.   I don't know.
24        Q.   Was it determined the year prior?
25        A.   (Witness shakes head.)
```



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                 47

1        Q.    Okay.

2        A.    I do not know the exact date.

3        Q.    Did you submit -- did you pay Compass Point at

4   any point in March?

5        A.    Pay them?

6        Q.    Yeah, pay them for their online presence,

7   because they had not terminated at that point.  Correct?

8        A.    I would imagine so, but I can't tell you for

9   sure.

10       Q.    So did you or Rick -- who was it, was it you

11  or Rick who communicated to Matt that InLight is

12  stopping the Compass Point contract?

13       A.    It was Rick.

14       Q.    That was Rick.  And -- and in so doing, had

15  you lined up a replacement vendor or third party to

16  manage the online presence?

17       A.    No, we haven't.

18       Q.    Did you make an internal decision within your

19  company that you would manage that yourself?

20       A.    That's correct.

21       Q.    Was that decision based -- what was that

22  decision based on?

23       A.    We were not getting the return that we

24  expected from the money we were spending on their

25  advertising campaign.



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              48

 1      Q.   And you say "they," you're talking about
 2  Compass Point?
 3      A.   Correct.
 4      Q.   So you're not getting a return on investment
 5  from Compass Point.  How would you -- what do you mean
 6  by return on investment?
 7      A.   We receive a report, as I mentioned, and we
 8  were getting less than 10 calls or contacts a day.
 9      Q.   Okay.
10      A.   And we were spending $1,000, so we didn't
11  think that was worth it.
12      Q.   Okay.  So back to the e-mail.  So at this
13  point in time on March 2nd, your testimony today is that
14  InLight had already made a decision to terminate the
15  Compass Point contract prior to ever receiving a message
16  from Mr. Cassidy.  Is that correct?
17      A.   That is correct.
18      Q.   Okay.  And you base that off of your own
19  personal knowledge or what you understood Mr. Hutton to
20  have said to you?
21      A.   What Rick and I have discussed.
22      Q.   Okay.  So both of you discussed terminating
23  the Compass Point contract?
24      A.   (Witness nods head.)
25      Q.   So it was very clear in your mind that the



1  contract was being terminated?

2        A.    Correct.

3        Q.    Okay.  Yet, nevertheless, you sent this

4  message from Mr. Cassidy to Mr. Ramsey.  And previously

5  you testified you sent it as a courtesy.

6        A.    Uh-huh.

7        Q.    What was -- what was the purpose of sending it

8  as a courtesy to Mr. Ramsey?  What did you hope for him

9  to do with the information?

10       A.    I have no hopes of anything.  I was just

11 sharing information with a business, company we've used

12 in the past for them to use the information as they see

13 it.

14       Q.    You say in this same e-mail that you asked

15 Mr. Cassidy if he had any proof of what he's saying in

16 here.  Why did you do that?

17       A.    To pass this information to Matt.

18       Q.    But what information specifically?

19       A.    If he had any proof, then I was going to

20 provide that proof to Matt.

21       Q.    So proof of what he's saying in the

22 allegations of what ReachLocal did to the UK businesses.

23 Correct?

24       A.    Correct.

25       Q.    Proof that ReachLocal spends most of its money



1  instead of spending it on AdWords?

2       A.    Uh-huh.

3       Q.    So that was the specific proof that you were

4  requesting from Mr. Cassidy?

5       A.    (Witness nods head.)

6       Q.    Did you not believe his statement when he said

7  it?

8       A.    I don't know the person.  I didn't know what

9  to believe, so --

10      Q.    But you did ask him for proof of it?

11      A.    Yes.

12      Q.    So you didn't just -- you didn't just forward

13 the information that's contained in these five or six

14 lines.  You wanted to actually get from Mr. Cassidy

15 proof of what he's saying, his allegations?

16      A.    Yes.

17      Q.    And you're saying the purpose of you getting

18 that proof was to pass it along to Mr. Ramsey as a

19 professional courtesy.  Is that correct?

20      A.    That is correct.

21      Q.    Were you at all bothered by what was mentioned

22 in Mr. Cassidy's statement?

23      A.    No, not at all.

24      Q.    You weren't bothered by the fact that

25 ReachLocal was keeping most of its money instead of

ADRIANA HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      51

1  spending it on AdWords?

2      A.   I didn't know that was the case.

3      Q.   If you understood it to be true, you asked for

4  proof.  Correct?

5      A.   I asked for proof, yes.

6      Q.   And you received that proof.  Correct?

7      A.   (Witness nods head.)

8      Q.   And that proof came in the form of the rest of

9  this document.  Right?

10     A.   (Witness nods head.)

11     Q.   Now let's talk about that document.  This

12  appears to be a screenshot of three or four pages.  This

13  is -- there's a link that you include in your e-mail to

14  Mr. Ramsey.  Does this document reflect that link?

15     A.   I believe so.  I have not looked at this link

16  since I receive it probably, and I didn't really pay

17  much attention to it, so --

18     Q.   You did receive this link.  Correct?

19     A.   Yes.

20     Q.   You did review the link.  Correct?

21     A.   I click on it, yeah, and I --

22     Q.   Okay.

23     A.   -- browsed through it, but I haven't looked at

24  it since then, I'm saying.

25     Q.   Okay.  Take a moment to review it now.



ADRIANA HUTTON                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                    52

```
 1          Are you ready?
 2     A.   Uh-huh.
 3     Q.   On the top it says PPC claims.  Do you see
 4 that?
 5     A.   Uh-huh.
 6     Q.   What did you understand that to mean?
 7     A.   I figured that will be the website where it
 8 was coming from.
 9     Q.   And this was something that was provided to
10 you by Mr. Cassidy.  Correct?
11     A.   Correct.
12     Q.   Does this -- did you understand that PPC Claim
13 was a company that was connected in any way to
14 Mr. Cassidy?
15     A.   Did not.
16     Q.   So you just understood that Mr. Cassidy sent
17 you this e-mail as proof, but you had no idea that he
18 was in any way connected to PPC Claim?
19     A.   That is correct.
20     Q.   Okay.  And in this e-mail it says the raw data
21 behind the ReachLocal platform.  Is that correct?
22     A.   Correct.
23     Q.   And having read it, is there anything in this
24 document that struck you as worth sharing with
25 Mr. Ramsey?
```



ADRIANA HUTTON                                September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                            53

 1      A.   I believe the decision was for him to decide

 2   if it was worth it or not, so I just forward the

 3   information for him.  I didn't evaluate it.  I didn't

 4   consider what it was.  I just forward to him for him to

 5   decide.

 6      Q.   Were you wondering about the contents of what

 7   Mr. Cassidy said, both in his message and in his -- in

 8   this link or e-mail that he sent?

 9      A.   I didn't.

10      Q.   But you read through both the message and the

11   contents --

12      A.   I clicked, yeah.  I believe I read it, yeah.

13      Q.   Did you speak to anyone -- did you speak to

14   Mr. Hutton about this message?

15      A.   Yeah.

16      Q.   When?

17      A.   Once I receive it.

18      Q.   Why did you do that?

19      A.   Just to let him know what was happening on

20   FaceBook.

21      Q.   To let him know what was happening -- what was

22   happening on FaceBook?

23      A.   That somebody contact us and it was not

24   business related, but --

25      Q.   What specifically did you tell Mr. Hutton



ADRIANA HUTTON                                   September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                            54

1   about this communication?

2        A.   I show him the communication.

3        Q.   So you showed him the FaceBook message?

4        A.   Uh-huh.

5        Q.   Did you tell him that you asked Mr. Cassidy

6   for proof?

7        A.   I believe so.

8        Q.   Did you show him the proof that you received

9   from Mr. Cassidy?

10       A.   That I don't know.

11       Q.   Okay.  Why did you think Mr. Hutton should

12  know about this?

13       A.   Because he owns the company and it's involving

14  FaceBook as well, so just informing him of that.

15       Q.   Did you have -- at this point you had

16  previously testified that you already made the decision

17  to let go of Compass Point.  Did this information that

18  you received in any way validate your decision?

19       A.   No.

20       Q.   Did you think it was a good decision because

21  of what's being said about ReachLocal?

22            MR. BROOKNER:  Objection to the form.

23  You can answer if you understand the question.

24       A.   No, it didn't affect.

25       Q.   (BY MR. KHAN)  Okay.  So you shared this with



ADRIANA HUTTON                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      55

 1  Mr. Hutton for what purpose?

 2       A.   Just to let him know that we have received

 3  that through FaceBook.

 4       Q.   Okay.  And to not take any further action?

 5       A.   Oh, yeah -- no.  No further action.

 6       Q.   And did Mr. Hutton respond in any way to your

 7  communication?

 8       A.   I don't believe so.

 9       Q.   Okay.  So he just looked at -- did he review

10  the material?

11       A.   I believe so.  I don't remember exactly.

12       Q.   Did he have any communication with you about

13  following up on the information that's contained in

14  Mr. Cassidy's message?

15       A.   I let him know later on that Mr. Cassidy

16  continue to send couple of e-mails through FaceBook and

17  say something about a class action suit or something and

18  that we obviously were not interested, so we just

19  ignored the rest of the messages.

20       Q.   Okay.  Well, backing up there.

21       A.   Uh-huh.

22       Q.   I thought the full extent of -- what is the

23  full extent of the communications with Mr. Cassidy?

24       A.   This was the full extent of this part.  There

25  are more attachments in there where after we received



1   this information from him, I forward it to Matt Ramsey

2   at Compass Point, and he responded to me with a letter

3   explaining who this person was.

4        Q.   Okay.

5        A.   And I forward that to Mr. Cassidy.  And then

6   after that we -- he communicated with us a few times,

7   but we didn't respond to any of his communications.

8        Q.   All right.  So let's just mark this as an

9   exhibit.  This is a document that was produced today by

10  your counsel.  This is the only copy I have.  I'll try

11  to see if I can pull it up online, but I think I'm going

12  to mark the entire document as Exhibit -- we're on --

13       A.   11.

14       Q.   -- 11.  And I'll hand it to you, and I'll see

15  if I can get a copy online here.

16                 (Exhibit 11 marked.)

17                 MR. BROOKNER:  I've also given you -- in

18  the PDF e-mail I sent you --

19                 MR. KHAN:  Yeah.

20                 MR. BROOKNER:  -- this is in that PDF

21  e-mail.  And this, by the way, is also --

22                 THE WITNESS:  It's not the -- no, it's in

23  the folder, yeah.

24                 MR. BROOKNER:  Okay.  And let me know

25  when you reach a good breaking point to just take a



Case 2:16-cv-01007-R-AJW Document 109 Filed 09/19/16 Page 148 of 208 Page ID #:10943

ADRIANA HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      57

```
 1  quick five-minute --
 2              MR. KHAN:  Sure.
 3              MR. BROOKNER:  -- bathroom break?
 4              MR. KHAN:  Sure.  Right after the lines
 5  of question about this --
 6              MR. BROOKNER:  Sure.  Sure.
 7              MR. KHAN:  -- I think that could work
 8  out.  If you bear with me, I'm just trying to open the
 9  document so I can follow along myself.
10      Q.   (BY MR. KHAN)  This appears, Ms. Hutton, to
11  be, the first few pages, the same e-mail that was
12  included in Exhibit 10, correct, the e-mail from Matt on
13  Wednesday, March 2nd?
14      A.   And then there is the response from Matt to
15  me.
16      Q.   Yes.  Yes.  Okay.  So we have gone over the
17  e-mail that you sent him on March 2nd.  Moving to page
18  2 -- page -- let's see if we can pull this up here.
19  Mr. Ramsey sends -- this is page 3, I think, of this
20  document.  Mr. Ramsey sends you an e-mail dated
21  Wednesday, March 2nd at 4:20 p.m.  Right?  That's that
22  same day?
23              MR. BROOKNER:  Are you talking about
24  Exhibit 11 now?
25              MR. KHAN:  Yes, I am.
```



1      Q.   (BY MR. KHAN)  And the subject line still

2   concerns ReachLocal.  Correct?

3      A.   Uh-huh.

4      Q.   And there's an attachment.  It says, Letter to

5   NA RL clients, version 2.  Okay.  This e-mail Mr. Ramsey

6   says, Hey Adriana, I talked with Rick about this this

7   morning.  What is Mr. Ramsey referring to when he says

8   this?

9      A.   The communications from Cassidy.  I believe

10  the allegations.

11     Q.   Okay.  And did you know that he spoke to

12  Mr. Hutton that morning when you sent him this

13  information?

14     A.   Yes.

15     Q.   Okay.  Do you know what they spoke about?

16     A.   I believe he basically told him the same thing

17  that he's saying on this e-mail and what's addressed on

18  the letter that was attached to that e-mail.

19     Q.   Okay.  Do you know why Mr. Ramsey called right

20  away when he received your e-mail?

21     A.   No.

22     Q.   Okay.  Did he call you or did he speak to you

23  at all apart from this e-mail?

24     A.   I believe I was unavailable and that's why

25  Rick answered, but --



1      Q.   Okay.  He says here, I talked with -- all

2   these companies take a cut.  Do you know if he's

3   referring to ReachLocal as one of those companies?

4      A.   (Witness nods head.)

5      Q.   Okay.  And he says I talked with him, meaning

6   Rick, about ROIs.

7      A.   Uh-huh.

8      Q.   Does ROI stand for return on investment?

9      A.   Correct.

10      Q.   Okay.  And then it says, But I logged into

11   ReachLocal this afternoon and, lo and behold, there is

12   already a letter written about this Kieran Cassidy

13   fella.  Seems he's bad news.  Crazy that he contacted

14   you all the way from England.  Do you recall reading

15   that?

16      A.   Yeah.

17      Q.   How did you react to that information?

18      A.   No reaction.

19      Q.   Okay.  Did you speak to Mr. Hutton about --

20   did you show Mr. Hutton this e-mail?

21      A.   Yeah.

22      Q.   You did?

23      A.   I think so, yeah.

24      Q.   Okay.  Why did you do that?

25      A.   Just to show him what's going on.  I like to



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                60

1   keep him informed of what's happening.

2       Q.   Okay.  And did this -- did the information --

3   it sounds like Mr. Ramsey attached a letter, the letter

4   that he's referring to.  Do you recall that?

5       A.   Yes.

6       Q.   And he -- that letter is included --

7       A.   Yes.

8       Q.   -- in this communication.  Correct?

9       A.   Yes.

10      Q.   Do you remember reading this letter,

11  Ms. Hutton?

12      A.   Yes, I browsed through it.

13      Q.   Okay.  Earlier you said you were just passing

14  along information to Mr. Ramsey.  Why did you feel like

15  you needed to read this letter?

16      A.   I just honestly browsed through it and copied

17  and pasted and sent it to Cassidy just to finish putting

18  this to bed and just informing people of what the

19  situation was.

20      Q.   I see.  So you reviewed this information, and

21  you felt it was important to communicate again to

22  Mr. Cassidy the contents of what Mr. Ramsey was

23  conveying?

24      A.   Yeah.

25      Q.   And what was the contents of what he's



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 152 of 208  Page ID #:10947

ADRIANA HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                        61

1  conveying?  What does this letter summarize to you?

2      A.   I think it talks about what PPC Claim had done

3  in the UK and some issues they were having.

4      Q.   Okay.  So now at this point you understood

5  that Mr. Cassidy was affiliated with PPC Claim?

6      A.   Yes.

7      Q.   Did you understand from this letter that he

8  had been contacting ReachLocal in the past?

9      A.   I don't know if it says it in there.  I guess

10  I was aware, but I don't like recall.

11      Q.   So based on the information that Matt shared

12  with you, you felt like it was additional information

13  that needed to go back to Mr. Cassidy.  Correct?

14      A.   Yes.  I wanted to be aware of what we receive,

15  and then I was hoping he would stop communicating with

16  us.

17      Q.   Why were you hoping he would stop

18  communicating with you?

19      A.   I just don't really like spending time on

20  things that are not worth it or related to us.

21      Q.   Did you feel the information Mr. Ramsey

22  provided to you was satisfying to you in terms of any

23  concerns you had?

24      A.   It honestly didn't matter to me.  I mean, I

25  read it.  I noticed it was an answer to what the issues



1  and questions were, and I just forward it, but --

2        Q.   Okay.  So you --

3        A.   -- this was a matter of such little importance

4  at that time for me that I just honestly didn't pay much

5  attention to it.

6        Q.   But you felt it was important enough to close

7  the loop of communication you had with Mr. Cassidy.

8  Correct?

9        A.   Yes.

10        Q.   You felt it was important enough to tell it to

11 Mr. Hutton.  Correct?

12        A.   Yes.

13        Q.   You felt it was important to take the

14 information that -- or you felt it was important to

15 convey it to Mr. Ramsey.  Correct?

16        A.   Yes.

17        Q.   And you felt it was important to take the

18 information Mr. Ramsey conveyed to you and share it with

19 Mr. Cassidy.  Correct?

20        A.   Yes.

21        Q.   Okay.

22              MR. KHAN:  We can take a break now.

23              THE VIDEOGRAPHER:  We are now off the

24 record.  The time is 10:23.

25              (Break from 10:22 a.m. to 10:28 a.m.)



ADRIANA HUTTON                                           September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                        63

```
 1              THE VIDEOGRAPHER:  We are back on the
 2    record.  The time is 10:29.  This is tape number 2.
 3        Q.   (BY MR. KHAN)  Ms. Hutton, some of your
 4    answers earlier this morning were through head nod.  So
 5    I would just caution you again that if you can please
 6    give an audible yes or no or explanation, just be
 7    audible in your responses, that would be very helpful.
 8        A.   Yes.
 9        Q.   Thank you.
10              Back to this e-mail chain which is in
11    Exhibit 11, which is an e-mail change between you and
12    Mr. Ramsey over the communications of Mr. Cassidy.  I
13    want to again go back to the original e-mail that was
14    sent by you to Mr. Ramsey.  And in that e-mail you
15    say -- you forwarded him the information that he might
16    want to see and then you ask for proof and then you
17    provided a link.  Did you -- were you intending for
18    Mr. Ramsey to look into this issue?
19        A.   That was completely his decision.  I just
20    wanted him to be informed.
21        Q.   Okay.  Did you ever ask him to look into the
22    substance of what Mr. Cassidy was saying?
23        A.   I did not.
24        Q.   Okay.  Do you know if Mr. Hutton did?
25        A.   I believe he didn't.
```



ADRIANA HUTTON
REACHLOCAL vs. PPC CLAIM LIMITED

September 12, 2016
64

1      Q.    Okay.   How do you know that?

2      A.    Because we didn't have any reasons to look

3  into it.

4      Q.    Okay.   But you asked for proof from

5  Mr. Cassidy.  Correct?

6      A.    Correct.

7      Q.    And you continued to have an exchange with

8  Mr. Cassidy.  Correct?

9      A.    Correct.

10     Q.    Where you sent him a copy of what Mr. Ramsey

11 forwarded to you.  Correct?

12     A.    Correct.

13     Q.    And then he responded to you with several

14 subsequent messages.  Correct?

15     A.    Correct.

16     Q.    Okay.   Why did you feel the need to continue

17 communicating with Mr. Cassidy if you didn't think

18 anything of it?

19     A.    I did not respond to his communications

20 afterwards, which kind of shows that I was not

21 interested.  I forward to him the response from

22 ReachLocal so he would stop e-mailing us and realize

23 that we were not interested in the issue.

24     Q.    When you say you were not interested in the

25 issue, what do you mean by this issue?



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 156 of 208   Page ID #:10951

ADRIANA HUTTON                                         September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      65

1      A.    At the end of the e-mails he say there was

2  going to be a lawsuit and he wanted us to be involved,

3  and we were not interested in any of that.

4      Q.    Right.   I'll get to that.

5             MR. BROOKNER:   Can you let the witness

6  finish her answer, please.

7             MR. KHAN:   I thought she did.

8      Q.    (BY MR. KHAN)   But go ahead, sorry.   Do you

9  have anything more to add to the answer?

10      A.    I forgot now.

11      Q.    Okay.   We'll get to your last e-mail exchange.

12  I'm not asking about that, Ms. Hutton.   I'm asking that

13  you took the information that Mr. Ramsey provided you,

14  and you felt it important enough to send that

15  information to Mr. Cassidy.   Is that correct?

16             MR. BROOKNER:   Objection to the

17  characterization of what Adriana was or was not doing.

18  She's testified at length that it was for informational

19  and professional courtesy purposes.   If you want to use

20  that as being, quote, important, then that's your

21  characterization, not hers.

22      Q.    (BY MR. KHAN)   You can answer the question.

23             MR. BROOKNER:   And you may answer the

24  question.

25      A.    Would you repeat the question?



 1       Q.    (BY MR. KHAN)  Yes.

 2             I'm just trying to understand why you sent the

 3   information Mr. Ramsey sent to you, which was a letter

 4   to Mr. Cassidy to continue your communications with him.

 5             MR. BROOKNER:  Objection to the form.

 6   Asked and answered.  And you may answer the question.

 7       A.    I wanted him to stop communicating with us, so

 8   I just send him that as a response.

 9       Q.    (BY MR. KHAN)  Did Mr. Cassidy -- was

10   Mr. Cassidy bothering you with these communications?

11       A.    I don't think bothering is the right word, but

12   it is annoying.

13       Q.    In your experience when you want someone to

14   stop communicating, is it because they're bothering you?

15       A.    This was a professional communication towards

16   InLight Company's -- Company, so I just wanted that

17   issue to be resolved and stopped.  So I just e-mail him

18   and say, you know --

19       Q.    Did you feel like it was a disruption to

20   InLight?

21       A.    Not necessarily.  It was annoying, but --

22       Q.    Why was it annoying?

23       A.    I have to take time that I could be spending

24   doing some other things and --

25       Q.    Take time doing what?



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 158 of 208  Page ID #:10953

ADRIANA HUTTON                                  September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                            67

1      A.   Responding to these allegations.

2      Q.   But you could have ignored it.  Correct?

3      A.   Sure, I guess --

4      Q.   But you didn't.  Correct?  So you took time to

5  respond.  Correct?

6      A.   Yes.

7      Q.   You felt it was important enough to respond?

8      A.   No.

9      Q.   So you responded just because you wanted him

10 to go away?

11     A.   To stop.

12     Q.   Okay.  So you were bothered by his

13 communication?

14     A.   Yeah.

15     Q.   Okay.  And so you felt like giving him --

16 asking him for proof was important to have him stop

17 communicating?

18     A.   The reason why I asked him for proof was so I

19 could provide that information to Matt so he would be

20 aware of what the situation was.

21     Q.   Okay.  Did you hope when you got that proof

22 and you provided it to Mr. Ramsey that Mr. Cassidy would

23 stop communicating with you?

24     A.   I would imagine he would stop after receiving

25 my communications saying that ReachLocal was aware and



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              68

 1 | all that information was in there.  I was hoping that
 2 | was going to be the end of it.
 3 |     Q.    Let's talk about the message that you gave to
 4 | Mr. Cassidy.  So if you look further along the
 5 | communication on Exhibit 11, there appears to be a
 6 | FaceBook message from InLight Gobos.
 7 |     A.    Uh-huh.
 8 |     Q.    And it appears to be sent on March 2nd?
 9 |     A.    Uh-huh.
10 |     Q.    That's the same day you received the
11 | communication from Mr. Cassidy.  Right?
12 |     A.    Uh-huh.
13 |     Q.    So Mr. Ramsey promptly responded to you with
14 | what he understood to be a letter that ReachLocal sent
15 | about Mr. Cassidy?
16 |     A.    Correct.
17 |     Q.    Is that right?
18 |     A.    Correct.
19 |     Q.    And you felt it important enough to respond to
20 | Mr. Cassidy the same day?
21 |     A.    I had the information.  I forwarded it to him
22 | when I had it.  It was not promptly or not.  I just had
23 | it, and I just forward it.
24 |     Q.    Okay.  And in this response it says here is
25 | ReachLocal's response.  Do you see that?



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              69

```
 1        A.    Uh-huh.
 2        Q.    So are you cutting and pasting Mr. Ramsey's
 3   full response?
 4        A.    Correct.
 5        Q.    Why did you feel it important to include the
 6   entire letter that Mr. Ramsey sent?
 7               MR. BROOKNER:  Objection to the
 8   characterization.  You can answer the question.
 9        A.    I just wanted to inform this guy what I
10   received.
11        Q.    (BY MR. KHAN)  Okay.  And you had reviewed
12   this entire message before you sent it.  Correct?
13        A.    I read it, I believe, yeah.
14        Q.    Okay.  Did you share it with Mr. Hutton?
15        A.    I believe so.
16        Q.    Okay.  Why did you share it with Mr. Hutton?
17        A.    I share all the information related to the
18   company with Rick.
19        Q.    Did you have a conversation with Mr. Hutton
20   about what's contained in this long message?
21        A.    I don't think we discuss it for long.  I'm
22   sure we talk about it, but --
23        Q.    Okay.  Did Mr. Hutton instruct you to send
24   this letter or response to Mr. Cassidy?
25        A.    No, he didn't.
```



1      Q.   Okay.  Did he ask you to respond in any way to

2  Mr. Cassidy?

3      A.   No, he didn't.

4      Q.   Did you feel that when you sent this response

5  that would be your last communication to Mr. Cassidy?

6      A.   Yes.

7      Q.   Why did you feel that?

8      A.   I just think there was no -- nothing else to

9  talk about.

10     Q.   So you felt like the substance of what was

11  said by Mr. Ramsey had satisfied -- would satisfy

12  Mr. Cassidy?

13     A.   I would imagine it will inform him that they

14  were aware of what he was doing and it was incorrect or

15  something related to that.

16     Q.   That they were aware that what he was doing --

17  that "they" meaning ReachLocal was aware?

18     A.   That he was saying this about ReachLocal and

19  ReachLocal already had a response to what he was saying

20  ReachLocal was doing.

21     Q.   Okay.  Did you read the part in this message

22  where it says that Mr. Cassidy is a disqualified

23  director in the UK?

24     A.   I haven't read this since I first got it.

25     Q.   I understand, but you can read it now --



ADRIANA HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                        71

1        A.    But --

2        Q.    -- so take your time.

3        A.    I remember reading that on the -- somewhere

4  else.

5        Q.    Do you see it now in what you're reading?

6        A.    Yes.

7        Q.    Do you see the part where it says the

8  circumstances leading to Mr. Cassidy's disqualification

9  and the compulsory liquidation of two companies he was

10  operating?

11       A.    Uh-huh.

12       Q.    What did you understand that information to

13  mean?

14             MR. BROOKNER:  Objection to the extent it

15  implies she had an understanding.  You can answer the

16  question.

17       A.    That he was no longer working with these

18  companies.

19       Q.    (BY MR. KHAN)  That he was no longer working

20  with what company?

21       A.    It says here Vehicle Match Services Limited

22  and Vehicle Seller UK Limited.

23       Q.    Okay.  Did you understand that he had been

24  disqualified to work from that company?

25       A.    That's what it says, yes.



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                    72

1      Q.    Okay.  And later on it says he failed to keep
2  up-to-date accounting records to explain transactions.
3  Do you see that part?

4      A.    Uh-huh.

5      Q.    Did you understand in reading this that
6  Mr. Cassidy had been involved in some prior activities
7  that were improper?

8            MR. BROOKNER:  I just want to object.
9  You keep using the past tense, did you understand.  I
10  think the testimony is that Ms. Hutton hasn't read it
11  since she got it, didn't have an understanding at the
12  time.  What you're asking for is her present
13  understanding.  If that's wrong, then perhaps you might
14  want to reask it.

15            MR. KHAN:  Right.  I don't think she
16  testified that she didn't have an understanding of this.

17      Q.    (BY MR. KHAN)  You read this when it was
18  received.  Correct?

19      A.    I read it, but I paid very little attention to
20  it.  I didn't really read much into it.  I just read it
21  as a response and sent it back.  I didn't really -- it
22  was not related to me.  It was not important for our
23  company at the time, so I just did not pay much
24  attention to it.

25      Q.    You're saying it wasn't important for you as a



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              73

1    company at the time, yet you forwarded it to
2    Mr. Cassidy.  Right, Ms. Hutton?
3         A.   Yeah.  Yes.
4         Q.   So it was important enough that you forwarded
5    it to Mr. Cassidy?
6         A.   I forwarded it to him to try to stop him from
7    communicating with us.
8         Q.   Because, as you testified earlier, he was
9    bothering you?
10        A.   It was annoying to have to communicate with
11   him for something that wasn't business related, yes.
12        Q.   Did you think this was not business related,
13   what Mr. Cassidy was saying?
14        A.   Yes.
15        Q.   Do you think this was unrelated to your
16   business?
17        A.   Yes.  It was not because at this point we
18   already were not -- excuse me -- planning on not working
19   with ReachLocal in the future, so it didn't really
20   impact us at all at that point.
21        Q.   So even though you had spent thousands of
22   dollars with ReachLocal, the information contained in
23   these e-mails and in -- or, sorry, in the messages did
24   not concern you?
25        A.   No.



ADRIANA HUTTON                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      74

1     Q.   Okay.  Did it concern Mr. Hutton?

2     A.   You have to ask him that question.

3     Q.   Did you feel -- did you wonder why you had

4  spent -- did you question why you spent thousands of

5  dollars with ReachLocal?

6     A.   No.

7     Q.   You didn't -- you didn't review Mr. Cassidy's

8  messages as indicating that perhaps ReachLocal was

9  overcharging its customers?

10     A.   No.

11     Q.   You didn't understand that ReachLocal was

12  perhaps hiding the margins for how it got paid?

13     A.   No.

14     Q.   Did you feel that Mr. Ramsey's relationship

15  with ReachLocal -- did you begin to question it or

16  wonder about it in light of these communications?

17     A.   No.

18     Q.   Okay.  Did you -- back to this communication.

19  You testified that you had read it when you forwarded

20  it.  You just didn't --

21     A.   Uh-huh.

22     Q.   You actually pasted it.  Correct?

23     A.   Uh-huh, copy and paste.

24     Q.   You copied and pasted it.  Okay.  And in this

25  message it appears that this was a letter from



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                75

1   ReachLocal as a company in response to what Cassidy is

2   saying.  Correct?

3       A.   Uh-huh.

4       Q.   Okay.  And then Mr. Cassidy responded to you.

5   Correct?

6       A.   Uh-huh.

7       Q.   He sent you a few messages about continuing to

8   engage about the subject of ReachLocal?

9       A.   Yes, that's correct.

10      Q.   And he sent a message on March 3rd, the next

11  day, saying send them this?

12      A.   Correct.

13      Q.   And did you read the message that he sent?

14      A.   I did not.  Didn't read it.  Didn't send it.

15      Q.   Did you open the LinkedIn

16  Truth-ReachLocal-UK-entering-administration?

17      A.   I did not.

18      Q.   Okay.  At this point in time, did you want to

19  have Mr. Cassidy stop communicating with you?

20      A.   Yes.

21      Q.   Why?

22      A.   I just didn't want to spend more time writing

23  to him since he wasn't bringing me any business.  It was

24  not business related.  I just want it to stop.

25      Q.   And so you wanted him to cease communications



1  with you.  Did you tell him that?

2      A.   No.  I just didn't communicate anymore.

3      Q.   Okay.  And did he respond to you in any way

4  subsequent to this?

5      A.   No.

6      Q.   Okay.  Back to the e-mails.  Matt Ramsey's

7  e-mail to you on March 2nd, which was the day you sent

8  him the initial message, I think it's on page 3 of this

9  document, where he says, I'll stop by tomorrow or Friday

10 to discuss further, but couldn't believe I found a

11 letter already addressing this guy.  At this point he

12 had spoken to Rick.  Correct?

13     A.   Yes.

14     Q.   And did you understand that he was stopping by

15 to discuss the Cassidy allegations?

16     A.   We actually discussed something different

17 because at this point, you know, we had already received

18 the letter from him.  We were not worried about this

19 issue.  So we were discussing some different issues that

20 we were having with our Google AdWords tracking into our

21 website.  That's what the following meeting with Matt

22 was about.

23     Q.   Okay.  So you were actually having ongoing

24 discussions about the services that Compass Point was

25 providing at this time?



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 168 of 208  Page ID #:10963

ADRIANA HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      77

1      A.    Not really.  Google AdWords uses some code to

2  track the visits to people to websites, and the code

3  that was provided by us -- to us was incorrect, and it

4  wasn't tracking the information correctly.  So this is

5  something to do with our website and tracking visitors.

6  It didn't have anything to do with ReachLocal at the

7  point.

8      Q.    You're saying that the meeting -- the point of

9  this meeting that was being discussed where he's saying

10  I want to stop by tomorrow or Friday to discuss had to

11  do with a technical issue on a Google AdWords?

12      A.    Something different, yes.

13      Q.    That was the entire scope of that meeting?

14      A.    Yeah, that's what we discussed.

15      Q.    There was nothing else discussed by Mr. Ramsey

16  about anything else except for the Google AdWords.

17      A.    As far as I --

18      Q.    Is that your testimony?

19      A.    Yeah, as far as I remember, we just discuss

20  that Google AdWords tracking.

21      Q.    So when you say "we," it was you and --

22      A.    Matt, and I believe there was somebody from

23  Compass Point also that does the tracking for him.  I

24  can't remember exactly the name, but it was somebody

25  else from Reach -- I mean, from Compass Point Marketing.



1    Q.   So you were having ongoing discussions -- you,

2  meaning the company, were having ongoing discussions

3  with Compass Point about technical issues with the

4  account?

5    A.   Yes.

6    Q.   And it was your understanding that Compass

7  Point knew that they were being terminated?

8    A.   Oh, yes.

9    Q.   Okay.  Did you communicate to Mr. Ramsey that

10 you were terminating the Compass Point account?

11   A.   I didn't.  Rick did.

12   Q.   And that would be done before March 2nd?

13   A.   Yes.

14   Q.   Do you recall any e-mail communications saying

15 that?

16   A.   No.

17   Q.   Do you recall a formal letter being sent --

18   A.   No.

19   Q.   -- to him about it?  Do you recall --

20   A.   I believe it was done by phone call.

21   Q.   There's another e-mail if you move along the

22 chain.  It's written the next day from you to Matt

23 Ramsey.  It's dated Thursday, March 3rd.  Do you see

24 that?

25   A.   Uh-huh.



1    Q.   In this e-mail you say, Thanks, Matt.  I would

2  prefer to wait until next week to get together.

3    A.   (Witness nods head.)

4    Q.   Is this the meeting that you were referring

5  to?

6    A.   Uh-huh, about the technical issues with the

7  website, correct.

8    Q.   And did a meeting go forward --

9    A.   Yes.

10   Q.   -- with Mr. Ramsey?

11       And in this e-mail you say, I have a few

12  questions for you but need to get my things ready first.

13  What were the questions related to?

14   A.   They provide us with a report of the visits

15  from ReachLocal was tracking, and they were not

16  coinciding -- or they were not the same as we were

17  receiving on the website, and we knew the tracking

18  analytics were incorrect.  So I needed to get the

19  information from my Google analytics account to show it

20  to him so we can get the code correct and rectify those

21  issues.

22   Q.   At this point in time when you received the

23  e-mail, did you ever communicate to Matt and say, Hey,

24  why are you still using ReachLocal?

25   A.   No.



ADRIANA HUTTON                                        September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      80

 1     Q.   Did you ever ask him, Hey, ReachLocal has
 2  issues from what Mr. Cassidy says.  Why did do you still
 3  use these guys?
 4     A.   No, I haven't.
 5     Q.   Did he take it upon himself to explain to you
 6  why he was using ReachLocal?
 7     A.   No.
 8     Q.   Did you -- his response to you attached a
 9  letter from ReachLocal.  Did you understand him to
10  want -- to feeling the need to explain and respond to
11  what Mr. Cassidy was saying?
12     A.   I don't know what he feel.  I didn't ask for
13  anything.  He just provided it.
14     Q.   Okay.  So you're saying that he sent you a
15  letter and he sent you an explanation about what
16  ReachLocal is doing just as a courtesy from him to you?
17     A.   I would imagine.
18     Q.   He didn't -- you didn't understand him to have
19  felt the need to provide that information based on
20  anything you asked?
21     A.   I wasn't expecting it.
22     Q.   You weren't expecting him to respond --
23     A.   To have the need to respond, no.
24     Q.   Hang on.  Let me finish the question.
25          You weren't expecting -- after you sent the



e-mail to him showing him proof and a link and what Mr. Cassidy said, did you expect him to respond in any way?

A. No, I didn't.

Q. Did Rick expect him to respond in any way?

A. I don't know what Rick expected, but I don't think so.

Q. Okay. So you just sent him the information because you wanted to help Matt?

A. Correct.

MR. BROOKNER: Objection. It mischaracterizes the testimony. She already testified she sent it to Matt as a professional courtesy because it was one of his people, to keep him posted. That being said, you are free to answer the question.

A. Yes, I just forward the information so he will be aware. Nothing else.

Q. (BY MR. KHAN) Okay. Did you feel like he should be aware of this information?

MR. BROOKNER: Objection. Form, asked and answered. You can answer.

A. Yes, he should be aware.

Q. (BY MR. KHAN) Why should he be aware, Ms. Hutton?

A. Because if that was happening to my company, I

ADRIANA HUTTON                                           September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                        82

1   would hope somebody to let me know of some issues as

2   well.  Just professional courtesy.

3        Q.   And you understood that ReachLocal is not

4   Matt's company.  Correct?

5        A.   Yes.

6        Q.   You understood he worked with ReachLocal?

7        A.   Yes.

8        Q.   You understood ReachLocal did online

9   marketing -- advertising for you at this time?

10       A.   Through Compass Marketing.  We did --

11       Q.   Yes.

12       A.   -- not hire ReachLocal directly.

13       Q.   Yes.  But you understood you were using

14   ReachLocal products at this time?

15       A.   I understand Matt was using ReachLocal.

16       Q.   And yet the only purpose for you to send the

17   e-mail you sent is just to have an FYI to him so he

18   knows this information exists?

19            MR. BROOKNER:  Objection.  Asked and

20   answered.  You can answer.

21       A.   Yes, that is correct.

22       Q.   (BY MR. KHAN)  Okay.  Let's talk about this

23   meeting.  When was this meeting?

24       A.   With Matt?

25       Q.   Yes.



ADRIANA HUTTON                                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                                    83

1        A.   I believe it was the following week, but I
2   don't recall an exact date.
3        Q.   Okay.  And where was the meeting?
4        A.   At Compass Marketing offices.
5        Q.   Okay.  And who attended this meeting?
6        A.   Matt Ramsey, I believe one of his employees,
7   and me.
8        Q.   One of Matt's employees --
9        A.   Correct.
10       Q.   -- and you?
11       A.   Uh-huh.
12       Q.   Did Mr. Hutton attend the meeting?
13       A.   No.
14       Q.   Okay.  Mr. Ramsey had spoken to Mr. Hutton
15   previously on March, I guess, 2nd.  Correct?
16       A.   I believe so.
17       Q.   From the e-mails?
18            Okay.  Do you know if he had subsequent
19   conversations with Mr. Hutton?
20       A.   I do not know.  About the subject, I don't
21   know.
22       Q.   Did Mr. Hutton plan to attend the in-person
23   meeting?
24       A.   No.  This is something that I handle.  He has
25   nothing to do with it.



1    Q.   When you say he has nothing to do with it,

2  what do you mean about that?

3    A.   He doesn't know how to do analytics or

4  anything Google related, so that's kind of my job.

5    Q.   Okay.

6         MR. KHAN:  I would like the court

7  reporter to please mark this document as Exhibit 11 --

8  or Exhibit 12, rather.

9         THE WITNESS:  12.

10         MR. KHAN:  12.  Sorry.

11         (Exhibit 12 marked.)

12    Q.   (BY MR. KHAN)  Take a moment to review this,

13  Ms. Hutton.  Exhibit 12 consists of the e-mail that you

14  had sent to Mr. Ramsey on March 2nd at 9:56 a.m. that

15  we've been talking about.  Right?

16    A.   Uh-huh.

17    Q.   And above that e-mail is an e-mail from

18  Mr. Ramsey, the subject line forwarding your e-mail to

19  Steven Dollar at ReachLocal.  Do you see that?

20    A.   Yes.

21    Q.   And do you see it's copied to

22  BenLayne@GetPointed?

23    A.   Yes.

24    Q.   And Ben Layne works for Compass Point.

25  Correct?



1      A.   I would imagine so.  I don't remember

2  everybody who works there.

3      Q.   And do you see in the e-mail where he says,

4  Steven, We've had one customer (who has been with

5  ReachLocal for I'm guessing four to five years) drop

6  ReachLocal completely this week.  Another one, below, is

7  questioning continuing with ReachLocal as well.  Do you

8  see that?

9      A.   Yes.

10     Q.   And the another one below refers to InLight.

11  Correct?

12     A.   Correct.

13     Q.   It's referring to your e-mail as well?

14     A.   Yes.

15     Q.   At this point in time, Mr. Ramsey has

16  interpreted what you sent him as questioning continuing

17  with ReachLocal.  Do you see that?

18     A.   I do.

19     Q.   And is that correct?

20     A.   I'm surprised because at this point he had

21  already been notified that we were not continuing

22  advertising through them, so I don't understand why he

23  will be saying that.

24     Q.   So Mr. Ramsey is saying that he's construing

25  your e-mail as questioning continuing with ReachLocal,



Case 2:16-cv-01007-R-AJW Document 109 Filed 09/19/16 Page 177 of 208 Page ID #:10972

ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                  86

1  and it's your testimony that Mr. Ramsey already knew

2  that InLight had terminated the account?

3       A.   That is correct.

4       Q.   Okay.  In your estimation, was Mr. Ramsey

5  mistaken?

6       A.   I can't tell why he's saying that, but I am

7  fully aware that he had been notified that we were going

8  to stop doing advertising through Compass Marketing.

9       Q.   Could it be that he's reviewing and construing

10 your e-mail that you sent about Mr. Cassidy as wondering

11 about ReachLocal?

12      A.   I don't know what he thought.  That's -- I

13 can't tell, but it's not the reason why it was sent.

14      Q.   Okay.  Do you believe it was reasonable for

15 Mr. Ramsey to review your e-mail that you forwarded with

16 proof of a link from Mr. Cassidy as interpreting that as

17 questioning whether InLight wants to continue business

18 with him?

19           MR. BROOKNER:  Objection to the extent

20 it's calling for severe speculation as to what somebody

21 else is thinking about an e-mail, but if you have any

22 idea how to answer that question, you can answer it.

23      A.   No, I, again, just sent it to him for FYI kind

24 of thing.  I don't know why --

25      Q.   (BY MR. KHAN)  So you're surprised that --



 1      A.    -- he interpret it --

 2      Q.    You're surprised he's interpreted your e-mail

 3  this way?

 4      A.    Yes, especially since he had already been

 5  notified that we were not continuing.

 6      Q.    You did not intend him to review this e-mail

 7  as having him -- having it being understood that InLight

 8  was questioning ReachLocal?

 9      A.    Absolutely not.

10      Q.    Okay.  When you say "absolutely not," what do

11  you mean by that?

12      A.    I was just informing him.  I was just passing

13  this information along to him, and he had already been

14  notified that we were not doing business with ReachLocal

15  anymore, so --

16      Q.    Yet he sent you an e-mail, did he not, where

17  he gave you a letter from ReachLocal responding to your

18  e-mail and also saying in that that Mr. Cassidy has been

19  on an ongoing campaign to discredit ReachLocal.

20  Correct?

21      A.    Yes.

22      Q.    And he also said that it's crazy that he's

23  doing this all the way from London.  You recall that

24  e-mail.  Right?

25      A.    Yes.



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              88

1       Q.   In light of that e-mail and in light of the

2   e-mail that you originally forwarded, do you think it's

3   reasonable for Mr. Ramsey to think that InLight, that is

4   you and Mr. Hutton, were wondering about what ReachLocal

5   was doing?

6       A.   I can't tell you what he thought about it.  I

7   don't think it is.

8       Q.   So even though his business partner is

9   ReachLocal and there are allegations against ReachLocal,

10  you don't think it's reasonable for him to wonder that

11  one of his clients is getting nervous?

12              MR. BROOKNER:  Objection.  Asked and

13  answered, mischaracterization.  You can answer.

14      A.   We already have decided to not do business

15  with him, so it did not matter at this point.

16      Q.   (BY MR. KHAN)  Okay.  Back to that point about

17  you had already decided.  You say that with certainty,

18  but you don't know that there was an actual

19  communication terminating Compass Point, do you?

20      A.   I know there is.  I just don't know it's in

21  writing because I believe it was a phone call, so I

22  cannot give you a date or anything more specific.

23      Q.   You don't believe you made that call, do you,

24  Ms. Hutton?

25      A.   I didn't.  That was done by Rick.  Rick was



Case 2:16-cv-01007-R-AJW   Document 109   Filed 09/19/16   Page 180 of 208   Page ID #:10975

ADRIANA HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      89

1   the person who talked to Matt.

2       Q.   Okay.  You didn't send an e-mail terminating

3   Compass Point?

4       A.   I did not.

5       Q.   You didn't send -- you didn't talk to Matt

6   over the phone terminating --

7       A.   I did not.

8            MR. BROOKNER:  Objection.  Asked and

9   answered.

10      Q.   (BY MR. KHAN)  So when -- last question on

11  this document.  When Mr. Ramsey says he believes

12  InLight's questioning whether to continue with

13  ReachLocal, do you believe that statement to be true or

14  false?

15      A.   It's his statement.  So I don't know what to

16  tell you, but we were not continuing at that point.

17      Q.   Just to round out this.  Why do you think he

18  would say that if it were not true?

19           MR. BROOKNER:  Objection.

20  Characterization, asked and answered.  You can answer if

21  you know.

22      A.   No idea why he did it.

23           MR. KHAN:  Okay.  I would like the court

24  reporter to please mark this exhibit as Exhibit 12.

25           THE WITNESS:  13.



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 181 of 208  Page ID
#:10976

ADRIANA HUTTON                                          September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                      90

 1                    MR. KHAN:  Or 13.  Thank you for

 2   correcting my numbers, Ms. Hutton.  You're more sharp --

 3                    THE WITNESS:  I've got them here in

 4   front.

 5                    MR. KHAN:  Lucky No. 13.

 6                    (Exhibit 13 marked.)

 7        Q.   (BY MR. KHAN)  Take a moment to review this

 8   document.  So this is an e-mail that appears to be from

 9   Matt Ramsey to Steven Dollar.  It's dated March 10th.

10   Do you see that?

11        A.   Yes, I do.

12        Q.   And in that e-mail on the first line it says,

13   InLight Gobos is coming to our office on Monday to

14   discuss PPC Claim matters.  Do you see that?

15        A.   I do.

16        Q.   Earlier, Ms. Hutton, you testified that the

17   meeting that you were having with Compass Point was to

18   discuss a technical issue with Google AdWords.  Correct?

19        A.   That is correct.

20        Q.   Yet Mr. Ramsey is characterizing a meeting

21   that's happening with you and/or Mr. Hutton with InLight

22   to discuss PPC Claim matters.

23        A.   That is not the discussion we had.

24        Q.   So why would Mr. Ramsey characterize a meeting

25   that he had with you to discuss PPC Claim matters?



1      A.    I don't know why he did it.

2      Q.    So do you believe he was -- he was mistaken in

3  his understanding of what the purpose of the meeting

4  was?

5            MR. BROOKNER:  Objection.  Asked and

6  answered.  She just said she doesn't know.  You can

7  answer.

8      A.    I don't believe he was mistaken because I

9  brought documentation.  We had already established what

10  the meeting was going to be about and --

11     Q.    (BY MR. KHAN)  Are you surprised -- I'm sorry.

12     A.    I'm very surprised.

13     Q.    Are you surprised that Mr. -- you're very

14  surprised that Mr. Ramsey believed that the purpose of

15  the meeting was to discuss PPC Claim?

16     A.    Yes, I am.

17     Q.    Okay.  And are you surprised because you had

18  communicated to him that you were terminating Compass

19  Point or InLight had communicated to him that they were

20  terminating Compass Point?

21     A.    No.

22     Q.    Okay.  So why are you surprised then?

23     A.    Because the discussion was about a complete

24  different matter, so I don't know why he's talking about

25  this --



ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                  92

1      Q.   Okay.  Why do you think he would?  What would
2   be his purpose of saying the agenda of the meeting is to
3   discuss PPC Claim?
4      A.   It would be speculation.
5            MR. BROOKNER:  Objection.  Asked and
6   answered.  She already said she didn't know what he was
7   thinking when he sent that e-mail.  You can answer the
8   question, however.
9      A.   Yeah, I would be completely speculating if I
10  say something.  I don't know what --
11     Q.   (BY MR. KHAN)  Okay.  Fair enough.
12          A few pages in he's responding, Mr. Ramsey is,
13  to an e-mail from Mr. Steven Dollar at ReachLocal.  Do
14  you see that?  It's the e-mail that says, Hey Gentlemen.
15     A.   Uh-huh.  It's from Steven to Matt.
16     Q.   Yes.
17     A.   Okay.
18     Q.   That's the one I'm referring to.  Have any one
19  of your clients been contacted from PPC Claim and can
20  you tell me which client relationships have been
21  impacted?  Do you see that question?
22     A.   Yes.
23     Q.   I know you had said you lost one client
24  already, but can you tell me who?  So in response
25  Mr. Ramsey says, InLight Gobos is coming to our office



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 184 of 208  Page ID #:10979

ADRIANA HUTTON                                              September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                          93

```
 1   on Monday to discuss PPC Claim matters.  Correct?

 2        A.   Yes, I see that.

 3        Q.   So is it -- reading this, is it your

 4   understanding that Mr. Ramsey is responding to

 5   ReachLocal that InLight has been contacted by PPC Claim?

 6             MR. BROOKNER:  Objection.  Asked and

 7   answered.  You may answer the question, however, if you

 8   know.

 9             MR. KHAN:  I'm actually referring to the

10   second part of the e-mail, Jason, but that's okay.  I

11   just was clarifying for you.

12             MR. BROOKNER:  Thank you.

13        A.   Repeat the question.

14        Q.   (BY MR. KHAN)  Yeah, I'm sorry.  I'll repeat

15   it.

16             With respect to just this e-mail now, not the

17   prior one, but reading it in connection with the prior

18   one, the e-mail says, Have any one of your clients been

19   contacted from PPC Claim?  Do you see that?

20        A.   Yes.

21        Q.   And Mr. Ramsey responds, InLight Gobos is

22   coming to our office to discuss PPC Claim.  Correct?

23        A.   Yes.

24        Q.   And so Mr. Ramsey understood that he's been

25   contacted by InLight with respect to PPC Claim.
```



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 185 of 208  Page ID #:10980

ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                               94

 1  Correct?

 2      A.   Repeat that last part, just the last part.

 3      Q.   So Mr. Ramsey understood in responding to this

 4  e-mail that InLight had been contacted by PPC Claim?

 5              MR. BROOKNER:  Objection to the extent it

 6  calls for the witness to speculate on what a third party

 7  understood.  But if you think you know, you can answer

 8  the question.

 9      Q.   (BY MR. KHAN)  I'm just basing it off your

10  reading of the e-mails.

11      A.   It seems that that's what he's referring to in

12  the e-mail.

13      Q.   Okay.  That's all I wanted to know.  I think

14  we're done with that document.

15      A.   Okay.

16      Q.   During the meeting, did Mr. Ramsey ever

17  discuss anything related to Mr. Cassidy?

18      A.   As far as I remember, no.

19      Q.   Did he ever speak to you after the March 2nd

20  but before the meeting about Mr. Cassidy or PPC Claim?

21      A.   I don't believe so.

22      Q.   Did he ever speak to Mr. Hutton?

23      A.   I do not know.

24      Q.   So as far as you understand during this

25  meeting with Mr. Ramsey, the subject of Mr. Cassidy



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 186 of 208  Page ID #:10981

ADRIANA HUTTON                                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                                              95

 1  never came up?

 2       A.    My meeting with Matt?

 3       Q.    Yes.

 4       A.    Correct.

 5       Q.    And the subject of PPC Claim never came up?

 6       A.    (Witness shakes head.)

 7       Q.    And the letter that ReachLocal sent never came

 8  up?

 9       A.    No.

10       Q.    Did ReachLocal come up?

11       A.    I don't think so.

12       Q.    Okay.

13       A.    I remember it being a very technical meeting,

14  just --

15       Q.    Do you know how long the meeting lasted?

16       A.    It shouldn't be more than 45 minutes.

17       Q.    Do you know for how long InLight was

18  evaluating whether to terminate its contract with

19  Compass Point?

20            MR. BROOKNER:  Objection.  Asked and

21  answered.  You can answer if you remember.

22       Q.    (BY MR. KHAN)  The question is about how long

23  you were thinking about it.

24       A.    Yeah, I know.

25            MR. BROOKNER:  Same objection.  Asked and



 1  answered.  And you can answer it if you remember.

 2      A.   I don't remember.

 3      Q.   (BY MR. KHAN)  Okay.  Was it a decision that

 4  came after discussions with Mr. Hutton?

 5           MR. BROOKNER:  Objection.  Asked and

 6  answered.  You can answer again.

 7      A.   Yes, Rick and I discussed stopping the

 8  campaign.

 9      Q.   (BY MR. KHAN)  Were you unsatisfied with

10  Compass Point's campaign in 2015?

11      A.   I would say we had considered the fact that we

12  might not be getting enough return on investment on what

13  we were using for the campaign for a while.  I can't

14  give you exact dates and --

15      Q.   So I understand your testimony correctly,

16  Ms. Hutton, you're saying that at some point in 2015 you

17  were questioning Compass Point's contract in terms of

18  its return on investment for your business?

19      A.   Yes.

20      Q.   Okay.  Do you believe that Mr. Cassidy's

21  communication to you over FaceBook had any role in

22  InLight's decision to stop using ReachLocal products?

23      A.   They did not.

24      Q.   Do you believe that Mr. Cassidy's contentions

25  in what he said in those messages that ReachLocal was



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 188 of 208  Page ID #:10983

ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                               97

1  hiding its margins, that ReachLocal wasn't pricing

2  correctly its products, impacted in any way whatsoever

3  InLight's decision to stop using ReachLocal products?

4        A.    They did not.

5        Q.    Did it have any impact on InLight's decision

6  to stop using Compass Point?

7        A.    Did not.

8        Q.    Okay.  What were the full and complete reasons

9  why InLight stopped using ReachLocal products?

10              MR. BROOKNER:  Objection.  Asked and

11  answered.  You can answer it again.

12              MR. SYVERSON:  Objection.  Beating a dead

13  horse.

14              MR. BROOKNER:  That works, too.

15        A.    We didn't believe we were receiving a return

16  on investment, a good return on investment.  I have

17  managed the campaigns in the past on my own, and we

18  thought we could do it again.

19        Q.    (BY MR. KHAN)  Do you believe that you may

20  have misled Mr. Ramsey in any way in discussing

21  Mr. Cassidy or PPC Claim?

22        A.    I don't think so, because at this point he had

23  already been informed the contract was terminated -- was

24  going to be terminated, so --

25        Q.    Yet you're very surprised that he understood



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 189 of 208  Page ID #:10984

ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                            98

1  that the meeting he had with you was to discuss PPC

2  Claim?

3      A.   Very.

4            MR. BROOKNER:  Could can we go off the

5  record for a second?

6            THE VIDEOGRAPHER:  We are now off the

7  record.  The time is 11:08.

8            (Break from 11:06 a.m. to 11:11 a.m.)

9            THE VIDEOGRAPHER:  We are back on the

10  record.  The time is 11:12.

11            MR. KHAN:  I have no further questions.

12        I'll propose the following stipulations.

13  We'll relieve the court reporter of her duty to maintain

14  the original transcript under the Code.  We'll send the

15  original transcript directly to Ms. Hutton's counsel,

16  Mr. Brookner, and he will make arrangements to have

17  Ms. Hutton review the transcript, make any necessary

18  changes or corrections to it and sign the transcript

19  under penalty of perjury within 30 days of receipt.

20            MR. BROOKNER:  That's fine.

21            MR. SYVERSON:  That's fine.  And I have

22  no questions.

23            MR. KHAN:  Okay.  So stipulated?

24            MR. SYVERSON:  So stipulated.

25            MR. BROOKNER:  Yes.



```
1                    MR. KHAN:  Thank you, Ms. Hutton.

2                    THE VIDEOGRAPHER:  We are now off the

3    record.  The time is 11:13.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    CHANGES AND SIGNATURE

 2   WITNESS NAME:  ADRIANA HUTTON

 3   DATE OF DEPOSITION:  SEPTEMBER 12, 2016

 4   PAGE     LINE     CHANGE          REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```



ADRIANA HUTTON
REACHLOCAL vs. PPC CLAIM LIMITED

September 12, 2016
101

```
1        I, ADRIANA HUTTON, have read the foregoing
   deposition and hereby affix my signature that same is
2  true and correct, except as noted above.

3

4                    _____
5                         ADRIANA HUTTON

6

7  THE STATE OF _____)
   COUNTY OF _____)
8
           Before me, _____, on
9  this day personally appeared ADRIANA HUTTON, known to me
   (or proved to me under oath or through
10 _____) (description of identity
   card or other document) to be the person whose name is
11 subscribed to the foregoing instrument and acknowledged
   to me that they executed the same for the purposes and
12 consideration therein expressed.
           Given under my hand and seal of office this
13 _____ day of _____, _____.

14

15
                    _____
16                  NOTARY PUBLIC IN AND FOR
                    THE STATE OF _____
17                  COMMISSION EXPIRES: _____

18

19

20

21

22

23

24

25
```



Case 2:16-cv-01007-R-AJW  Document 109  Filed 09/19/16  Page 193 of 208  Page ID #:10988

ADRIANA HUTTON                                    September 12, 2016
REACHLOCAL vs. PPC CLAIM LIMITED                              102

```
 1  STATE OF TEXAS   )

 2  COUNTY OF DALLAS )

 3       I, Julie C. Brandt, a Certified Shorthand Reporter

 4  duly commissioned and qualified in and for the State of

 5  Texas, Certified Realtime Reporter and a Registered

 6  Merit Reporter, do hereby certify that there came before

 7  me on the 12th day of September, 2016, at the offices of

 8  Gray Reed & McGraw, located at 1601 Elm Street, Suite

 9  4600, Dallas, Texas, the following named person, to-wit:

10  ADRIANA HUTTON, who was duly sworn to testify the truth,

11  the whole truth, and nothing but the truth of knowledge

12  touching and concerning the matters in controversy in

13  this cause; and that she was thereupon examined upon

14  oath and her examination reduced to typewriting by me or

15  under my supervision; that the deposition is a true

16  record of the testimony given by the witness.

17       I further certify that pursuant to FRCP Rule 30(e)

18  that the signature of the deponent:

19       [X] was requested by the deponent before the

20  completion of the deposition, and that signature is to

21  be before any notary public and returned to counsel

22  within 30 days from date of receipt of this transcript.

23       [ ] was not requested by the deponent or a party

24  before the completion of the deposition.

25       I further certify that I am neither attorney or
```



1  counsel for, nor related to or employed by any of the

2  parties to the action in which this deposition is taken,

3  and further that I am not a relative or employee of any

4  attorney or counsel employed of any attorney or counsel

5  employed by the parties hereto, or financially

6  interested in the action.

7        CERTIFIED TO BY ME on this the 13th day of

8  September, A.D., 2016.

9

10

11

12

13        _____
          Julie Brandt, CSR, RMR, CRR
14        Texas CSR No. 4018
          Expiration date:  12/31/16

15

16

17

18

19

20

21

22

23

24

25



1

**Exhibit 3**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4    REACHLOCAL, INC.,            )    Case No.

5          Plaintiff,             )    2:16-cv-1007

6           vs.                   )    R-AJW

7    PPC CLAIMS LIMITED AND       )

8    KIERAN PAUL CASSIDY,         )    Volume I

9          Defendants.            )    Pages 1-271

10

11

12

13

14          DEPOSITION OF SHARON ROWLANDS

15                  TAKEN ON

16           TUESDAY, AUGUST 2, 2016

17

18

19

20

21

22

23

24    Reported by: BRENDA R. COUNTZ, RPR-CRR

25    Job No: 110250

1

2

3

4

5

6

7

8

9

10          Deposition of SHARON ROWLAND taken at

11     the law firm of Raines Feldman LLP, 9720 Wilshire

12     Boulevard, 5th Floor, Beverly Hills, California,

13     on Tuesday, August 2, 2016, before Brenda R.

14     Countz, CSR No. 12563.

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF REACHLOCAL, INC.

4              BROWN NERI SMITH & KHAN

5              BY:  AMJAD KHAN, ESQ.

6                   JILL GLENNON, ESQ

7              11766 Wilshire Boulevard

8              Los Angeles, CA 90025

9

10

11

12                   - AND -

13

14

15             REACHLOCAL

16             BY:  TENLAY NALIBOFF, ESQ.

17             21700 Oxnard Street

18             Woodland Hills, CA 91367

19

20

21

22

23

24

25

Page 4

```
 1   FOR THE DEFENDANTS PPC CLAIMS LIMITED AND KIERAN

 2   PAUL CASSIDY:

 3

 4           RAINES FELDMAN

 5           BY:  ERIK SYVERSON, ESQ.

 6                SCOTT LESOWITZ, ESQ.

 7           9720 Wilshire Boulevard

 8           Beverly Hills, CA 90212

 9

10

11

12

13   ALSO PRESENT:

14           BRENT JORDAN, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2                      I N D E X

 3   WITNESS              EXAMINATION BY           PAGE

 4   SHARON ROWLANDS

 5

 6                       MR. SYVERSON              8

 7                    E X H I B I T S

 8   NO.          DESCRIPTION                     PAGE

 9   Exhibit 1    Reuters Article Entitled "Firm    29

10                that Vetted Snowden Reaches $40

11                Million Settlement with U.S."

12   Exhibit 2    NASDAQ Daily Stock Price Chart    55

13   Exhibit 3    Amended Complaint                 95

14   Exhibit 4    Supplemental Declaration of Sharon  115

15                Rowlands

16   Exhibit 5    Compilation of Web Page Printouts  147

17   Exhibit 6    ReachLocal 2015 10-K              169

18   Exhibit 7    ReachLocal's Attorneys' Eyes Only  228

19                Initial Disclosures

20   Exhibit 8    Complaint for Breach of Fiduciary  256

21                Duties

22

23

24

25
```

Page 6

1        BEVERLY HILLS, CA - WEDNESDAY, AUGUST 2, 2016

2                        11:26 A.M.

3

4            THE VIDEOGRAPHER:  This is the start of

5    DVD No. 1 in the videotaped deposition of Sharon

6    Rowlands taken in the matter of ReachLocal, Inc,

7    V PPC Claims Limited et al, filed in the United

8    States District Court, Central District of

9    California, Case No. 2:16-cv-1007.

10            This deposition is being held at 9720

11   Wilshire Boulevard, Beverly Hills, California on

12   August 2, 2016 at approximately 11:26 a.m.

13            My name is Brent Jordan.  I'm the legal

14   video specialist from TSG Reporting, Inc.  The

15   court reporter is Brenda Countz in association

16   with TSG.

17            Counsel present, please identify

18   yourselves for the record.

19            MR. SYVERSON:  Erik Syverson for the

20   defendants.

21            MR. KHAN:  I'm John Khan for the

22   plaintiff.  With me is Jill Glennon of Brown Neri

23   Smith & Khan, the same firm, and ReachLocal,

24   Inc.'s general counsel, Tenlay Naliboff.

25            MR. SYVERSON:  I should have identified

1   my trusty associate, Scott Lesowitz, is also

2   present for the defendants.

3            THE VIDEOGRAPHER:  Would the court

4   reporter please swear in the witness.

5

6            SHARON ROWLANDS,

7        having been first duly sworn, was

8        examined and testified as follows:

9

10           MR. SYVERSON:  Okay, so first things

11  first.  This deposition was noticed for 10:00

12  a.m.  We are starting at -- let's be generous and

13  call it 11:30.  Mr. Khan, I want to give your

14  client an hour and a half worth of credit for

15  testimony time.  So that means that the testimony

16  time will be five and a half hours today.

17           Is that agreeable?

18           MR. KHAN:  That's agreeable.  That's

19  fine.  I'll just note for the record that the

20  deposition was noticed for 10:00 and the

21  videographer arrived at 11:00 and the deposition

22  started late.

23           But we agree with the stipulation and

24  we appreciate that, but we reserve all rights to

25  raise the issue of the lateness of the

1   BY MR. SYVERSON:

2       Q.   You said absolutely not.  You were very

3   effusive and I'm just asking why you don't feel

4   any responsibility.

5           MR. KHAN:  Objection, argumentative,

6   relevance.

7   BY MR. SYVERSON:

8       Q.   I'm not challenging your belief.  I'm

9   genuinely interested in why you don't feel any

10  responsibility.

11          MR. KHAN:  Same objections,

12  argumentative, irrelevant.

13          THE WITNESS:  I had no knowledge of

14  him.  I knew nothing about him.  I knew nothing

15  about the background check done on him.  I am

16  actually -- I mean I am privy to confidential

17  components about that background check from when

18  I was CEO but I'm not able to disclose them.

19          But from the information I had at the

20  time, I do know that there is no way that

21  background check could have possibly revealed

22  anything about him that would have given anybody

23  a hint of what he might eventually do.

24  BY MR. SYVERSON:

25      Q.   Now, you stopped being CEO of Altegrity

1   in 2013, that is right?

2       A.   That's right, the end of 2013.

3       Q.   And is that because you were fired from

4   that position?

5       A.   No --

6           MR. KHAN:  Objection, lacks foundation,

7   objection as to form.

8           THE WITNESS:  No, I was not fired.

9   BY MR. SYVERSON:

10      Q.   What happened?  If you weren't fired,

11  did you decide to leave?

12      A.   Yes.  Essentially we decided in the

13  second quarter of 2013 on my recommendation to

14  the board that we needed to take the company in a

15  whole different direction; that because of the

16  USIS situation, the original strategy wasn't

17  going to play out.

18          We had actually tried to sell the

19  commercial assets of the business, the Kroll

20  assets, but that had been an unsuccessful process

21  so the company was starting to be in a situation

22  that was difficult.

23          My recommendation to the board was that

24  Altegrity should be dismantled; that the best

25  strategy going forward was to put USIS off to one

1   USIS.

2            And on the back of that, they put, if

3   you like, new Providence people onto the board.

4   BY MR. SYVERSON:

5       Q.    How would we find out who the board

6   members of Altegrity were when you left

7   Altegrity?

8            MR. KHAN:   Objection vague, lacks

9   foundation, calls for speculation.

10            THE WITNESS:   I'm sure there must be,

11   you know, publicly-filed documents.

12            MR. SYVERSON:   Okay, we can take a

13   break.

14            THE VIDEOGRAPHER:   Off video at 12:25.

15            (Break taken.)

16            THE VIDEOGRAPHER:   Back on video at

17   12:36 p.m.

18   BY MR. SYVERSON:

19       Q.    After you left Altegrity, where did you

20   go?

21       A.    I went to ReachLocal.

22       Q.    What is ReachLocal?

23       A.    ReachLocal is a company that provides

24   digital marketing and advertising solutions to

25   local businesses.

1        A.    (Perusing.)

2        Q.    That paragraph states that Mr. Cassidy

3   misappropriated ReachLocal's entire current and

4   former client database, correct?

5        A.    That is correct.

6        Q.    Approximately how vast is this

7   database?

8              MR. KHAN:  Objection, lacks foundation.

9              THE WITNESS:  Current clients would be

10   approximately 17,000.  Former clients would be

11   many more than that.

12   BY MR. SYVERSON:

13        Q.    More than 17,000?

14        A.    Yes.

15        Q.    And how does ReachLocal store this

16   database?

17        A.    I think you are now moving into

18   territory that it's not appropriate for a CEO to

19   try and opine on.  I manage the overall

20   organization of the company.  I am probably not

21   the best qualified to describe the database

22   structure of how we store the data.

23        Q.    That's fair.

24              Do all employees have access to this

25   database?

1     A.     No.

2     Q.     What employees have access to it?

3            MR. KHAN:  Objection, calls for

4     speculation.

5            THE WITNESS:  I think again, if you

6     want to get very granular, I would want to refer.

7     BY MR. SYVERSON:

8     Q.     Has the confidentiality of the database

9     ever been breached?

10    A.     Electronically, not that I'm aware of.

11    Q.     How did you learn that ReachLocal's

12    entire current and former client database had

13    been compromised?

14    A.     Kieran Cassidy told me.

15    Q.     And when was that?

16    A.     It was, I believe, early January.  I

17    think we've actually disclosed the e-mail as part

18    of this testimony, so I think you have it.

19    Q.     Did you ever consider the possibility

20    that he was lying to you?

21           MR. KHAN:  Objection, asked and

22    answered.  We covered this territory.

23           THE WITNESS:  I took his claim very

24    seriously, which is what any CEO should do.  If

25    anybody says to you they have your entire client

Page 254

1    database, you have to take it very seriously,

2    particularly when immediately after that he

3    started reaching out to clients directly.  And

4    that's why we felt we had to move very swiftly to

5    put the TRO in place.

6              I took his claim very seriously.

7    BY MR. SYVERSON:

8        Q.   Those clients were not publicly

9    discoverable, correct?

10       A.   A percentage of those clients were not

11   publicly discoverable.  So it begs the question,

12   how did he get those client names?  And why did

13   he use that very specific language?  Why didn't

14   he just say, I have most of your clients, or lots

15   of your clients?

16             That word "entire," that word "entire"

17   says to me everyone.  And when he used the word

18   "database" instead of a list and he said former

19   clients, that is very, very worrying to me.

20       Q.   Did you ever consider that he knew how

21   to get under your skin?

22       A.   Huh?

23       Q.   Did you ever consider that he knew how

24   to get under your skin, so to speak?

25             MR. KHAN:  Objection, vague, calls for